IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| VS. § | CAUSE NO. 4:23CR18 |
| § | Judge Mazzant |
| ALI DANIAL HEMANI § | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO DISMISS INDICTMENT**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the United States of America, by and through the undersigned Assistant United States Attorney for the Eastern District of Texas, and files its Response to Defendant **Ali Danial Hemani's** (hereafter "**Hemani**") Motion to Dismiss Indictment, and in support thereof would show the following:

**Hemani** requests that this Court dismiss his indictment pursuant to *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022), claiming that under *Bruen*, 18 U.S.C §922(g)(3) is unconstitutionally vague and violates his Second Amendment right to keep and bear arms. The United States objects to **Hemani**'s motion because the analysis in *Bruen* pertains to the Second Amendment right of "law-abiding citizens" to carry a handgun for self-defense outside the home. Nothing in *Bruen* casts doubt on the ability of the federal government to prohibit drug users like **Hemani** from possessing a firearm.

**I.     Factual Summary**

In April and October of 2021, downloads of **Hemani**'s phone revealed that he was abusing controlled substances including promethazine.   Specifically, in one conversation **Hemani**

texted another individual and discussed the purchase and sale of bottles of promethazine from different suppliers. **Hemani** stated that he had three bottles to sell and needed clients in high end areas around Dallas. In another conversation, **Hemani** stated that he had purchased five bottles of promethazine and offered to sell one bottle for $120. He further stated that he had started "sipping" from his other source of supply and noted that "this shits too addicting" and "idk if I want to stop." A search warrant executed on August 3, 2022 at the residence **Hemani** shared with his parents resulted in the location and seizure of cocaine, marijuana, and two firearms. One of the firearms. a Glock handgun registered to **Hemani,** was found in **Hemani'**s bedroom. **Hemani** confessed that he had purchased the 4.7 grams of cocaine that was found in his mother's room three to four months earlier. He further admitted that he purchased cocaine one to two times a year and smoked marijuana every other day. He added that he kept a quarter ounce of marijuana in his car or hidden at home and that he purchased large quantities of drugs which he would split with his friends.

## II.     Arguments and Authority

**Hemani** claims that § 922(g)(3) violates the Second Amendment under the framework announced in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Before *Bruen*, every circuit to consider the issue—including the Fifth Circuit—held that § 922(g)(3) does not violate the Second Amendment. See *United States v. Carter*, 750 F.3d 462, 466–68 (4th Cir. 2014); *United States v. Dugan*, 657 F.3d 998, 999–1000 (9th Cir. 2011); *United States v. Yancey*,621 F.3d 681, 683–87 (7th Cir. 2010); *United States v. Seay*, 620 F.3d 919, 925 (8th Cir. 2010); *United States v. Patterson*, 431 F.3d 832, 835–36 (5th Cir. 2005); *United States v. May*,

538 F. App'x 465, 466 (5th Cir. 2013); *United States v. Richard*, 350 F. App'x 252, 260 (10th Cir. 2009). Although *Bruen* made the preexisting Second Amendment standard "more explicit," including by clarifying that the proper analysis focuses on the historical record rather than "means- end" scrutiny, *see* 142 S. Ct. at 2134, *Bruen* does not change the result as to §922(g)(3). Unlawful drug users and addicts, by definition, fall outside the scope of the Second Amendment's text, which protects only law-abiding, responsible citizens. And, in any event, § 922(g)(3)'s temporary prohibition of gun possession by unlawful drug users and addicts comfortably fits a longstanding historical tradition of disarming groups considered dangerous or unvirtuous.

   A.   **Under *Bruen*, a gun restriction violates the Second Amendment only if it burdens conduct covered by the Amendment's text and lacks a historical analogue.**

The Second Amendment states: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment gives law-abiding, responsible citizens a right to keep and bear arms for self- defense. The Court held unconstitutional two District of Columbia laws that effectively banned handgun possession in the home and required all guns in homes to be kept inoperable and so unavailable for self-defense. *Id.* at 628–34. But the Court emphasized that the Second Amendment right is "not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. "[N]othing in [the *Heller*] opinion [was to] be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive

places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27; *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (repeating *Heller*'s "assurances" as to "longstanding regulatory measures"). The Court meant its list of "presumptively lawful regulatory measures only as examples," not as exhaustive. *Heller*, 554 U.S. at 627 n.26.

In *Bruen*, the Supreme Court "made the constitutional standard endorsed in *Heller* more explicit." 142 S. Ct. at 2134. It explained: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129–30.

Applying that standard, the Court held unconstitutional New York's licensing law, which allowed an applicant to obtain a license to carry a gun outside his home only by proving that "proper cause exists." *Id.* at 2123. New York courts had read "proper cause" as "a special need for self-protection distinguishable from that of the general community." *Id.* First, the Court held that the Second Amendment's plain text covered the conduct at issue. *Id.* at 2134–35. The petitioners— "two ordinary, law-abiding, adult citizens"—were undisputedly among "'the people' whom the Second Amendment protects." *Id.* at 2134. And their proposed conduct— "carrying handguns publicly for self-defense"--fell within "the right to keep and bear arms." *Id.*

Second, the Court surveyed historical data from "medieval to early modern England" through "the late-19th and early-20th centuries" to determine whether New York's licensing law squared with historical tradition. *Id.* at 2135–56. After a "long journey through the Anglo-American history of public carry, [the Court] conclude[d] that respondents ha[d] not met their

burden to identify an American tradition justifying the State's proper-cause requirement." *Id.* at 2156. "Apart from a few late-19th century outlier jurisdictions," the Court summarized, "American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense" or required a showing of special need for public carry. *Id.*

### B.   The Second Amendment's text does not cover possession of a firearm by unlawful drug abusers.

This Court need not consider whether § 922(g)(3) squares with the nation's historical tradition of gun regulation because it burdens no conduct covered by the Second Amendment's plain text. Defendant has the burden at this initial stage of the analysis to show that the Second Amendment covers his conduct. He cannot carry his burden because unlawful drug abusers are, by definition, not "law-abiding" citizens, *see Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635), and thus not among "the people" whom the Second Amendment protects.

#### 1.   The party challenging a gun regulation has the burden of showing that the Second Amendment's text covers his conduct.

In *Bruen*, the Supreme Court did not address which party has the burden of showing that the Second Amendment's text covers—and thus "presumptively" protects—the conduct at issue. *See* 142 S. Ct. at 2130. But it implied that the party challenging a gun regulation has that initial burden. To repeat, the Court's analysis proceeded in two steps: it asked, first, whether the Second Amendment's plain text covers the conduct at issue and, second, whether the regulation squares with the nation's tradition of gun regulation. *See, e.g., id.* at 2126, 2130. At step two, the Court assigned the government the burden of offering historical evidence to support the regulation. *Id.* To do so, the Court analogized to "the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms." *Id.* at 2130

˜5˜

(citing *Heller*, 554 U.S. at 582, 595, 606, 618, 634–635). The Court did not say which party has the burden at step one. Nor did it need to since the parties did not dispute that the respondents were among "the people" whom the Second Amendment protects and that publicly carrying handguns for protection fell within "the right to keep and bear arms." *Id.* at 2134.

Continuing the Supreme Court's First Amendment analogy, the party challenging a gun regulation has the burden at step one. Although the government has the burden of justifying a purported restriction on the freedom of speech, the party challenging the restriction must show that the First Amendment right applies in the first place. *See, e.g.*, *Harmon v. City of Norman, Oklahoma*, 981 F.3d 1141, 1147 (10th Cir. 2020) ("Plaintiffs had the initial burden of showing that the First Amendment applies to their conduct." (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 n.5 (1984)); *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 205 (2d Cir. 2004) ("The party asserting that its conduct is expressive bears the burden of demonstrating that the First Amendment applies."). Likewise here, Defendant has the burden of showing that the Second Amendment applies to—and thus presumptively protects—his conduct.

### 2. Illegal drug abusers are not among "the people" whom the Second Amendment protects.

**Hemani** cannot show that the Second Amendment's plain text covers his conduct. *Heller* and *Bruen* defined the right to bear arms as belonging to "law-abiding, responsible" citizens, *Heller*, 554 U.S. at 635; *Bruen*, 142 S. Ct. at 2156, or "ordinary, law-abiding citizens," *Bruen*, 142 S. Ct. at 2122, 2134. For that reason, *Bruen* did not question the constitutionality of "shall-issue" licensing regimes that "require applicants to undergo a background check or pass a

firearms safety course" to ensure that "those bearing arms" are "'law-abiding, responsible citizens.'" *Id.* at 2138 n.9; *see id.* at 2162 (Kavanaugh, J., concurring) ("[S]hall-issue licensing regimes are constitutionally permissible"). Thus, *Bruen* does not cast doubt on firearms restrictions that prevent irresponsible, non-law-abiding citizens from possessing firearms.

Anyone who violates § 922(g)(3) is, by definition, not a law-abiding, responsible citizen who enjoys the Second Amendment's protection under *Heller* and *Bruen*. The statute applies only to a person who "is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))." To qualify, a defendant's illegal drug use must be both (1) "with regularity and over an extended period of time"; and (2) close in time to the gun possession. *United States v. McCowan*, 469 F.3d 386, 392 (5th Cir. 2006); *see also* 27 C.F.R. § 478.11 (ATF regulation defining "unlawful user" in § 922(g)(3) as a "current user" of a controlled substance in a manner other than as prescribed by a physician, meaning that "the unlawful use has occurred recently enough to indicate that the individual is actively engaged in such conduct"); *United States v. Patterson*, 431 F.3d 832, 839 (5th Cir. 2005) (explaining that cases addressing the § 922(g)(3) require "contemporaneousness and regularity" (collecting cases)). A current and regular illegal drug user can hardly be termed "law-abiding" or "responsible."

In this case, for example, **Hemani** admitted that the firearms found in his residence along with the cocaine and marijuana belonged to him. He admitted to purchasing and using cocaine and marijuana regularly. Additionally, there is a historical record of **Hemani'**s drug use from the April and October 2021 downloads of his phone indicating that he was using and selling promethazine. All of these facts support the analysis that **Hemani** was not only a current user of

˜7˜

controlled substances, but used them with regularity.

*Bruen*'s endorsement of the "shall-issue" schemes that exist in 43 states confirms that § 922(g)(3) does not cover illegal drug abusers. *Bruen*, 142 S. Ct. at 2138 & n.9; *id.* at 2162 (Kavanaugh, J., concurring). A number of those shall-issue schemes specifically exclude from eligibility applicants who meet § 922(g)(3)'s standard. Among Ohio's eligibility criteria, for instance, the applicant must "certify[y] that [he] is not an unlawful user of or addicted to any controlled substance as defined in 21 U.S.C. 802." Ohio Rev. Code § 2923.125(o);*see also* Ark. Code § 5-73-309(7)(A) (requiring that the applicant "[d]oes not chronically or habitually abuse a controlled substance to the extent that his or her normal faculties are impaired"); Miss. Code. § 45- 9-101(e) (same).

*Bruen* indicates that these regimes denying the right to carry to drug abusers are constitutional. The Court observed that "these shall-issue regimes, which often require applicants to undergo a background check … , are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law abiding, responsible citizens.'" *Bruen*, 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). As Justice Kavanaugh explained in his concurrence (joined by the Chief Justice), the shall-issue regimes "are constitutionally permissible" even though they "may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 2162 (Kavanaugh, J., concurring); *see id.* ("Going forward, therefore, the 43 States that employ objective shall-issue licensing regimes . . . may continue to do so."). *Bruen* therefore confirms that the right to carry firearms does not extend to illegal drug users. *See United States v. Daniels,* --- F. Supp. 3d       , 2022 WL 2654232, at *2 (S.D.

Miss. 2022) (explaining that "[b]ecause it is concerned with 'unlawful' drug users and addicts, there is some doubt that section 922(g)(3) is textually covered by the Second Amendment," but ultimately rejecting the defendant's Second Amendment challenge based on the historical tradition of analogous regulations).

In sum, because conduct that violates § 922(g)(3) involves contemporaneous and regular violation of the criminal drug laws—and will always show lack of responsibility—people subject to § 922(g)(3) are not "law-abiding, responsible citizens" under *Heller* and *Bruen*. This Court should uphold the statute on that basis and need not consider whether the government can show that the statute is consistent with historical tradition.

### C. Section 922(g)(3)'s prohibition of firearm possession by illegal drug abusers squares with the nation's historical tradition of gun regulation.

Even if the Second Amendment's plain text covers **Hemani**'s conduct, his Second Amendment claim fails because § 922(g)(3) "is consistent with the Nation's historical tradition of firearm regulation." *See Bruen*, 142 S. Ct. at 2130. The historical record shows a longstanding tradition of categorically restricting the gun rights of groups viewed by legislatures as dangerous or unvirtuous.

Section 922(g)(3) is sufficiently analogous to those historical restrictions to pass constitutional muster. The constitutional question is not whether § 922(g)(3)'s restriction has existed since the founding. Rather, courts considering present-day gun regulations must "reason[] by analogy." *Id*. at 2132. "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* (emphasis original); *see also Nat'l Rifle*, 700 F.3d at 196 ("*Heller* demonstrates that a regulation

can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue"). "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Bruen*, 142 S. Ct. at 2133.

**a.** The government has always categorically restricted the gun rights of some groups to promote public safety. In England, officers of the Crown could "seize all arms in the custody or possession of any person" whom they "judge[d] dangerous to the Peace of the Kingdom." Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662). And "the act of 'going armed to terrify the King's subjects' was 'a great offence at the common law'" if it was committed with "evil intent or malice." *Bruen*, 142 S. Ct. at 2141 (brackets and emphasis omitted) (quoting *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686)). Thus, "by the time of American independence, England had established a well-practiced tradition of disarming dangerous persons—violent persons and disaffected persons perceived as threatening to the crown." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 261 (2020); *see id.* at 259–61 (detailing history).

Likewise, "[t]he historical record shows that gun safety regulation was commonplace in the colonies, and around the time of the founding, a variety of gun safety regulations were on the books." *Nat'l Rifle*, 700 F.3d at 200. The colonies (and later the states) passed laws that "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people." *Bruen*, 142 S. Ct. at 2145.this regard.  Early colonial regulations also "included safety laws … disarming certain groups and restricting sales to certain groups." *Nat'l Rifle*, 700 F.3d at 200. "For example, several jurisdictions passed laws that confiscated weapons owned by persons who refused to swear an oath of allegiance to the state or to the nation." *Id.*; *see also Medina v.*

*Whitaker*, 913 F.3d 152, 159 (D.C. Cir. 2019) (explaining that "during the revolution, the states of Massachusetts and Pennsylvania confiscated weapons belonging to those who would not swear loyalty to the United States"); Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157–60 (2007); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506–08 (2004); Joyce Lee Malcolm, To Keep and Bear Arms 140–41 (1994). Historical accounts confirm the founders' attitudes towards disarming potentially dangerous groups. "*Heller* identified … as a 'highly influential' 'precursor' to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (quoting 554 U.S. at 604). That report recognized that the government could disarm potentially dangerous or irresponsible people, stating that "citizens have a personal right to bear arms 'unless for *crimes committed, or real danger of public injury*.'" *Id.* (emphasis added) (quoting 2 Bernard Schwarz, The Bill of Rights: A Documentary History 662, 665 (1971)). Similarly, Samuel Adams offered an amendment at the Massachusetts convention to ratify the Constitution, recommending "that the said Constitution be never construed to authorize Congress … to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." Schwarz, The Bill of Rights 674–75, 681 (emphasis added). Thomas M. Cooley's 1868 treatise, which *Heller* described as "massively popular," 554 U.S. at 616, later explained that some classes of people were "almost universally excluded" from exercising certain civic rights like gun rights, including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, A Treatise on the

Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 29 (1st ed. 1868).

Indeed, "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *Yancey*, 621 F.3d at 684–85 (quoting *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) (collecting scholarly sources)); *United States v. Carpio-Leon*, 701 F.3d 974, 979–80 (4th Cir. 2012) (same). The Second Amendment thus incorporates "a common-law tradition that permits restrictions directed at citizens who are not law-abiding and responsible" and "'does not preclude laws disarming the unvirtuous (i.e. criminals).'" *United States v. Bena*, 664 F.3d 1180, 1183–84 (8th Cir. 2011) (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986)); *see also United States v. Rene E.*, 583 F.3d 8, 15–16 (1st Cir. 2009) ("Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as … limited to those members of the polity who were deemed capable of exercising it in a virtuous manner." (quoting Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002))).

**b.** A parallel and equally longstanding tradition views intoxication as a condition rendering firearm possession dangerous, and accordingly restricting the firearms rights of those who become intoxicated. In 1655, Virginia prohibited "shoot[ing] any gunns at drinkeing." Act XII of March 10, 1655, 1655 Va. Laws 401, 401–02. In 1771, New York prohibited firing guns during the New Year's holiday, a restriction that "was aimed at preventing the 'great Damages ... frequently done on [those days] by persons . . . being often intoxicated with Liquor.'" *Heller*,

554 U.S. at 632 (quoting Ch. 1501, 5 Colonial Laws of New York 244–46 (1894)).

In the era following ratification of the Fourteenth Amendment in 1868, which extended the Second Amendment to the states, *see McDonald v. City of Chicago*, 561 U.S. 742 (2010), many states enacted statutes prohibiting intoxicated persons from possessing, using, or receiving firearms. *See, e.g.*, Kansas Gen. Stat., Crimes & Punishments § 282 (1868) (providing that "any person under the influence of intoxicating drink" may not "carr[y] on his person a pistol … or other dangerous weapon"); 1878 Miss. Laws 175–76 § 2 (making it unlawful to sell pistols and certain knives to a "person intoxicated"); 1883 Mo. Laws 76, § 1 (prohibiting carrying a dangerous weapon "when intoxicated"); 1883 Wis. Sess. Laws 290, Offenses Against Lives and Persons of Individuals, ch. 329 § 3 ("It shall be unlawful for any person in a state of intoxication, to go armed with any pistol or revolver."); 1890 Okla. Sess. Laws 495, art. 47, § 4 (officers may not "carry[]… arms while under the influence of intoxicating drinks"); 1899 S.C. Acts 97, No. 67, § 1 (forbidding "boisterous conduct" while "under the influence of intoxicating liquors," including "discharg[ing] any gun" near a public road); *see also State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886) (upholding Missouri statute as "a reasonable regulation of the use of such arms"). The historical tradition embodied by these laws continues today, with most states "restrict[ing] the right of habitual drug abusers or alcoholics to possess or carry firearms." *Yancey*, 621 F.3d at 684 (collecting statutes).

**c.** The Supreme Court has recognized the historical tradition of disarming unvirtuous or dangerous citizens. In *Heller*, it endorsed "longstanding prohibitions on the possession of firearms by felons and the mentally ill," among others. *Heller*, 544 U.S. at 626–27. The Court "identif[ied] these presumptively lawful regulatory measures only as examples; [its] list d[id]

not purport to be exhaustive." *Id.* at 627 n.26. In *McDonald*, the Court reiterated that *Heller* "did not cast doubt on" those "longstanding regulatory measures." *McDonald*, 561 U.S. at 786. Likewise, nothing in *Bruen* casts doubt on those longstanding regulations. *See Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) (explaining that the Court's decision "does not expand the categories of people who may lawfully possess a gun"); *id.* at 2162 (Kavanaugh, J., concurring) (reiterating *Heller*'s statements).

Courts relying on this "'virtuous citizen' theory" have upheld "modern laws banning the possession of firearms by illegal aliens and juveniles—classes of people who might otherwise show, on a case-by-case basis, that they are not particularly dangerous." *Medina*, 913 F.3d at 159. In *National Rifle*, the Court rejected a Second Amendment challenge to § 922(b)(1) and (c)(1), which restrict the ability of people under 21 to buy handguns, calling that restriction "firmly historically rooted." 700 F.3d at 204. The court explained that the regulation "is consistent with a longstanding tradition of targeting select groups' ability to access and to use arms for the sake of public safety." *Id.* at 203..

Courts have reasoned similarly for other categorical restrictions similar to *Heller*'s non-exhaustive list of presumptively lawful regulations. *See, e.g.*, *Bena*, 664 F.3d at 1184 (holding that § 922(g)(8)'s prohibition of gun possession by people under domestic-violence protective orders "is consistent with a common-law tradition that the right to bear arms is limited to peaceable or virtuous citizens"); *Skoien*, 614 F.3d at 640 (same for § 922(g)(9)'s prohibition of gun possession by those convicted of misdemeanor crimes of domestic violence); *Rene E.*, 583 F.3d at 16 (rejecting a Second Amendment challenge to § 922(x), which restricts the ability of people under 18 to possess handguns, and explaining "that the founding generation would have

regarded such laws as consistent with the right to keep and bear arms").

   **d.** The same historical tradition readily sustains the modern-day prohibition of firearm possession by unlawful drug users and addicts. Both before and since *Bruen*, courts have described§ 922(g)(3)'s prohibition as consistent with this longstanding tradition. For instance, although the Eighth Circuit ultimately relief in part on a means-end inquiry that *Bruen* abrogated, it also found "that § 922(g)(3) is the type of longstanding prohibition on the possession of firearms that *Heller* declared presumptively lawful." *Seay*, 620 F.3d at 925 (cleaned up). Similarly, in rejecting a Second Amendment challenge to § 922(g)(3), the Seventh Circuit explained that widespread restrictions on the gun rights of habitual drug users and alcoholics "are merely the latest incarnation of the states' unbroken history of regulating the possession and use of firearms dating back to the time of the amendment's ratification." *Yancy*, 621 F.3d at 686. Those courts' historical analyses survive *Bruen*. Indeed, in the only post-*Bruen* decision addressing a Second Amendment challenge to § 922(g)(3) to date, the court found "that the analysis in *Yancey* demonstrates the historical attestation demanded by the *Bruen* framework. *Daniels*, 2022 WL 2654232, at *4. It thus ruled that § 922(g)(3) squares with an "American legal tradition" of "analogous statutes which purport to disarm persons considered a risk to society—whether felons or alcoholics." *Id.*

  Like the age-based regulation addressed in *National Rifle* and other analogous categorical regulations, § 922(g)(3) "is consistent with a longstanding tradition of targeting select groups' ability to access … arms for the sake of public safety." *See* 700 F.3d at 203. "Congress enacted the exclusions in § 922(g) to keep guns out of the hands of presumptively risky people." *Yancey*, 621 F.3d at 683 (citing *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 112 n.6 (1983)).

Thus, "in passing § 922(g)(3), Congress expressed its intention to keep firearms out of the possession of drug abusers, a dangerous class of individuals." *Seay*, 620 F.3d at 925. And one can hardly question Congress's judgment that unlawful drug abusers are, as a class, presumptively dangerous. *See, e.g.*, *Carter*, 750 F.3d at 467–69 (discussing empirical data tying drugs to gun violence); *Yancey*, 621 F.3d at 685–86 (explaining that habitual drug users "are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms" and noting that "[a]mple academic research confirms the connection between drugs and violent crime"). Section 922(g)(3) thus reflects a permissible legislative judgment consistent with historical tradition. Even still, its *temporary* prohibition on possession imposes a far lesser burden than the permanent ban on possession by other groups, like convicted felons. *See Yancey*, 621 F.3d at 686–87.

It does not matter that a 1968 law created the modern federal restriction on possession of firearms by unlawful drug abusers. Indeed, § 922(g)(1)'s "prohibition[] on the possession of firearms by felons"—which *Heller* expressly endorsed—has a similar historical pedigree. *See* 544 U.S. at 626–27. The federal felon-in-possession law too is "of mid-20th century vintage." *Nat'l Rifle*, 700 F.3d at 196. It "was not enacted until 1938, was not expanded to cover non-violent felonies until 1961, and was not re-focused from receipt to possession until 1968." *Id.*; *see also Skoien*, 614 F.3d at 640 (noting that the "first federal statute disqualifying felons from possessing firearms was not enacted until 1938"). That same 1968 enactment created § 922(g)(3)'s restrictions on drug abusers. *See Yancey*, 62 F.3d at 683 (citing Gun Control Act of 1968, Pub. L. 90-618, § 102, 82 Stat. 1213, 1220). *Heller*'s point in endorsing felon-in-possession laws was not that they had existed in their modern form since the founding but that

˘16˘

they were *analogous enough* to historical regulations to be deemed "longstanding." *See* 544 U.S. at 626–27. So too with § 922(g)(3)'s restriction on drug abusers.

### D. Section 922(g)(3) is not Unconsitutionally Vague, Facially or As Applied

Finally, **Hemani** argues that the Court should allow a Constitutional challenge of Section 922(g)(3) on its face, rather than the "as applied" standard that is practiced in the Fifth Circuit. In support of this argument, the Defense relies upon *United States v. Morales-Lopez*, a District Court case from Utah with no precedential value to this Court, which is an outlier in that it ignores precedent to allow a facial void for vagueness analysis of 922(g)(3).   No. 2:20-CR-00027-JNP,

"Facial challenges . . . are . . . to be discouraged. *Sabri v. United States*, 541 U.S. 600, 608- 09, 124 S.Ct. 1941, 158 L.Ed.2d 891 (2004). "[F]acial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008). Facial challenges "are best when infrequent" and "are especially to be discouraged" when application of the challenged statute to the case at hand would be constitutional when the facts are eventually developed. *Sabri*, 541 U.S. at 608, 609, 124 S.Ct. 1941.

Not surprisingly, then, "[a] facial challenge to a legislative Act is the most difficult challenge to mount successfully." United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d, 697 (1987).

In the present case, 922(g)(3), a legislative Act, is not so vague as to be constitutionally

˘17˘

deficient under Fifth Circuit precedent, either facially or as applied, because this statute gives ordinary people a fair notice of the conduct it punishes. The Court should deny **Hemani's** motion to dismiss the indictment because the Defendant cannot legally attack the statute facially, because the statute is not facially invalid regardless, because the statute is not unconstitutional as applied to the facts and circumstances of his case, and because his other constitutional arguments are made without and in contention with precedent.

## I. CONCLUSION

WHEREFORE, premises considered, **Hemani**'s Motion to Dismiss Indictment is without support and should be denied.

Respectfully submitted,

BRIT FEATHERTON
United States Attorney

/s/Maureen Smith
MAUREEN SMITH
Assistant United States Attorney
600 E. Taylor St., Ste. 2000
Sherman, Texas 75090
Telephone: 903/868-9454
Facsimile: 903/892-2792

## CERTIFICATE OF SERVICE

I hereby certify a true and correct copy of the foregoing was delivered to Brian O'Shea, attorney for defendant, via CM/ECF electronic filing as of this the 23rd day of February, 2023.

/s/ Maureen Smith
MAUREEN SMITH