UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | NO. 4:23CR018 |
| | § | (Judge Mazzant) |
| ALI DANIAL HEMANI | § | |

**DEFENDANT'S MOTION FOR PRETRIAL RELEASE**

COMES NOW, Defendant, ALI DANIAL HEMANI, by his attorney, and respectfully requests that this Court release him pursuant to the Bail Reform Act, 18 U.S.C. § 3142 and *United States v. Salerno*, 481 U.S. 739 (1987). In support, Defendant shows:

Defendant Ali Hemani was arrested on this charge February 10, 2023. At his initial appearance on February 13, 2013 the Government indicated they would be seeking pretrial detention. A detention hearing was scheduled for February 16, 2023. The Government filed a formal Motion Seeking Detention February 16, 2023 and the hearing began that day. After some testimony, the Court held the hearing in recess to allow Defendant to locate a third party custodian. The continuation of the Detention Hearing is scheduled for March 8, 2023.

The Government moved to detain Mr. Hemani because he is charged with a felony involving the possession of a firearm. 18 U.S.C. § 3142 (f)(1)(E). They have alleged that he is a serious flight risk. 18 U.S.C. § 3142 (f)(2)(A). They claim that there is "no condition or combination of conditions will reasonably assure his appearance as required and the safety of any other person and the community". 18 U.S.C. § 3142(e)(1). Pretrial services have recommended release with conditions. PSR p. 5.

This is not a presumption case. 18 U.S.C. § 3142(e).[1] There are two burdens of proof involved. The Government must prove by a preponderance of the evidence that he is a serious risk of flight. 18 U.S.C. § 3142(f)(2). *United States v. Araneda*, 899 F.2d 368, 370 (5th Cir. 1990); *United States v. Fortna*, 769 F.2d 243, 250 (5th Cir. 1985). They also must prove that there are no condition(s) that will reasonably assure the safety of the community by clear and convincing evidence. 18 U.S.C. §3142(f); *United States v. Salerno*, 481 U.S. 739, 750 (1987).

In determining whether there are any conditions that will reasonably assure Mr. Hemani's appearance and the safety of the community the Court is to take into account available information and balance the nature and circumstances of the offense, the weight of the evidence, the history and characteristics of the person and the nature and seriousness of the danger to any person or the community that would be posed by release. 18 U.S.C. §3142(g). "Reasonably ensure" does not mean 100% guarantee as that would be an impossibly high standard. *United States v. Fortna*, 769 F.2d 243, 250 (5th Cir. 1985); *United States v. Ploof*, 851 F.2d 7, 11 (1st Cir. 1988)

### I. Bail Reform Act and Release Statistics

Congress's stated intent when they enacted Bail Reform Act of 1984, 18 U.S.C. § 3142 (BRA) was to detain only those high-risk defendants who were likely to pose a significant risk of

---

[1] In summary: a rebuttable presumption of detention arises if:
- 18 U.S.C. § 3142(e)(2):
  The current charge is one listed in 18 U.S.C. § 3142(f)(1):
  - crime of violence, § 1591, § 2332b(g)(5)(b) with max over 10 years;
  - an offense if max is life in prison or death,
  - a controlled substance crime with a maximum punishment of more than 10 years under 21 U.S.C. § 801, et. al., 21 U.S.C. § 951, et. al., or Ch 705 of Title 46;
  - a felony charge if defendant has 2 certain type of priors;
  - felony not otherwise crime of violence involving a minor or firearm –
  ***AND IF*** the defendant has a previous conviction or is currently on release/bond for another charge; or
- 18 U.S.C. § 3142(e)(3) the judicial officer finds probable cause to believe the defendant committed:
  - a controlled substance crime with a maximum punishment of more than 10 years under 21 U.S.C. § 801, et. al., 21 U.S.C. § 951, et. al., or Ch 705 of Title 46;
  - an offence under 18 U.S.C. § 924(c), § 956(a), or § 2332(b);
  - an offense under 18 U.S.C. § 2332b(g)(5)(b) with a max over 20 years;
  - or an offense involving a minor.

flight or danger to the community if they were released pending trial.[2] Accordingly, the standard for all other defendants was supposed to be release. As the Supreme Court held in *Salerno*, "[i]n our society liberty is the norm, and detention prior to trial . . . is the carefully limited exception." 481 U.S. at 755.

The statute states that the Court "shall order" pretrial release, § 3142(b), except in certain narrow circumstances. Even if the Court determines under § 3142(c) that an unsecured bond is not sufficient, the Court "shall order" release subject to "the least restrictive further condition[s]" that will "*reasonably assure*" the defendant's appearance in court and the safety of the community. § 3142(c)(1) (emphasis added). Under this statutory scheme, "it is only a 'limited group of offenders' who should be detained pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98-225, at 7 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3189); *see also United States v. Byrd*, 969 F.2d 106, 109 (5th Cir. 1992) ("There can be no doubt that this Act clearly favors non-detention.").

Studies have found that since the BRA, rather than jailing only the worst of the worst, the lowest-risk offenders in the system have been overincarcerated; people who are stable, employed, educated, and have minimal to no criminal history.[3] Every day a defendant remains in custody the risk that he may lose employment, housing, and community ties increases.[4] The economic harms stemming from being detained pretrial are shown to persist. Even three to four years after their

---

[2] Amaryllis Austin, *The Presumption for Detention Statute's Relationship to Release Rates*, 81 FED. PROB. 52, 56–57 (2017), archived at https://perma.cc/9HGU-MN2B.

[3] *Id.* at 57.

[4] *Id.* at 53; *see also* Alexander M. Holsinger & Kristi Holsinger, *Analyzing Bond Supervision Survey Data: The Effects of Pretrial Detention on Self-Reported Outcomes*, 82(2) Fed. Prob. 39, 42 (2018), archived at https://perma.cc/LQ2M-PL83 (finding that for people detained pretrial for at least three days, 76.1% had a negative job-related consequence and 37.2% had an increase in residential instability).

bail hearing, people released pretrial were still 24.9% more likely to be employed than those who were detained.[5]

Another AO study found a relationship "between the pretrial detention of low-risk defendants and an increase in their recidivism rates, both during the pretrial phase as well as in the years following case disposition."[6] Recent studies have confirmed that pretrial detention is criminogenic[7] and cautioned that "lower crime rates should not be tallied as a benefit of pretrial detention."[8] In addition, federal "pretrial detention is itself associated with increased likelihood of a prison sentence and with increased sentence length," even after controlling for criminal history, offense severity, and socio-economic variables.[9] These stark statistics must also be considered in light of the fact that 99% of federal defendants are not rearrested for a violent crime while on pretrial release.[10] In other words, pretrial detention imposes enormous costs on criminal defendants, their loved ones, and the community, in a counterproductive attempt to prevent crimes that are extremely unlikely to happen in the first place.

There are also significant fiscal costs associated with high federal pretrial detention rates. As of 2016, the average pretrial detention period was 255 days (although several districts averaged

---

[5] Will Dobbie et al., *The Effects of Pretrial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges*, 108(2) Amer. Econ. Rev. 201, 204 (2018), archived at https://perma.cc/X77W-DAWV.

[6] Austin, *supra* note 1, at 54 (citing Christopher T. Lowenkamp et al., *Investigating the Impact of Pretrial Detention on Sentencing Outcomes* (The Laura and John Arthur Foundation 2013), archived at https://perma.cc/8RPX-YQ78).

[7] Paul Heaton et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stan. L. Rev. 711, 718 (2017), archived at https://perma.cc/5723-23AS ("[D]etention is associated with a 30% increase in new felony charges and a 20% increase in new misdemeanor charges, a finding consistent with other research suggesting that even short-term detention has criminogenic effects."); Arpit Gupta et al., *The Heavy Costs of High Bail: Evidence from Judge Randomization*, 45 J. Legal Stud. 471, 496 (2016) ("[O]ur results suggest that the assessment of money bail yields substantial negative externalities in terms of additional crime.").

[8] Emily Leslie & Nolan G. Pope, *The Unintended Impact of Pretrial Detention on Case Outcomes: Evidence from New York City Arraignments*, 60 J.L. & Econ. 529, 555 (2017).

[9] James C. Oleson et al., *The Sentencing Consequences of Federal Pretrial Supervision*, 63 Crime & Delinquency 313, 325 (2014), archived at https://perma.cc/QAW9-PYYV.

[10] Thomas H. Cohen et al., *Revalidating the Federal Pretrial Risk Assessment Instrument: A Research Summary*, 82(2) Fed. Prob. 23, 26 (2018), archived at https://perma.cc/8VM9-JH9T.

over 400 days in pretrial detention).[11] Pretrial detention costs an average of $73 per day per detainee, while pretrial supervision costs an average of just $7 per day.[12]

The government's own data show that when release increases, crime and flight do not. In 2021, 99% of released federal defendants nationwide appeared for court as required and 99% were not arrested for new crimes on bond.[13] This near-perfect compliance rate is seen equally in federal districts with very high release rates and those with very low release rates. Even in districts that release two-thirds of all federal defendants on bond, just 1% fail to appear in court and 1% are rearrested while released.[14]

The bond statistics for the Eastern District of Texas follow the same trends. In this district, out of 2,880 federal defendants 726 were released pretrial. Only 0.55% of released defendants failed to appear, and only 0.68% were rearrested on release. If technical violations are included only 9.9% of released defendants had issues. *See* App. 1, AO Table H-15, 2022. Yet despite the statistically low risk of flight and recidivism that defendants like Mr. Hemani pose, the government recommends detention in 71% of cases nationwide and in 78% of cases in this district.[15] *See* App. 2, AO Table H-3, 2022. Clearly the government's detention requests are not tailored to the low risk of flight and recidivism that defendants in this district and elsewhere pose.

---

[11] Austin, *supra* note 1, at 53.
[12] *Id.* Thus, 255 days of pretrial detention would cost taxpayers an average of $18,615 per detainee, while pretrial supervision for the same time would cost an average of $1,785.
[13] AO Table H-15 (Sept. 30, 2022).
[14] Calculated with AO Table H-14A for the 12-month period ending September 30, 2021. The failure-to-appear and rearrest rates for these districts were calculated using AO Table H-15. With regard to flight, the ten federal districts with the lowest release rates (average 20.00%) have an average failure-to-appear rate of 1.6%, while the ten districts with the highest release rates (average 64%) have an *even lower* failure-to-appear rate of With regard to recidivism, the ten districts with the lowest release rates have an average rearrest rate on bond of 0.8%, while the ten districts with the highest release rates have an average rearrest rate of 1.1%.
[15] Pretrial Services recommended detention in 63.4% of cases for the same time period.

## II. Reasons to Detain

The Government is seeking to detain because Ali Hemani is charged with a felony involving the possession of a firearm, 18 U.S.C. § 3142 (f)(1)(E), and they are alleging that he is a serious flight risk 18 U.S.C. § 3142(f)(2)(A) and dangerous. As such, they claim that there is "no condition or combination of conditions will reasonably assure his appearance as required and the safety of any other person and the community". 18 U.S.C. § 3142(f).

The charge alone does not create a presumption of detention. The Government is correct that this 18 U.S.C. § 922(g)(3) deviates from the vast majority of firearms cases. However, there are many key details left out[16] in favor of inflammatory rhetoric.

### A. The Nature and Circumstances of the Crime

Federal Agents have been surveilling the Hemani family for about three years on suspicion that they support radical Islam and the Iranian Government to the detriment of the U.S. From testimony at the first part of this Detention Hearing on February 16, 2023, it is clear their phones have been tapped, their records have been subpoenaed from third parties, and they have been followed. Attempts have been made to find out the target of investigation and/or allegations to no avail.[17] The Government is pulling materials from that investigation in support of this motion. To date the defense has received no discovery from the Government, including any potential *Brady* material.

The 18 U.S.C. § 922(g)(3) charge arose from the second search of the home Ali Hemani shares with his parents by Federal agents pursuant to a warrant in August of 2022. One registered handgun and under 1g of alleged cocaine (4.7g with packaging, mistyped in the Governments

---

[16] United States Brief in Support of Pretrial Detention p. 3
[17] Multiple agents/officers (approximately 10) were present for the last detention hearing. Of all them, the one called to testify had only limited information from a recent briefing. He had only recent been brought in and had no firsthand knowledge of any of the investigation, including the relevant search.

motion as 47g) was found. According to the Government,[18] Mr. Hemani cooperated with Agents and very candid statements. In fact, Mr. Hemani has spoken with Federal agents multiple times during this investigation, as have his parents. Agents knowledgeable about this larger investigation, to whom the family had spoken with, were among those present at the previous hearing.

### B. Serious Risk of Flight

The Government alleges that Mr. Ali Hemani poses a "serious risk" of flight and that there are no combination of conditions that will reasonably assure his appearance under § 3142(f)(2)(A) due his international ties. They must prove this by a preponderance of the evidence. 18 U.S.C. § 3142(f)(2). The mere possibility of flight is not the same as the inclination. *Truong Dinh Hung v. U. S.*, 439 U.S. 1326, 1329 (1978).

Ali has deep and enduring ties to DFW and no intention of fleeing. His parents are naturalized U.S. citizens of Pakistani decent. He was born July 13, 1997 in Dallas and holds dual U.S. and Pakistani passports. The Hemani's have a large family in the United States and in the Middle East. They travel frequently to visit and for religious purposes. This has included trips to Iran, where Mr. Hemani's brother lives with his wife and children. It is not illegal for U.S. citizens to travel there but the State Department warns against it.[19]

Ali has only ever lived in the DFW area. The family lived at 2013 Chalfont Carrollton TX until Ali was eighteen, when they moved to the current residence. Ali graduated from Creekview High School where he played football, was on the Honor Roll, and a member of the National Honor Society. He graduated from the University of Texas at Arlington with a degree in Management and Information Systems in 2019. He was a UTA Presidential Scholar.

---

[18] United States Brief in Support of Pretrial Detention p. 4
[19] https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/iran-travel-advisory.html

Ali has attended services and programs at the Islamic Center of Momin in Irving and The City of Knowledge Islamic Center in the Colony his entire life. He participated in the Dallas Muslim Youth Group and the Muslim Student Association. Since college he has volunteered monthly with Project Downtown DFW, a non-profit that provides essentials for people experiencing homelessness.

Ali has been steadily employed since shortly after his college graduation in his field of study. As he gained experience, he has been able to move up to better jobs. This detention has caused him to lose his current position. He is confident he can easily find employment if released.

The family has traveled internationally and returned during the ongoing investigation. The search that gave rise to this arrest was in August of 2022. He was not arrested for five months, he did not flee. The Government was not concerned that he would be a serious flight risk until this month.

There is no evidence to show by a preponderance of evidence that Ali poses a "serious risk" of flight and that there are no combination of conditions that will reasonably assure his appearance under § 3142(f)(2). The facts show the opposite.

### C. Danger to the Community

Since the charge involves the § 3142f(1) condition of involving a firearm, the Government has alleged Mr. Hemani is a danger to the community. The standard is not for the Government to show any possible danger but for the Government to prove there are no condition(s) that will reasonably assure the safety of the community by clear and convincing evidence. 18 U.S.C. §3142(f); *United States v. Byrd*, 969 F.2d 106 (5th Cir. 1992); *United States v. Salerno*, 481 U.S. 739, 750 (1987).

There was incomplete testimony presented about the beliefs alleged to be held by the Hemani family and Muslims[20], with the inference those beliefs made them dangerous. The Hemanis are practicing Shi'a Muslims. Islam[21], which is practiced by more than 1.91 billion people, or about 24% of the world's population, is the world's second most popular religion. Population researchers predict that Islam will have nearly caught up to Christianity by 2050.[22]

Christianity, Islam, and Judaism are all monotheistic Abrahamic faiths, which trace their spiritual lineage to Abraham.[23] Islam originated with the teachings of Muhammad in the 7th century.[24] Muslims believe Muhammad is the final of many religious prophets and that the Qu'ran, the Islamic scripture, was revealed to him by God. In order to live an Islamic life, believers must follow the five pillars, or tenets, of Islam, which are the testimony of faith (*shahada*), daily prayer (*salah*), giving alms (*zakah*), fasting during Ramadan (*sawm*), and the pilgrimage to Mecca (*hajj*). The two primary branches of Islam are Sunni and Shia, which is based on the centuries old religio-political leadership debate about the rightful successor to Muhammad. There are various denominations within this division.

Both Sunni Muslims and Shi'a Muslims agree the three holiest sites in Islam are the Masjid al-Haram (including the Kaaba), in Mecca, Saudi Arabia; the Al-Masjid an-Nabawi, in Medina, Saudi Arabia; and the Al Aqsa Mosque compound, in Jerusalem. Shi'a Muslims also consider numerous sites across the Middle East holy. These include, among many, the Imam Ali Shrine in Najaf, Iraq; the Imam Husayn Shrine in Karbala, Iraq; and the Imam Reza Shrine[25] in Mashad,

---

[20] He admitted he had limited knowledge on the religion and the Hemani's individual observances.
[21] Counsel is not a religious scholar and this is very short summary to give a general overview.
[22] https://worldpopulationreview.com/country-rankings/religion-by-country; summary as of 2023; data from: United Nations population data, The Association of Religion Data Archives; the CIA World Factbook; and the Pew Research Center.
[23] https://www.pbs.org/wgbh/globalconnections/mideast/themes/religion/index.html
[24] https://www.cia.gov/the-world-factbook/field/religions/
[25] An estimated 25 million Shi'a Muslims visit this shrine annually. https://en.wikipedia.org/wiki/Imam_Reza_shrine

Iran.[26] Travel to these sites (*Ziyarah*[27]), is a religious obligation commonly undertaken by Shi'a Muslims all over the world, including thousands of Americans.

*Eid al-Adha* (the festival of the sacrifice) is the second most important Muslim holiday. In the Islamic lunar calendar, *Eid al-Adha* falls on the tenth day of the *Dhu al-Hajjah*[28] and lasts for four days. In the international (Gregorian) calendar, the dates vary from year to year, shifting approximately 11 days earlier each year[29]. It is recognized and celebrated worldwide[30] by the symbolic slaughter of livestock[31] and distribution of the meat among family, friends, and the poor. In America, it is more common for Muslims to give money to charitable organizations that distribute meat to needy Muslims.[32]

This holiday commemorates Abraham's[33] willingness to sacrifice his son Ishmael[34] [35], trusting and following the commandments of God, as they would never lead to harm. Since both father and son submitted to the will of God, Ishmael was spared and replaced by a ram. Allah says "So pray to your Lord and do sacrifice (to Him alone)."[36] This *willingness* to sacrifice is a major point in all three Abrahamic faiths and lauded as a virtue. It is not literal, despite western misunderstanding (intentional or unintentional).

---

[26] https://en.wikipedia.org/wiki/Holiest_sites_in_Shia_Islam
[27] https://en.wikipedia.org/wiki/Ziyarat
[28] The time of the *hajj* pilgrimage to Mecca. https://yaqeeninstitute.org/read/paper/living-abrahams-legacy-relevance-of-rites-and-rituals-in-the-modern-age#ftnt_ref37
[29] https://en.wikipedia.org/wiki/Eid_al-Adha
[30] See *Eid al-Adha* blessing from Secretary of State Anthony J. Blinken. https://www.state.gov/on-the-occasion-of-eid-al-adha-2/
[31] https://www.usnews.com/news/world/articles/2022-07-09/millions-of-muslims-commemorate-eid-al-adha-amid-high-prices
[32] https://www.timeanddate.com/holidays/us/eid-al-adha
[33] https://www.al-islam.org/stories-prophets/sacrifice-prophet-ibrahim
[34] This story is also in the book of Genesis in the Christian Bible and Jewish Torah, though in those versions the sacrifice is an unknowing Isaac not a willing Ishmael. https://aboutislam.net/reading-islam/understanding-islam/the-story-of-sacrifice-of-abraham-in-the-bible-and-the-quran/
[35] In Islam the names are spelled Ibrahim and Ismail. https://en.wikipedia.org/wiki/Eid_al-Adha
[36] Quran 108:2.

The Government presented a Facebook comment from July 12, 2021 attributed to Mr. Hemani's mother and described it as a literal hope Ms. Hemani has for her sons to be violent martyrs. The key fact left out is that in 2021 *Eid al-Adha* was July 20, placing the start of *Dhu al-Hijjah* about July 10.[37] A time when it is common for observant Muslims to comment on sacrificing for God. They presented comments she made allegedly in support of Iranian officials along with the families travels to show she supports violence. With three years of gathered evidence, all the government can show is a common Facebook comment without context. This along with two pictures out of who-knows-how-many terabytes of evidence they have in their possession is insufficient to say the speaker is "advocating violence against the United States". No evidence has been presented that Ms. Hemani has advocated or promoted violence against the U.S.

### D. Relevance

The discussion of religion and Ms. Hemani's beliefs is completely inappropriate and irrelevant to the issue of Ali Hemani's 18 U.S.C. § 922(g)(3) charge and pretrial detention.

First, Ms. Hemani is a United States citizen with the First Amendment right to worship and voice political support as she chooses. She has not "advocated violence against the United States". The Government has no right to demand any explanation for her protected speech.[38]

More importantly, even if, *arguendo*, a connection to violence could be made to her, the Government would still lack any evidence to tie those beliefs to her son. They have not shown even a scintilla of evidence that Mr. Hemani harbors any violent beliefs or intentions.[39] They have shown no evidence that he has ever plotted, planned, attempted, or committed any violent act.

---

[37] For comparison, this is akin to claiming that someone speaking about the sacrifice of Christ, during Lent, is calling for literal Christian martyrdom. *See* "For God so loved the world that He gave His only begotten Son, that whosoever believeth in Him should not perish, but have everlasting life." John 3:16; and "God presented Christ as a sacrifice of atonement, through the shedding of his blood—to be received by faith." Romans 3:25.

[38] Though she has repeatedly been questioned by Agents and cooperated.

[39] Which would then be possibly protected by his First Amendment rights.

This is insinuation and fear-mongering, not clear and convincing evidence that there are no conditions that will reasonably ensure the safety of the community. They have not met their burden.

### E. Other Factors

At the first appearance Mr. Hemani's father attempted to speak to him. Security escorted him out. He did not make a scene. Like many parents that we see everyday, he was a bit emotional seeing his son in such a precarious and unfamiliar situation. As evidenced by his presence at the next hearing, it is not an ongoing problem.

Mr. Hemani was employed before his arrest. He lives in his parents' modest home. He qualified for the appointment of a public defender. This is not "having the means to flee".

Having family living in the Middle East and previous foreign travel are not indicative of a "serious risk of flight".

The combination of no criminal history and a mother with religious or political beliefs does not make someone a "perfect fit for criminal activity".

Being Muslim is not indicative of being a serious flight risk or a danger.

He openly discussed his previous drug use history multiple times with Agents, and a U.S. Probation officer. Any omissions were unintentional and not to evade or deceive.

Mr. Hemani has been free for about five months between the Government's discovery of this alleged offense and his arrest. None of his circumstance have changed in that time and there have not been any indicators of flight or dangerousness.

This does not amount to a preponderance of the evidence that he is a serious flight risk. 18 U.S.C. § 3142 (f)(2)(A). Nor do they amount to clear and convincing evidence that there is "no

condition or combination of conditions will reasonably assure his appearance as required and the safety of any other person and the community". 18 U.S.C. § 3142(e)(1).

### III. Conditions

By statute, a defendant cannot be detained unless a record finding is made that no release conditions can reasonably assure the safety of the community and the defendant's appearance in court. § 3142(e). Here, the government has not met its high burden of proving by clear and convincing evidence that there are no release conditions that will reasonably assure the safety of the community. The government also has not proved by a preponderance of the evidence that Mr. Hemani is a serious flight risk. § 3142(f)(2). Thus, the Defendant should be released and subject to the least restrictive conditions possible. § 3142(c)(1)(B).

The proposed following conditions of release under § 3142(c)(1)(B), will reasonably assure his appearance in court and the safety of the community.

- Reside in the custody of third-party custodian who agrees to assume supervision and to report any violation of a release condition to the court.
- Maintain or actively seek employmen.t
- Turn over both passports to care of the court.
- Follow any restrictions on personal associations, place of abode, or travel.
- Report on a regular basis to PTS for regular drug testing.
- Refrain from possessing a firearm, destructive device, or other dangerous weapon.
- Refrain from use of alcohol.
- Refrain from any use of a narcotic drug or other controlled substance without a prescription.
- Abide by any other condition that the court deems is reasonably necessary to assure the appearance of the person as required and the safety of any other person and the community.

### IV. Conclusion

For these reasons, as there is not enough evidence to support a finding by clear and convincing evidence that Mr. Hemani is a serious flight risk. Nor is there enough evidence to support a finding by a preponderance of the evidence that not that there is no combination of

conditions that will reasonably ensure the safety of the community. Therefore, Defendant, Ali Hemani respectfully requests that this Court release him pending trial with conditions.

                                      Respectfully submitted,

                                      /s/ Brian O'Shea
                                      BRIAN O'SHEA
                                      Assistant Federal Public Defender
                                      Eastern District of Texas
                                      7460 Warren Pkwy., Suite 270
                                      Frisco, TX 75034
                                      (469)362-8506
                                      Brian_O'Shea@fd.org

                                      *Attorney for Defendant*

## CERTIFICATE OF CONFERENCE

    As supported in the Government's BRIEF IN SUPPORT OF PRETRIAL DETENTION, the Government is opposed to this motion.

## CERTIFICATE OF SERVICE

    I hereby certify that on the  2nd day of March, 2023, a true and correct copy of the foregoing Defendant's MOTION FOR PRETRIAL RELEASE was sent by CM/ECF to:

Heather Rattan
Assistant U.S. Attorney
101 E. Park Blvd., Suite 500
Plano, Texas 75074

                                      /s/ Brian O'Shea
                                      *Attorney for Defendant*