THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

* * * * *

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | 4:23-CR-018-ALM-KPJ-1 |
| | * | Plano, Texas |
| VS. | * | |
| | * | 3:16 p.m. - 4:10 p.m. |
| ALI DANIAL HEMANI | * | February 16, 2023 |

* * * * *

**DETENTION HEARING**

BEFORE THE HONORABLE KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE

* * * * *

Proceedings recorded by electronic sound recording
Transcript produced by transcription service

*GLR TRANSCRIBERS*
9251 Lynne Circle
Orange, Texas 77630 * 409-330-1610

2

1  **APPEARANCES:**

2  For the Government:

3      MS. HEATHER H. RATTAN *(Plano Office)*
       MS. MAUREEN E. SMITH *(Sherman Office)*
4      **U.S. Attorney's Office**
       101 East Park Blvd
5      Suite 500
       Plano, TX 75074
6
   For the Defendant:
7
       MR. BRIAN G. O'SHEA *(Frisco Office)*
8      MR. MICHAEL J. PANNITTO *(Sherman Office)*
       **Federal Public Defender's Office**
9      7460 Warren Parkway
       Suite 270
10     Frisco, Texas 75034

11 Deputy Clerk:

12     MARIA COX

13

14

15                      **WITNESS INDEX**

16 GOVERNMENT'S EVIDENCE:

17     Task Force Officer Jason Hollingshead

18          Direct Examination by Ms. Rattan....... 5

19          Cross-Examination by Mr. O'Shea........ 28

20          Redirect Examination by Ms. Rattan..... 43

21          Recross-Examination by Mr. O'Shea...... 45

22

23

24

25

```
 1              P R O C E E D I N G S

 2          3:16 P.M. - FEBRUARY 16, 2023

 3          THE COURT:  Court calls Case No. 4:23-CR-18,

 4   United States vs. Ali Danial Hemani.

 5          MS. RATTAN:  Heather Rattan and Maureen Smith

 6   for the United States, Your Honor.

 7          MR. O'SHEA:  Brian O'Shea for Mr. Hemani.

 8   Your Honor, do you mind if Ms. [u/i] sits with us at

 9   the counsel table?

10          THE COURT:  If who?

11          MR. O'SHEA:  [Sarah].

12          THE COURT:  Oh, no, that's fine.

13              Good afternoon.

14              Sir, please raise your right hand to be

15   sworn.

16          DEPUTY CLERK:  Do you solemnly swear that the

17   testimony you are about to give in the case now before

18   the Court shall be the truth, the whole truth, and

19   nothing but the truth, so help you God?

20          DEFENDANT HEMANI:  Yes.

21          THE COURT:  All right, we're here today for

22   your detention hearing.

23              Are both counsel ready to proceed?

24          MS. RATTAN:  Yes, Your Honor, the United

25   States is ready.
```

 1          MR. O'SHEA:  Your Honor, we're ready.  I don't

 2  have a copy of the Pretrial Report.

 3          THE COURT:  Okay, we'll get you a copy.  Have

 4  you not seen it?

 5          MR. O'SHEA:  No, Your Honor.

 6          MS. RATTAN:  We have an extra.

 7          THE COURT:  Okay.

 8          MR. O'SHEA:  I have it now, Judge.

 9          THE COURT:  Okay.

10          MR. O'SHEA:  We're ready.

11          THE COURT:  All right.  Mr. O'Shea, if you

12  will just let -- you and your client review it and let

13  me know if  you have any requested modifications to

14  information that's contained in the report.

15          Ms. Rattan, do you have any modifications

16  you'd like to make to the report?

17          MS. RATTAN:  We've reviewed it and we'll

18  highlight during the officer's testimony any issues

19  that we have.

20          THE COURT:  Okay.

21          MS. RATTAN:  Thank you.

22          THE COURT:  All right, thank you.

23          Mr. O'Shea, you may have a seat at counsel

24  table with your client at this time.

25          Ms. Rattan, you may call your witness.

TFO Jason Hollingshead - Direct by Ms. Rattan                    5

```
 1              MS. RATTAN:  Thank you, Your Honor.
 2                   The United States calls Officer Jason
 3  Hollingshead.
 4          DEPUTY CLERK:  Do you solemnly swear that the
 5  testimony you are about to give in the case now before
 6  the Court shall be the truth, the whole truth, and
 7  nothing but the truth, so help you God?
 8          THE WITNESS:  I do.
 9          DEPUTY CLERK:  Please state your hand and
10  spell it.
11          THE WITNESS:  Good afternoon.  My name is
12  Jason Hollingshead, J-a-s-o-n H-o-l-l-i-n-g-s-h-e-a-d.
13          THE COURT:  You may proceed.
14          MS. RATTAN:  Thank you, Your Honor.
15      TFO JASON HOLLINGSHEAD, Called by the Government
16                  DIRECT EXAMINATION
17  BY MS. RATTAN:
18  Q.  Officer Hollingshead, will you describe for the
19  Court where you work.
20  A.  Yes, ma'am.  I'm a detective with the Denton, Texas
21  Police Department, currently assigned as a Task Force
22  Officer of the FBI in Dallas.
23  Q.  And how long have you been a police officer?
24  A.  16 years.
25  Q.  And how long have you been assigned with the FBI as
```

1  a Task Force Officer?

2  A.   Since November of 2019.

3  Q.   Let me direct your attention to this defendant, Ali

4  Hemani.   Are you familiar with this defendant and with

5  this case?

6  A.   Yes, ma'am.

7  Q.   Now, you weren't one of the lead investigators or

8  the lead investigator, but, of course, you have

9  familiarity with the defendant and the facts supporting

10  the case; is that correct?

11  A.   That's correct.

12  Q.   Now, the defendant is charged by Indictment with

13  being a user in possession of a firearm; is that

14  correct?

15  A.   Yes.

16  Q.   But we've moved for detention because there's a

17  concern that the defendant is a serious flight risk.

18  Then there's also concerns about him being a danger to

19  the community; is that right?

20  A.   That's correct.

21  Q.   Now, of course, we've also moved because he, in

22  fact, did possess the firearm that he's charged with;

23  right?

24  A.   Yes.

25  Q.   So three different grounds.

1              Before we focus on the evidence supporting the

2   Indictment, let's talk about the defendant and focus on

3   the defendant, who he is, and what his day-to-day life

4   is.

5              How old is the defendant?

6   A.   I believe he's 25 years old.

7   Q.   So he's 25 years old.  And can you describe for the

8   Court where he lives?

9   A.   Yes.  He lives in Lewisville, Texas with his mother

10  and his father.

11  Q.   So the three of them live there -- the defendant,

12  his mother and his father -- in the house in

13  Lewisville, Texas?

14  A.   Correct.

15  Q.   Has he ever been married?

16  A.   Not that I'm aware of.

17  Q.   Does he have any significant relationships that

18  you're aware of outside that home?

19  A.   None that I'm aware of.

20  Q.   So it's the defendant, his mother and father

21  living together in a home in Lewisville.  How long,

22  approximately, have they lived there in that house?

23  A.   I don't recall.

24  Q.   Would it be since around 2016?

25  A.   Yeah, I believe my initial response is around five

1  years, but I'm not certain on that.

2  Q.   Okay.  Now, you've said it's the three of them

3  living in the house.  Does he also have a brother?

4  A.   He does.

5  Q.   Who is his brother?

6  A.   His name is Mohammad.

7  Q.   Mohammad Hemani, same last name; is that right,

8  Hemani?

9  A.   Yes, ma'am.

10  Q.   And did his brother previously live there in the

11  house with the defendant, Ali, and the two parents?

12  A.   He did.

13  Q.   At some point did the brother leave this home with

14  the other family members?

15  A.   Yes.

16  Q.   Around when was that?

17  A.   I believe it was in 2018 or 2019 he moved.

18  Q.   And can you describe for Judge Johnson where the

19  defendant's brother, Mohammad Hemani, moved?  Where is

20  he now?

21  A.   He now resides in Iran.

22  Q.   And when you say he resides in Iran, does the FBI

23  have information about what the defendant's brother,

24  Mohammad Hemani, does there in Iran?

25  A.   Yes, ma'am.

TFO Jason Hollingshead - Direct by Ms. Rattan                    9

1  Q.   And what is that?

2  A.   It's my understanding he moved to Iran to attend an

3  Islamic University.

4  Q.   Now, the Islamic University that he was attending

5  when he moved to Iran, are there special concerns about

6  that specific university?  And if there are, would you

7  explain and describe them to Judge Johnson?

8  A.   Yes.  My understanding is that specific Islamic

9  University has been designated as having ties to

10 terrorism.

11 Q.   And has that been specifically designated by the

12 United States Government as being a university that's

13 identified as being associated with terrorism and

14 terrorists?

15 A.   Yes, ma'am.

16 Q.   And that's where his brother, Mohammad, attends or

17 has attended; is that right?

18 A.   That's my understanding.

19 Q.   Now, do you know how close or how frequently the

20 defendant is in contact with his brother, Mohammad,

21 there in Iran?

22 A.   Yes.  He told interviewing agents that he contacted

23 him weekly.

24      MS. RATTAN:  And, Your Honor, may the record

25 reflect that on page 2 of the Pretrial Services Report

1  the defendant does acknowledge that his brother,

2  Mohammad, resides in Iran and that he maintains weekly

3  contact with his brother?

4          THE COURT:  Yes.

5  BY MS. RATTAN:

6  Q.  So that's his brother.

7          Now, let me direct your attention to other

8  members of the family, and that's his mother and his

9  father who he lives with.  Are you familiar with who

10  his father is?

11  A.  Not particularly.

12  Q.  All right, is his father named Nadim Hemani?

13  A.  Yes.

14  Q.  And the defendant had an initial appearance before

15  Judge Johnson on these charges earlier in the week; is

16  that right?

17  A.  That's correct.

18  Q.  Is it your information that, in fact, the

19  defendant's mother and father came to this courtroom on

20  the day the defendant had an initial appearance before

21  Judge Johnson?

22  A.  Yes.

23  Q.  And were there concerns raised about the

24  defendant's father's behavior in this courtroom?

25  A.  Yes.

1   Q.   Will you describe for Judge Johnson what happened?

2   A.   Yes.  I know that courtroom security addressed his

3   mother and father and gave them specific instructions

4   that they were not to communicate with Mr. Hemani, not

5   to approach him, and almost immediately Mr. Hemani got

6   up and attempted to approach his son and had to be

7   escorted, along with his wife, from the courtroom.  And

8   his father was not permitted to return to the courtroom

9   because he wouldn't comply.

10  Q.   So, in direct contradiction to what the defendant's

11  father was told by courtroom security, he violated what

12  they requested; is that your understanding?

13  A.   Yes, ma'am.

14  Q.   And then was excluded from the courtroom?

15  A.   Correct.

16  Q.   So let me talk to you about the defendant's mother

17  now.  The defendant's mother is Sameena Hemani; is that

18  correct?

19  A.   That's correct.

20  Q.   So, do you have information about the defendant's

21  mother and her association with concerning

22  organizations?

23  A.   Yes.

24  Q.   Would you give the Court an overview of that?

25  What do you mean?  What is his mother involved in?

1    A.   There are several instances where his mother has

2    been identified on open source materials or social

3    media accounts making statements about wishing that her

4    sons were to become martyrs?

5    Q.   And did you bring specific information or evidence

6    about the defendant's mother's behavior and what she

7    said about her hopes for her sons, Mohammad and Ali?

8    Did you bring that to court today to show to Judge

9    Johnson?

10   A.   Yes.

11        MS. RATTAN:   Your Honor, we have a PowerPoint

12   presentation and we'd like to show the Court a video at

13   this point.

14        THE COURT:   Do you have any objection?

15        MR. O'SHEA:   No objection, Your Honor.

16        THE COURT:   All right.   You may play it.

17   BY MS. RATTAN:

18   Q.   Now, before we show the video, would you kind of

19   set the stage for the Court?   What are we getting ready

20   to see?

21   A.   The first video that you'll view is obtained from

22   open source and it is a clip from Iranian television to

23   be an interview of Sameena Hemani by a news

24   organization in Iran.

25   Q.   So it's sort of a "man on the street" interview?

```
 1  A.   Correct.
 2  Q.   And she stops and gives an interview to somebody on
 3  the street and then it's recorded and it can be found
 4  easily on the Internet?
 5  A.   Yes.
 6  Q.   And there are pictures of people behind her.  Can
 7  you describe that for the Court?
 8  A.   Yes.  So she appears to be standing in a courtyard
 9  and behind her are large banners and photos depicting
10  General Quasem Soleimani.
11  Q.   Okay.
12       MS. RATTAN:  So, with the Court's permission,
13  may we play the video, Your Honor?
14       THE COURT:  Yes.
15       MS. RATTAN:  It's two minutes and 19 seconds.
16       [Pause - Video playing]
17          For the record, the video is now playing.
18  There is sound associated with the video, but the sound
19  isn't playing.  May we proceed, Your Honor?
20       THE COURT:  Yes.
21  BY MS. RATTAN:
22  Q.   Officer Hollingshead, this video, as you described,
23  it's kind of a "man on the street" interview.  And is
24  that the defendant's mother speaking?
25  A.   Yes.
```

1    Q.   Okay.  And she's speaking in Farsi; is that right?

2    A.   That's correct.

3    Q.   And the length of the interview is about two

4    minutes and 19 seconds.  And then there behind her head

5    is a large billboard of multiple figures; is that right?

6    A.   Correct.

7    Q.   Now, as we look at the video now, to her left, the

8    largest head and the largest figure, is that Quasem

9    Soleimani?

10   A.   Yes.

11   Q.   So let's back up for a minute and put this video in

12   a time frame.  When was this video created?

13   A.   I believe it was in February of 2020.

14   Q.   Okay.  So February of 2020 the defendant's mother

15   is in public in front of a very large banner of Quasem

16   Soleimani and she's making statements.  So let's talk

17   about who Quasem Soleimani is.  Will you describe who

18   that is?

19   A.   Certainly.  Quasem Soleimani was regarded as, I

20   guess, the number two in command in the country of

21   Iran.  He was the commander of the branch of the

22   Iranian military that dealt with extraterritorial and

23   covert operations.  He was also claimed to be

24   responsible for the creation of weapons of mass

25   destruction.

1   Q.   And it's February at this point that she's making

2   this interview or making this video of 2020.  Was there

3   a significant event that occurred just one month prior

4   on January 3rd of 2020 in relation to Quasem Soleimani,

5   who was the number two in command and oversaw

6   clandestine operations in Iran?  What had happened?

7   A.   Yes.  General Soleimani had been killed in a drone

8   strike on January 3rd of that year.

9   Q.   Okay.  So, in a U.S. drone strike on January 3rd of

10  2020, Soleimani -- you called him General Soleimani --

11  he received the title of general posthumously after

12  death; is that right?

13  A.   Correct.

14  Q.   And that was an honor to him?

15  A.   Correct.

16  Q.   Was he considered a martyr in Iran by that

17  community?

18  A.   He was.

19  Q.   Because he had been killed in a drone strike by the

20  United States; is that correct?

21  A.   That's correct.

22  Q.   Now, had the Hemanis -- had the Hemani family, in

23  response and in mourning to the death of Soleimani,

24  traveled to Iran?

25  A.   Yes.

1   Q.   And describe what happened once they traveled to

2   Iran.  Is that when this video was made?

3   A.   Correct.  There was a funeral for Mr. Soleimani and

4   also then a very widely attended celebration of his

5   life, for lack of a better term, around that time, and

6   it appears that the family had traveled there to

7   participate in that.

8   Q.   Okay.  And you say the family.  Who were you

9   talking about?

10  A.   I'm talking about Ali Hemani, his mother and his

11  father.

12  Q.   Okay.  So they had all three traveled to Iran and

13  were involved, apparently, in the recognition of the

14  martyrdom of General Soleimani, who was killed by a

15  United States drone strike?

16  A.   Correct.

17  Q.   Now, she's speaking in this interview in Farsi; is

18  that right?

19  A.   That's right.

20  Q.   Has the FBI done a summary translation of what

21  she's saying in this interview?

22  A.   Yes.

23  Q.   Can you describe or tell Judge Johnson what the

24  defendant's mother, who's traveled along with the

25  defendant to Iran to mourn the death of this General

1  Soleimani, what does she say on this video?

2  A.   I can quote from the summary of that, what that

3  states on this day.  She's visiting the mausoleum of

4  General Quasem Soleimani because she had been saddened

5  by Soleimani's martyrdom.  She wants to pray that her

6  son also becomes a martyr like Soleimani.  She says the

7  blood of a martyr is never in vain and the fruits of it

8  soon become evident.  She compares Iran with the United

9  States and says Iran is an excellent country and she

10  would live there if it were up to her because Iran is

11  governed by Islamic rule, which is divine.  In

12  contrast, America is governed by arrogants.  When the

13  interviewer asked her what she prayed for at

14  Soleimani's shrine, she said she prayed that her two

15  sons become like Soleimani.

16  Q.   So, when you see this, the defendant's mother

17  saying she wants her son to become a martyr and that

18  she's praying that her two sons become like Soleimani,

19  does that give you concern that our community might be

20  in danger?

21  A.   Absolutely.

22  Q.   And why is that?

23  A.   I believe Ali Hemani, living under the influence

24  of his mother day in and day out in the home with her,

25  falling under that influence, and her greatest desire

1    is for him, along with her other son, to become a

2    martyr, someone engaged in the death of innocent lives

3    and the creation of weapons of mass destruction, it's

4    very concerning.

5    Q.   Also, within the Iranian community, after Soleimani

6    was killed in this drone strike, were there calls for

7    revenge?

8    A.   Yes, the individual who replaced Soleimani in that

9    position stated that there would be revenge for his

10   death.

11   Q.   Now, you've testified that it wasn't just the

12   mother who traveled to Iran after General Soleimani

13   was killed; that also, this defendant, Ali Hemani,

14   traveled; is that right?

15   A.   That's correct.

16   Q.   And would that have been him traveling in February

17   of 2020, along with his mother and his father?

18   A.   Yes.

19          MS. RATTAN:  Your Honor, may the record

20   reflect and may I bring the Court's attention to the

21   top of page 3 on the defendant's Bond Report?  The

22   United States Probation Officer asked the defendant

23   about his international travel and he reports traveling

24   in July of '19 to Saudi is what it says.  And then the

25   next travel he reports is to Iraq in August of 2021.

```
 1              So, between those two travels, he traveled
 2    to Iran in February of 2020, and that's the event that
 3    the officer has just testified to.  And this specific
 4    travel that the officer has just testified to, the
 5    defendant did not mention and left out of the travel
 6    history that he provided to this Court.
 7              THE COURT:  Thank you.
 8    BY MS. RATTAN:
 9    Q.  Now, if we can look back on the PowerPoint
10    presentation, there are a couple of slides that just
11    show a pull from the video, and we've just shown the
12    defendant's mother and the fact that the image of
13    Soleimani is directly behind her.
14              If we can go to the next page.  So that's her
15    directly in front of Soleimani's image, saying that she
16    wants her sons to be martyrs and wants her sons to be
17    like Soleimani?
18    A.  Correct.
19    Q.  And if we can go to the next page.  Can you
20    describe for the Court what this is?  Is it a Facebook
21    information from the defendant's mother's Facebook
22    account?
23    A.  Yes, this is a summary report from the FBI
24    describing an agent's investigation and how he observed
25    this post on Sameena's Facebook account.
```

1  Q.   So the video was made, in the shadow of Soleimani's

2  death, of the defendant's mother.  And we're going

3  forward now over a year to July 12th of 2021.  Does she

4  still seem to have those same interests and passions?

5  A.   Yes, it seems she's continuing to echo the same

6  sentiments that she expressed on television a year

7  prior.

8  Q.   And what is this posting?

9  A.   This was a post that was also in Farsi, but

10  general translation is that she wishes Muslims would

11  sacrifice their own sons, like Ismail, while following

12  the [Sunnah Ibrahimi], and Allah would have given them

13  the blessing of leadership of religion and the world

14  and the emergence of Imam [u.i.].

15  Q.   And so do you take that as her having the same

16  sentiments that she would like for her sons, Mohammad

17  and Ali, to be martyrs, as Soleimani was?

18  A.   Yes, it seems she's continuing that same line of

19  thinking.

20  Q.   Okay.  And then after that, let's look at another

21  piece of information from the defendant's mother's

22  Facebook.  Can you describe what this is?

23  A.   Yes, I believe this is from around 2020, but this

24  is a profile from Sameena Hemani's Facebook.  It

25  appears to depict Sameena Hemani, along with her

1  brother and her brother's wife, there in Iran.
2  Q.   Okay.  So the defendant's aunt and uncle and
3  mother.  And this is his mother's Facebook profile
4  picture; is that right?
5  A.   Yes.
6  Q.   And then what do you have in the background there,
7  if you can just describe it?
8  A.   Right.  In the background they are standing in
9  front of additional banners depicting Soleimani.
10  Q.   Okay.  So, in terms of the defendant's
11  international contacts, you know that he's traveled
12  internationally and he has his brother living in Iran,
13  Mohammad.
14  A.   Yes.
15  Q.   And he has continual contact with his brother.
16  And then we've just seen a picture of his aunt and
17  uncle on the Facebook with his mother.  So tell us
18  about his aunt and uncle.  Are those additional
19  international contacts that the defendant has?
20  A.   Yes.  My understanding is that his aunt and uncle
21  both reside in Iran.
22  Q.   Now, along with being a citizen of the United
23  States, does this defendant have dual citizenship?
24  A.   He does.
25  Q.   And what is that?

```
 1  A.   He has dual citizenship between the United States
 2  and Pakistan.
 3  Q.   When the defendant and his family have traveled,
 4  has the FBI noticed, observed, concerning things that
 5  they've done while traveling?
 6  A.   Yes.
 7  Q.   Will you describe that for Judge Johnson?
 8  A.   Certainly.  So I know that there was --
 9  investigators have noted some trade craft practices.
10  Appears to be avoiding or attempting to avoid detection
11  or suspicion.  There was communication between Ali
12  Hemani and family members with instructions from Ali
13  stating that he was going to use his relatives to check
14  his bags, so that way he didn't have to loiter in the
15  bags claim area and would be looked at less intent, I
16  suppose, less detection, less suspicion.
17  Q.   And he indicated he felt he would be less likely to
18  be questioned; is that right?
19  A.   That's correct.
20  Q.   Was there also an event related to travel here in
21  the state of Texas that was unusual and concerning?
22  A.   Yes.
23  Q.   Will you describe that?
24  A.   This is at a time where Ali's brother, Mohammad,
25  and Mohammad's wife and children were at the house
```

1   there in Lewisville with the entire Hemani family.  And

2   one night, approximately 10:00 or 10:30, the entire

3   family, kids and all, loaded up, packed into a vehicle,

4   and they drove straight from the residence in

5   Lewisville to Houston at high rates of speed, driving

6   crazy, for lack of a better term.

7           They arrived in Houston, drive around for a

8   couple of hours, drop Ali off, and then the entire

9   family drives immediately straight back to Lewisville.

10  Along the way, they are making evasive maneuvers,

11  exiting, turning around, tactics that we commonly see

12  as surveillance detection techniques, trying to see if

13  they're followed.

14          The very next day, Ali Hemani takes a bus back

15  from Houston to the residence in Lewisville.

16  Q.   Back to Lewisville?

17  A.   Yes.

18  Q.   So about 10:30 p.m., seven people, family members,

19  load into a car and drive high rates of speed to

20  Houston?

21  A.   Right.

22  Q.   And then six of them come immediately back, doing

23  evasive maneuvers, leaving Ali there; is that right?

24  A.   That's correct.

25  Q.   And then Ali comes back the next day?

```
 1   A.   Yes.
 2   Q.   So all of the things, the defendant's international
 3   travel, the cryptic behaviors that you've just
 4   described, the concerning behaviors as you've just
 5   described, his contacts internationally, his brother,
 6   his aunt, his uncle, does that give you and the FBI
 7   concern that he's a serious flight risk?
 8   A.   Yes.
 9   Q.   Now, let's focus on this offense and the facts that
10   support the Indictment.  Can you give the Court an
11   overview of what they are?
12   A.   I'm sorry, could you rephrase the question?
13   Q.   Yes.  His possession of the firearm and being a
14   user of drugs.
15   A.   Yes.
16   Q.   Describe that for us.
17   A.   Right.  So Ali has been identified as a user and
18   also a distributor of illegal drugs, namely marijuana,
19   cocaine, and promethazine.  And he was also found to be
20   in possession of a firearm during the execution of a
21   search warrant at his residence.
22   Q.   So has his phone been reviewed to determine whether
23   he does have links to drugs, as you've described?
24   A.   Yes.
25   Q.   And he does?
```

1  A.   He does.

2  Q.   Specifically, the phone showed that he was involved

3  with promethazine; is that correct?

4  A.   Correct.  One entry from the phone, he's

5  communicating with an individual and he's looking

6  individuals that he can distribute or sell this

7  promethazine to.

8  Q.   And he says he uses it, too, he really likes it,

9  and it's addictive; is that right?

10 A.   Yes.

11 Q.   So then when a search warrant is executed on the

12 family home, what's found there?

13 A.   Well, along with the firearm, they found I believe

14 it was approximately 60 grams of marijuana.  They found

15 a usable quantity of cocaine.  I believe it was about a

16 gram of cocaine, but with packaging about four and a

17 half grams.

18         MS. RATTAN:  And, Your Honor, may the record

19 reflect that we've filed a brief in support of the

20 defendant's detention.

21         THE COURT:  Yes.

22         MS. RATTAN:  And in the brief I said 47 grams.

23 It should be 4.7 grams.  And that's what the officer is

24 describing.

25         THE COURT:  And that's with the cocaine?

TFO Jason Hollingshead - Direct by Ms. Rattan                    26

1          MS. RATTAN:  Yes, Your Honor.

2          THE COURT:  Thank you.

3   BY MS. RATTAN:

4   Q.   So the search warrant found cocaine and marijuana

5   and a firearm?

6   A.   Yes.

7   Q.   Can you describe the firearm?

8   A.   I believe it was a Glock.  I don't know the model

9   number, but I believe it was chambered .9 millimeter.

10          MS. RATTAN:  And then, Your Honor, may the

11   record reflect that in the defendant's Bond Report, on

12   page 4, the defendant reports about the middle of the

13   page to the United States Probation Officer, when he's

14   asked about his drug abuse, that he uses alcohol and

15   cocaine, and that he last used each of those about one

16   year ago.

17          THE COURT:  Okay.

18   BY MS. RATTAN:

19   Q.   Now, the information that law enforcement has,

20   that the FBI has, is that he also uses marijuana?

21   A.   Yes.

22   Q.   In fact, in an interview with the FBI, did he say

23   he used marijuana?

24   A.   He did.

25   Q.   And was there marijuana seized from the family

1  home?

2  A.   Yes.   Are you talking about during the search

3  warrant?

4  Q.   Yes.

5  A.   Yes, that's correct.

6  Q.   And when the FBI interviewed him about his use of

7  marijuana, did he say he uses it about every other day?

8  A.   Yes.

9  Q.   But he doesn't report anything about marijuana to

10  the United States Probation Officer when he's asked; is

11  that your understanding?

12  A.   That's my understanding.

13  Q.   And then you also in your testimony talked about

14  him abusing and trying to sell promethazine.   And he

15  doesn't mention anything, according to your

16  understanding.   I know you haven't reviewed the Bond

17  Report.   But he doesn't mention to the Probation

18  Officer about abusing or using promethazine; is that

19  right?

20  A.   That's my understanding.

21  Q.   So let me ask you a couple of questions about the

22  gun.   Was the gun surrendered to the FBI by the

23  defendant?   He gave it up?

24  A.   Yes.

25  Q.   Okay.   And was, in fact, that gun registered to the

1   defendant?

2   A.   It was.

3   Q.   So, based on this evidence, the evidence that

4   supports the Indictment, but also all the other factors

5   and family surrounding the defendant, again, do you

6   believe that he's a serious flight risk to flee from

7   justice in this case and do you believe that he's a

8   danger or concern to the community?

9   A.   I do to both.

10   Q.   Okay.

11          MS. RATTAN:  Your Honor, I'll pass the witness.

12          THE COURT:  All right.  Cross-examination?

13                    **CROSS-EXAMINATION**

14   **BY MR. O'SHEA:**

15   Q.   Do you go by Detective or Agent?

16   A.   Detective is fine.

17   Q.   And I know I would botch your name here, so let me

18   get organized here and make sure I'm not calling you

19   something you're not.  Is it -- how do you say it?

20   A.   It's Hollingshead.

21   Q.   Holling --

22   A.   Hollingshead.

23   Q.   -- ton?

24   A.   Hollingshead.

25   Q.   Okay.  All right.

```
 1  A.   If you get close, I'll answer to it.
 2  Q.   Okay.  Let me start by asking you, how long have
 3  you been -- well, how long has law enforcement been
 4  watching the Hemani family?
 5  A.   I don't know the answer to that.  I know about the
 6  involvement in 2021, but I don't have information about
 7  how far back that goes.
 8  Q.   Were you aware that their house was searched in
 9  August of 2020?
10  A.   I'm not familiar with August of 2020.
11  Q.   Okay.  Have you ever heard of a gentleman named
12  Muzamil Zaidi?
13  A.   No, sir, I don't know who that is.
14  Q.   Okay.  Well, so you don't know that he was -- or
15  Ali and his family, his house was searched on August
16  2020 before the August 22nd -- 2022 search?
17  A.   I'm aware of the August of 2022.  I don't know
18  about the August of 2020 incident.
19  Q.   So would you have any disagreement if I told you
20  that the family was -- the house was searched in August
21  of 2020 and the entire family was interrogated that day?
22  A.   I have no knowledge of that, so --
23  Q.   Okay.  Were you involved in the search in August of
24  2022?
25  A.   No, sir.
```

1  Q.   Have you seen any paperwork regarding that?

2  A.   No, sir.

3  Q.   Well, you understand that's when the gun was found?

4  A.   Correct.  I've seen a photograph of the gun, but I

5  haven't seen the search warrant,if that's what --

6  Q.   Okay.  But you know that the family was -- have you

7  seen the inventory of the gun?

8  A.   No, sir.

9  Q.   Okay.  You know that the house was searched in that

10 August 2022.  Are you familiar with that?

11 A.   Yes, sir.

12 Q.   And at that time the family was separated to give

13 statements?

14 A.   Yes, sir.

15 Q.   Okay.  So Ali -- I mean, you referenced some

16 statements that he told you back in August of 2022

17 admitting to marijuana use?

18 A.   No, sir, I'm referring to statements that he gave

19 to arresting agents just within the last few weeks to a

20 month.

21 Q.   Okay.  So he admitted to the marijuana?

22 A.   Yes, sir.

23 Q.   And you wouldn't know whether or not he admitted to

24 the marijuana in 2022?

25 A.   I do not.

```
 1   Q.   Okay, or 2020?
 2   A.   Well, I believe, my understanding of the incident
 3   and the search in August of 2022 is he told agents
 4   where the marijuana was located.  He pointed it out to
 5   them.
 6   Q.   Okay.  So, when he was talking to Pretrial, and
 7   since he had already told law enforcement he used
 8   marijuana, there was really no reason to lie to
 9   Pretrial at this point, would there?
10   A.   I'm not sure what his interview with Pretrial was
11   like.
12   Q.   Okay.  Well, the Government has characterized it
13   as a lie.
14   A.   Okay.
15   Q.   Okay?  So, does it make any sense that he would lie
16   about it since he's already told y'all about it and
17   y'all have found it?
18   A.   I'm not sure why he would say what he said.  It
19   doesn't seem to be truthful.
20   Q.   Okay.  So what about the -- we have the passports
21   here.  And the same thing, the Government has
22   inferred -- in fact, directly inferred -- that he lied
23   about the travel to Iran.  Obviously, you all have
24   pictures; right?
25   A.   Pictures of the report?
```

1  Q.   Pictures of the trip to Iran.

2  A.   We have the video from the report.

3  Q.   Right.  So when is it, to your knowledge, that the

4  Government started watching the Hemani family?

5  A.   I don't have knowledge of the date that --

6  Q.   In a year?  2019?

7  A.   I'm sorry, say it again.

8  Q.   Was it 2019?

9  A.   I don't know, sir.

10         THE COURT:  Mr. O'Shea, please let him finish

11 answering your question before you another question.

12         MR. O'SHEA:  Okay.

13 BY MR. O'SHEA:

14 Q.   Was it 2019?

15 A.   I have no idea when the investigation was

16 initiated.

17 Q.   And you got involved when?

18 A.   A couple of weeks ago when I was briefed on this to

19 prepare for a detention hearing.

20 Q.   And who briefed you?

21 A.   The arresting agent.

22 Q.   Okay.  And you did review some records related to

23 the 2022 search?

24 A.   Yes, sir, I've seen summarized reports.

25 Q.   Did those reports reflect -- the ones that you

1  saw, did they reflect that the Government was able to

2  inventory items from the house?

3  A.   I'm sorry, sir, could you re-ask the question?

4  Q.   Yeah.   The reports that you saw, did they indicate

5  that the Government was able to take items from the

6  Hemani's house?

7  A.   Are you talking about the August of 2022 search

8  warrant?

9  Q.   Yes, sir.   '22, yes.

10  A.   I'm aware of items taken from that search warrant

11  in August in 2022, but I have not seen a full

12  inventory.   So I don't --

13          MR. O'SHEA:   May I approach?

14          THE COURT:   Yes.

15  BY MR. O'SHEA:

16  Q.   Officer, do you recognize what I just handed you as

17  Defendant's Exhibit No. 1?

18  A.   Yes, it's an FD-597.

19  Q.   Okay.   And what does that mean?

20  A.   That is a receipt of property that's usually left

21  with the homeowner when a search warrant is executed.

22  Q.   Okay.   What's the date on that?

23  A.   August 3, 2022.

24  Q.   So what does it signify?

25  A.   This would signify items that were seized during a

 1  search of the residence that's listed here on the

 2  receipt.

 3  Q.   And that was back in August of 2022; right?

 4  A.   Yes, sir.

 5  Q.   And on the first page it looks like -- I mean,

 6  there's a lot of electronics, recorders, hard drives on

 7  the second page; would you agree?

 8       *[Pause]*

 9            Let me just have you take a quick look through

10  the whole thing.

11       *[Pause]*

12  A.   Okay.

13            MR. O'SHEA:  Your Honor, may I approach?  I

14  have a copy to give the Court.

15            THE COURT:  Do what?

16            MR. O'SHEA:  I'll give you one.

17            THE COURT:  Oh, yes, please.  Thank you.

18  BY MR. O'SHEA:

19  Q.   So would you agree that that inventory reflects

20  that there were dozens of electronics and sim [card]

21  devices, there were phones on there?

22  A.   Yes, sir.

23  Q.   And they were taken from the Hemani house that day?

24  A.   Yes, sir.

25  Q.   Now, why would the Government do that?

```
 1              MS. RATTAN:  I object, it's irrelevant.
 2              THE COURT:  Well, I think more than
 3    irrelevant.  He's already testified that he wasn't
 4    involved in the execution of the search.  So I'm not
 5    sure he's qualified to answer that question, unless I'm
 6    misconstruing that testimony.
 7              THE WITNESS:  Your Honor, I can speculate, but
 8    I can't state --
 9              THE COURT:  Yeah, I don't want him to
10    speculate.  So sustained.
11    BY MR. O'SHEA:
12    Q.   Okay.  Have you -- but you've been involved in this
13    investigation since August 3rd; right?
14    A.   Within the last few weeks.
15    Q.   Okay.  Have you looked -- take another look at that
16    inventory.  And with your 16 years of experience in law
17    enforcement, and without speculating, knowing that the
18    FBI has that in their possession, would you think they
19    would be interested in looking through all those
20    electronics?
21              MS. RATTAN:  I'm going to have to object.  It
22    is irrelevant.
23              MR. O'SHEA:  Your Honor, they're trying to
24    impute this woman's -- her ideology onto my client to
25    say he's a terrorist.  They have everything they've
```

1   taken out of that house.  If there's anything that

2   connects her ideology, besides a family trip, I think

3   the Court should be able to know whether or not there's

4   messages back and forth to the --

5           THE COURT:  I don't understand where you're

6   going with the question, but he's not qualified to

7   answer this question because he's already said he

8   wasn't involved in this particular execution of the

9   warrant.  And so his testimony is irrelevant.

10  BY MR. O'SHEA:

11  Q.  Do you have any evidence that my client

12  communicated with his mother and share their beliefs?

13  A.  I do not.

14  Q.  Do you have any evidence that Ali Hemani believes

15  that America is a bad country?

16  A.  Personally, I do not.

17  Q.  Okay.  Ali Hemani, where was he born?

18  A.  I'm not sure.

19  Q.  Okay.  He's a U.S. citizen; correct?

20  A.  Yes.

21  Q.  He went to Creekview High School?  Do you know

22  anything about my client's background?

23  A.  No, sir, not particularly.

24  Q.  Okay.  Do you know what his political views are?

25  A.  I do not.

```
1  Q.   Okay.  So you don't know whether or not he has ill
2  will or ill feelings towards the United States?
3  A.   I do not know that.
4  Q.   You don't know whether he's mad that General
5  Soleimani was blown up in January of 2020?
6  A.   I don't know that, sir.
7  Q.   You don't know if he could care less?
8  A.   I don't know, sir.
9  Q.   Okay.  Have you been able to see anything that was
10 taken off of him, as far as law enforcement, any
11 property or anything?
12 A.   No, sir, I'm not aware of that.
13 Q.   Do you have any understanding of the Muslim
14 religion?
15 A.   Very limited.
16 Q.   Now, you must know that alcohol is prohibited;
17 right?
18 A.   Yes.
19 Q.   We all know that because they didn't want people
20 drinking at the soccer; right?  So my client drinks or
21 has admitted to drinking; right?
22 A.   Yes, sir.
23 Q.   Okay.  That's prohibited by the Muslim religion;
24 right?
25 A.   I believe so.
```

1  Q.   What about smoking marijuana; do you know?

2  A.   I would imagine that's probably prohibited.

3  Q.   Okay.

4  A.   But I don't know for a fact.

5  Q.   The 4.7 grams of cocaine was found in his mother's

6  room; right?

7  A.   That's correct.

8  Q.   Do you know if she was asked about that?

9  A.   I'm not aware of that.

10  Q.   Okay.

11  A.   I know he was.

12  Q.   Is cocaine considered something okay by the Muslim

13  religion, to your knowledge?

14  A.   To my knowledge, probably not, but I don't know.

15  Q.   So in this motion by the Government it says and

16  we've mentioned that he's talked about abusing

17  controlled substances?

18  A.   Yes.

19  Q.   You said on Direct that you had -- you were

20  concerned that he lives with his mother?

21  A.   That's a factor, yes, sir.

22  Q.   Okay.  If he lived with someone else, would that

23  alleviate at least that concern?

24  A.   It would alleviate just the concern of living, but

25  I don't think that's going to alleviate concern about

1   contact with his mother or her ideologies.

2   Q.   But you've already said that you don't know -- you

3   don't have -- there's no evidence whatsoever that he

4   shares her ideology?

5   A.   There's no evidence that I'm aware of.

6   Q.   Okay.  Well, who else would be aware of it?

7   A.   You would have to talk to the case agent about

8   that.  I'm sure there's a lot more information that I

9   don't know.

10  Q.   So there's a statement in here, "I wish Muslims

11  would sacrifice their own sons like Ismail."  Who's

12  Ismail?

13  A.   I don't know for a fact.

14  Q.   So this is a metaphor; right?

15  A.   She uses the word "like."

16  Q.   That would be a simile.

17  A.   Yes, sir.

18  Q.   So a metaphor, she's saying that she would, like

19  Ismail -- the story of Ismail is the story from the

20  Quran; right?  You don't know?

21  A.   I've never read it.

22  Q.   Okay.  You don't know that this is a story of

23  sacrifice that's celebrated once a year in the Muslim

24  community?

25  A.   No, sir, I'm not familiar.

```
 1   Q.   Are you familiar with any religions at all?

 2   A.   Yes.

 3           MS. RATTAN:  That's not relevant.

 4           THE COURT:  Sustained.

 5   BY MR. O'SHEA:

 6   Q.   You know the story of sacrifice is pretty common

 7   throughout most religions; right?

 8   A.   Yes.

 9   Q.   Okay.  And this is the story of father sacrificing

10   his son even though he didn't want to; right?

11           MS. RATTAN:  Relevance, I object.

12           THE COURT:  Well, overruled.  If he knows.  I

13   don't want to --

14   A.   I don't know the story of Ismail.  I've never heard

15   of it referred that way.  I know the story of Abraham

16   and Isaac, if that's what you're trying to --

17   Q.   Okay, well, that's before this one.  That's the

18   other Abraham.  Ibrahim is the father of Ismail, as

19   referenced in the Quran, but that's earlier.

20   A.   I guess I'm not familiar, I'm sorry.

21   Q.   Okay.  This is Ibrahim, who had to sacrifice

22   Ismail, right, for God because Allah told him to, the

23   difference being that Ismail agreed to do it.  The son

24   did.

25           THE COURT:  Mr. O'Shea, he's already told you
```

1  he doesn't know.

2          MR. O'SHEA:  Right, okay.

3  BY MR. O'SHEA:

4  Q.   Did my client ever consent to be sacrificed in the

5  name of Allah, to your knowledge?

6  A.   Not to my knowledge.

7  Q.   Okay.  Has he ever -- has Ali ever agreed to do

8  anything in the name of extremism or terrorism against

9  this country?

10 A.   Nothing that I'm aware of personally.

11 Q.   Okay.  He's charged with possession of a gun?

12 A.   Yes.

13 Q.   And that's not illegal?

14 A.   It is if you're a known drug user.

15 Q.   Well, we filed a motion.  Have you read any recent

16 case law about possession?

17         MS. RATTAN:  Object to relevance.

18         THE COURT:  Sustained.

19 BY MR. O'SHEA:

20 Q.   What is it about -- if he were to turn in his

21 passport and have an ankle monitor or live with

22 somebody else, would some of your concerns be

23 alleviated, or what else would there be?

24 A.   No, sir.

25 Q.   No?

```
 1  A.   No, sir.
 2  Q.   Okay.  Is there anything that would alleviate your
 3  concerns?
 4  A.   Of which concerns specifically, sir?
 5  Q.   What are your concerns?
 6  A.   Well, danger to the community and flight risk.
 7  Q.   Okay.  Is there anything that would alleviate the
 8  fact of him being a danger of a flight risk?  If you
 9  put a monitor on him, took his passport?
10  A.   No, sir.  I've seen those ankle monitors cut off
11  multiple times.
12  Q.   There's no other way you can -- so, if he didn't
13  have the passport to get on a plane?
14  A.   That's assuming that he doesn't have the ability to
15  obtain the passport, be it forged or some other ways,
16  altered to be able to flee.  We've got to do it right
17  once.
18  Q.   And you would think he would do that?
19  A.   I don't know, sir.  It's a possibility.  He's very
20  comfortable and familiar with foreign travel and also
21  with taking steps to avoid detection.
22  Q.   Why would he do that if he loves America?
23           MS. RATTAN:  I object, it calls for
24  speculation.  It's not relevant.
25           THE COURT:  Sustained.
```

```
 1   BY MR. O'SHEA:

 2   Q.   He's had a stable job; right?

 3   A.   I believe he does, yes, sir.

 4   Q.   Makes money?

 5   A.   Yes.

 6   Q.   Owns a car?

 7   A.   Yes, sir.

 8   Q.   Y'all have that car.

 9        Okay.  He went to high school here, his

10   friends are here, his parents are here, his whole life

11   is here.  But the fact of his travel to see his family

12   to those countries, where he has family, that's why you

13   think he should be in jail?

14   A.   That's one factor, a contributing factor.  It's not

15   the entirety of the argument.

16   Q.   You have no evidence that he has any animosity

17   towards the United States?

18   A.   I personally do not have any, no, sir.

19   Q.   Okay, thank you.

20        MR. O'SHEA:  Pass the witness.

21        THE COURT:  Redirect?

22        MS. RATTAN:  May it please the Court.

23                   REDIRECT EXAMINATION

24   BY MS. RATTAN:

25   Q.   In terms of the cocaine that was found during the
```

```
 1  search warrant, you said it was found in the mother's
 2  room; is that right?
 3  A.   Correct.
 4  Q.   Did the defendant, in the interview with the FBI,
 5  claim ownership and say that's his cocaine?
 6  A.   He did.
 7  Q.   Now, defense counsel is asking you about the
 8  defendant Ali Hemani's solidarity with individuals in
 9  Iran and his willingness to be, as his mother
10  describes, a martyr.  In fact, was it the whole
11  family -- the mother, the father, and Ali Hemani -- who
12  traveled after Soleimani's death, within a month of his
13  death, to Iran to participate in the event celebrating
14  his life and his martyrdom?
15  A.   Yes, the entire family.
16  Q.   Okay.  And Ali presumably was employed, took off
17  from his job to go Iran to participate in the events
18  related to Soleimani's death?
19  A.   Correct.
20  Q.   And it was while they were there that his mother
21  was recorded saying that she wanted her sons to be
22  martyred?
23  A.   That's correct.
24  Q.   And his aunt and his uncle and his brother, and we
25  know that his brother is in Iran and has attended a
```

```
 1  university that the United States has designated as
 2  associated with terrorists; is that right?
 3  A.   That's correct.
 4          MS. RATTAN:  I'll pass the witness.
 5          THE COURT:  Any other questions, Mr. O'Shea?
 6          MR. O'SHEA:  Yes, Your Honor.
 7                     RECROSS-EXAMINATION
 8  BY MR. O'SHEA:
 9  Q.   You mentioned that Ali, with his drug use, he was
10  involved in the distribution of drugs.  Can you tell the
11  Court why he wasn't charged with a 21 U.S.C. 841 or
12  846, or do you know?
13          MS. RATTAN:  I object.  It calls for
14  speculation.  It's not relevant.
15          MR. O'SHEA:  That's all I have, Your Honor.
16          THE COURT:  Any other questions, Ms. Rattan?
17          MS. RATTAN:  No, Your Honor.
18          THE COURT:  All right, you may step down.
19          THE WITNESS:  Thank you, Your Honor.
20          THE COURT:  Thank you.
21              Ms. Rattan, do you have any other
22  witnesses?
23          MS. RATTAN:  No, we rest.
24          THE COURT:  All right.  Mr. O'Shea, would you
25  like to call any witnesses?
```

1          MR. O'SHEA:  Your Honor, his parents are here,

2    but under the circumstances, I don't think it would be

3    in their interest if I called them as a custodian.

4    They're willing to be a custodian, but I don't want to

5    put any of their testimony on the record that may

6    jeopardize them in any way with all these

7    investigations going on.

8               So they do have their passports they can

9    turn into the Court.  We can find a custodian, if the

10   Court would allow us to find one, that may be more

11   suitable since the Government does have concerns that

12   he's living under his mother's roof.

13              So, I think if I put either one of them on

14   the stand, the Court would have to probably, from what

15   I've seen, give them attorneys.  So it puts me in a

16   little bind as far as, you know, custodian within a

17   couple of days.  But I would need more time to find a

18   custodian if that would be something the Court would

19   consider.

20        THE COURT:  Do you want to say something,

21   Ms. Rattan?

22        MS. RATTAN:  Yes, Your Honor.  Our concern is

23   not just immediate and ongoing exposure to his mother.

24   The point is he's a 25-year-old man and he's lived for

25   25 years under the influence of what we've seen in this

1   video and this Facebook posting of someone who's very

2   passionate about her sons being martyrs for a cause.

3   So removing him at this point at this age from that

4   influence doesn't seem like it will alleviate the

5   problem or the issue in terms of him being a danger to

6   the community.

7          THE COURT:  I understand that's the

8   Government's position.

9          I think as to the question that you're

10  asking the Court, Mr. O'Shea, I believe that if your

11  client wants to propose a third-party custodian, then

12  he's entitled to do that.  I don't want to tell you I

13  think he should or shouldn't.  I don't disagree with

14  your concerns about putting the mother and/or the

15  father on the witness stand without representation.

16  But if your request is to continue the hearing to

17  either allow you time to do that or to present another

18  third party custodian, then I think you should be able

19  to do that on behalf of your client.

20         MR. O'SHEA:  Well, Your Honor, I don't have a

21  custodian at the moment.  I mean, there's been --

22         THE COURT:  I know you don't.  And so I said

23  I'd be willing to continue the hearing to afford you

24  time to do that if that's what you and your client --

25         MR. O'SHEA:  Right.  I'm not trying to

1  continue the whole hearing, but just for that limited

2  purpose, to reopen and present to the Court and

3  Pretrial a third party custodian.  And if the Court

4  wanted to reconvene and the Government wanted to, you

5  know, do their thing, I would like to have that

6  opportunity.

7          THE COURT:  Okay.  Well, then why don't we

8  continue the hearing.  And I won't reset it today.

9  I'll wait and do a little bit of investigation and

10 conferring with your client and the family.  And then

11 you can notify the Court when you want the Court to

12 reset it, and I will.

13         MR. O'SHEA:  Thank you, Your Honor.

14         THE COURT:  Okay.  Anything further from

15 counsel at this time?

16         MS. RATTAN:  No, Your Honor.

17         MR. O'SHEA:  No, Your Honor.

18         THE COURT:  All right, we'll stand adjourned.

19         *[4:10 p.m. - Proceedings adjourned]*

20

21

22

23

24

25

C E R T I F I C A T I O N

     I certify that the foregoing is a correct
transcript of the electronic sound recording of the
proceedings in the above-entitled matter.


/s/ Gwen Reed
3-5-23

*GLR TRANSCRIBERS*
9251 Lynne Circle
Orange, Texas 77630 * 409-330-1610