# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Crim. No. 4:23-cr-18-ALM-KPJ-1** |
| | § | |
| **ALI DANIAL HEMANI (1),** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

## OPINION AND ORDER
## OF DETENTION PENDING TRIAL

Defendant Ali Danial Hemani ("Defendant") is charged in an Indictment with violating 18 U.S.C. § 922(g)(3) (Possession of a Firearm by a User of a Controlled Substance). The United States moved to detain Defendant pending trial pursuant to 18 U.S.C. § 3142(f)(1),(2). Defendant filed a Motion for Pretrial Release (the "Motion for Pretrial Release") (Dkt. 21), wherein Defendant requests the Court release him pursuant to the Bail Reform Act, 18 U.S.C. § 3142, and *United States v. Salerno*, 481 U.S. 739 (1987). The Government filed a response in opposition (Dkt. 25).[1] Upon consideration, the Court finds the Motion for Pretrial Release (Dkt. 21) is **DENIED**, the Government's Motion for Detention is **GRANTED**, and Defendant should be **DETAINED** pending trial.

---

[1] On February 16, 2023, the Government filed its brief in support of pretrial detention (the "Government's Brief") (Dkt. 14), wherein the Government asserts Defendant is a flight risk and a danger to the community. *See id.* at 1. The Government's Brief (Dkt. 14) asserts the same arguments as the response in opposition (Dkt. 25), with the response providing additional arguments in support of the Government's oral motion for detention, including that Defendant poses a serious risk that he will obstruct or attempt to obstruct justice. *See generally* Dkts. 14, 25.

## I.    LEGAL STANDARD

"The Bail Reform Act provides that a person shall be released pending trial unless a judge finds that 'no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.'" *United States v. Villaurrutia*, 850 F. App'x 330, 331 (5th Cir. 2021) (per curiam) (quoting 18 U.S.C. § 3142(e)). A judicial officer may order a defendant detained pending trial upon satisfying two prerequisites. First, the officer must hold a hearing pursuant to a circumstance listed in 18 U.S.C. § 3142(f). *See United States v. Byrd*, 969 F.2d 106, 109–10 (5th Cir. 1992). Only criminal defendants whose cases involve one or more of the following circumstances may be detained pending trial:

- a crime of violence, a violation of section 1591, or an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed;

- an offense for which the maximum sentence is life imprisonment or death;

- an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. § 801 *et seq.*), the Controlled Substances Import and Export Act (21 U.S.C. § 951 *et seq.*), or chapter 705 of title 46;

- any felony if such person has been convicted of two or more offenses described in subparagraphs (A) through (C) of this paragraph, or two or more state or local offenses that would have been offenses described in subparagraphs (A) through (C) of this paragraph if a circumstance giving rise to federal jurisdiction had existed, or a combination of such offenses;

- any felony that is not otherwise a crime of violence that involves a minor victim or that involves the possession or use of a firearm or destructive, or any other dangerous weapon, or involves a failure to register under 18 U.S.C. § 2250;

- any offense if there is a serious risk that such person will flee; or

- any offense if there is a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.

18 U.S.C. § 3142(f).

Second, after a hearing, the judicial officer must determine whether the United States has shown by a preponderance of the evidence that "no condition or combination of conditions will reasonably assure the appearance of the person," or by clear and convincing evidence that "no condition or combination of conditions will reasonably assure . . . the safety of any other person and the community." 18 U.S.C. § 3142(e)(1), (f)(2). Section 3142(g) provides that a court shall consider the following factors in determining whether a person poses a flight risk or a danger to the community: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence; (3) the defendant's history and characteristics, including, among other things, his family ties, length of residence in the community, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

If, based on the foregoing factors, the judicial officer finds there are no conditions that would "reasonably assure the appearance of the person as required and the safety of any other person and the community," the judicial officer shall order the criminal defendant detained pending trial. 18 U.S.C. § 3142(e); *see also United States v. Okhumale*, 813 F. App'x 936, 939 (5th Cir. 2020) (per curiam) (holding pretrial detention requires "the presence of one of the circumstances outlined in § 3142(f) *and* a determination under § 3142(e) that . . . no conditions imposed could either assure the appearance of the defendant or the safety of the defendant and community" (citing *Byrd*, 969 F.2d at 109–10))).

## II.    PRETRIAL SERVICES REPORT[2]

Defendant advised he was born on July 13, 1997, in McKinney, Texas and is twenty-five years old.[3] Defendant reported he has lived in the Dallas/Fort Worth area his entire life with his parents Nadim Hemani ("Mr. Hemani") and Sameena Hemani ("Ms. Hemani"). Defendant advised he and his parents have lived at their current residence in Lewisville, Texas since April 2016. Defendant reported there are no firearms in his residence.

Defendant advised he has a passport currently located at his residence and has traveled to the following: Saudi Arabia in July 2019; Iraq in August 2021; London, United Kingdom in January 2022; and Iran in July 2022. Defendant reported he has never been married, is currently single, and has no children. Defendant reported that in 2019, he earned a bachelor's degree in Information Systems from the University of Texas at Arlington in Arlington, Texas. Defendant advised he has the following work history: Plasma Computing Group Project Manager since June 2022, earning approximately $5,000 per month; Globe Life Business Analyst from September 2021 to June 2022, earning approximately $5,8333.33 per month; Caliber Home Loans, Inc., Product Owner from July 2021 to September 2021, earning approximately $4,166.67 per month; and Nourtek Business Analyst from June 2019 to July 2020, earning approximately $4,166.67 per month. Defendant reported he has approximately $500 in his personal checking account, owns a $20,000 vehicle, and has no debt. Defendant further reported a monthly cash flow of approximately $4,400, and that he pays Mr. Hemani approximately $3,000 monthly as reimbursement for Defendant's vehicle and education.

---

[2] A Pretrial Services Report is a concise summary and conclusion of the pretrial investigation pertaining to the pretrial release of the criminal defendant. *See* 18 U.S.C. § 3154.

[3] On February 16, 2023, Pretrial Services filed the Pretrial Services Report (Dkt. 13).

Defendant advised Pretrial Services he is in excellent physical health with no medical problems reported. According to Pretrial Services, there is no evidence to suggest Defendant has a current or past mental health condition. Defendant reported he has used alcohol occasionally since age eighteen, with his last use approximately one year ago, and cocaine occasionally since age twenty-four, with his last use approximately one year ago. Defendant reported no criminal history, and a criminal record check conducted through the National Crime Information Center revealed no criminal history for Defendant. Ms. Hemani verified the information provided by Defendant to Pretrial Services.

On March 8, 2023, Pretrial Services filed an addendum to the Pretrial Services Report (the "Addendum") (Dkt. 24), wherein Pretrial Services provides additional information regarding the suitability of Defendant's proposed third-party custodians, Ali Sheikholeslam-Nouri ("Mr. Sheikholeslam-Nouri") and Deborah Arlen Sheikholeslam-Nouri ("Ms. Sheikholeslam-Nouri"). In the Addendum (Dkt. 24), Pretrial Services states that an interview was conducted with Mr. and Ms. Sheikholeslam-Nouri on March 2, 2023. Mr. and Ms. Sheikholeslam-Nouri advised they would allow Defendant to reside with them at their residence in Denton, Texas, and reported they are the sole residents of their home and have no firearms. Ms. Sheikholeslam-Nouri advised she works outside the home and that Mr. Sheikholeslam-Nouri is retired and would be available to monitor Defendant's compliance with Defendant's pretrial release conditions and the Court's orders. Mr. Sheikholeslam-Nouri further advised Pretrial Services that in addition to the conditions of release, he and Ms. Sheikholeslam-Nouri plan to have their own rules, and, if Defendant does not follow these rules, they will resign as third party custodians. Pretrial Services reported that neither Mr. nor Ms. Sheikholeslam-Nouri has a criminal history.

### III.    DETENTION HEARING

The Court held a detention hearing on February 16, 2023, which was continued on March 9, 2023 (together, the "Hearing") (Dkts. 15, 22, 26) pursuant to Defendant's request. The United States was represented by Assistant United States Attorney Heather Rattan. Defendant was represented by Brian O'Shea.

#### A.  Government's Proffer

Detective Jason Hollingshead ("Detective Hollingshead"), a Denton Police Department detective assigned to the Federal Bureau of Investigation ("FBI") taskforce in Dallas, testified as to the details leading to Defendant's arrest.

Detective Hollingshead testified Defendant lives with his parents, Mr. and Ms. Hemani, in Lewisville, Texas. Detective Hollingshead further testified Defendant has weekly communication with his only brother, Mohammed Hemani, who previously lived with Defendant and his family until approximately 2018 or 2019, and later moved to Iran to attend an Islamic university. Detective Hollingshead testified this Islamic university has been designated as having ties to terrorism. Detective Hollingshead further testified that during Defendant's arraignment on February 13, 2023, a courtroom security officer ("CSO") gave specific instructions to Defendant's parents not to communicate with Defendant. Mr. Hemani subsequently had to be escorted out of the courtroom for failure to comply with these instructions. Detective Hollingshead testified that Ms. Hemani previously made statements on television and social media that she wished for her sons to be martyrs.

Detective Hollingshead testified that Defendant and Defendant's parents traveled in February 2020 to Iran to mourn the death of Iranian General Qasem Soleimani ("Soleimani").[4] Detective Hollingshead testified that Soleimani was the "commander of the branch of the Iranian military that dealt with extraterritorial and covert operations" and was believed to be "responsible for the creation of weapons of mass destruction." Dkt. 22 at 14. Detective Hollingshead further testified Soleimani was killed in a U.S. drone strike on January 3, 2020, and Soleimani is considered a martyr by some in Iran. The Government proffered, without objection, and the Court admitted a video of Ms. Hemani speaking in Farsi to Iranian news media in February 2020. Detective Hollingshead testified the FBI translated the video of Ms. Hemani's interview and summarized her statements as follows:

> I can quote from the summary of that, what that states on this day. [Ms. Hemani is] visiting the mausoleum of General Quasem Soleimani because she had been saddened by Soleimani's martyrdom. She wants to pray that her son also becomes a martyr like Soleimani. She says the blood of a martyr is never in vain and the fruits of it soon become evident. She compares Iran with the United States and says Iran is an excellent country and she would live there if it were up to her because Iran is governed by Islamic rule, which is divine. In contrast, America is governed by arrogan[ce]. When the interviewer asked her what she prayed for at Soleimani's shrine, she said she prayed that her two sons become like Soleimani.

*Id.* at 17. Detective Hollingshead testified he believes Defendant is "living under the influence of his mother day in and day out in the home with her, falling under that influence, and her greatest desire is for him, along with her other son, to become a martyr, someone engaged in the death of innocent lives and the creation of weapons of mass destruction, it's very concerning." *Id.* at 17–18. Detective Hollingshead further testified there were calls for revenge following the death of

---

[4] Qasem Soleimani's name is also spelled as Qassem Soleimani, Quasem Soleimani, and Qassim Suleimani. Soleimani was posthumously promoted to the rank of major general in the Iranian armed forces.

Soleimani. Detective Hollingshead testified Defendant failed to report his February 2020 trip to Pretrial Services.

Detective Hollingshead testified that on July 12, 2021, Ms. Hemani posted on Facebook, which has been translated from Farsi as follows:

> This was a post that was also in Farsi, but general translation is that she wishes Muslims would sacrifice their own sons, like Ismail, while following the [Sunnah Ibrhaimi], and Allah would have given them the blessing of leadership of religion and the world and the emergence of the Imam.

*Id.* at 20. Detective Hollingshead testified that in 2020, Ms. Hemani also posted a Facebook profile picture of her with her brother and her brother's wife in front of a banner depicting Soleimani.

Detective Hollingshead testified that during a 2019 border search, Defendant's phone revealed communications with multiple other individuals, believed to be affiliated with Iran's Islamic Revolutionary Guard Corps (the "IRGC"), discussing committing fraud to interfere with financial systems of the United States. Additionally, Detective Hollingshead testified there were messages that expressed hatred towards the United States's government and anti-American sentiment.

Detective Hollingshead testified that FBI investigators had observed Defendant and his family using "tradecraft" practices to avoid detection and suspicion. Defendant previously communicated with his family members with instructions that his family members check his luggage for flights in order to not loiter in the baggage claim area, which would provoke less suspicion. Detective Hollingshead further testified there had been suspicious domestic travel. At approximately 10:00 or 10:30 p.m., Defendant, Mr. and Ms. Hemani, Mohammed Hemani, and Mohammed Hemani's wife and children got into a vehicle together and drove from their residence in Lewisville, Texas to Houston, Texas at high rates of speed and, as Detective Hollingshead testified, were "driving crazy." *Id.* at 22–23. After they arrived in Houston, Defendant and his

family drove around for several hours and eventually left Defendant in Houston. Defendant's family then immediately drove directly back to their residence in Lewisville. Detective Hollingshead testified that on their drive back, Defendant's family made evasive maneuvers and used tactics commonly used as surveillance detection techniques. On the next day, Defendant took a bus from Houston back to Lewisville alone.

Detective Hollingshead testified that Defendant and Defendant's family had also used counter-surveillance measures during their return trip from Iran in July 2022. During a July 2022 border crossing search of Defendant's cellphone, law enforcement agents found Defendant had deleted all messaging applications and wiped communication data from his cellphone to the level law enforcement agents in their experience have found to be associated with criminal activity. FBI agents also observed that during the return trip from Iran in July 2022, Defendant, Mr. and Ms. Hemani, and Mohammed Hemani returned to the United States on separate flights, with separate itineraries, and through different ports of entry. Mr. and Ms. Hemani arrived in the morning on July 24, 2022 to Dallas/Fort Worth International Airport ("DFW") and Mohammed Hemani arrived later that afternoon to DFW. Defendant traveled on July 24, 2022 to John F. Kennedy International Airport ("JFK") in New York City, New York, and stayed in New York City overnight and was booked to travel from LaGuardia Airport ("LGA") to DFW on July 25, 2022. On July 24th, Defendant purchased a second ticket to fly from JFK to DFW on July 25, 2022. Detective Hollingshead testified Defendant flew from LGA to DFW on July 25th, but kept his ticket to fly from JFK. Detective Hollingshead testified this is a tactic known as "scrambling," i.e., purchasing two different flights from two different locations to identify possible surveillance, which is used as a counter-surveillance measure. When Defendant arrived to DFW, Mr. Hemani and Mohammed Hemani were waiting in the unsecured area in DFW. Detective Hollingshead

testified that Mr. Hemani and Mohammed Hemani did not make contact with Defendant while in the unsecured area and rather made contact in the DFW parking garage. Detective Hollingshead testified this is a tradecraft practice and Defendant's father and brother were acting as lookouts to determine whether Defendant had been followed by law enforcement. Detective Hollingshead testified that during Defendant's arrest, he was asked in a hypothetical situation that if there was an imminent attack, would he report it. Defendant stated to FBI agents he would not report an imminent attack if it were conducted by a "Shia brother."

Detective Hollingshead further testified as to the details of the instant offense. In August 2022, FBI agents executed a search warrant of Defendant's residence and conducted an interview with Defendant and Mr. and Ms. Hemani. During their search, FBI agents found a Glock 9mm registered to Defendant, approximately one (1) gram of cocaine in Ms. Hemani's bedroom, approximately sixty (60) grams of marijuana, and promethazine. Detective Hollingshead testified that a search of Defendant's phone showed text messages of Defendant seeking to sell or distribute promethazine to other individuals, Defendant discussing his use of promethazine, and Defendant stating that promethazine is addictive.

Detective Hollingshead testified that FBI agents seized Defendant's cellphone following his February 2023 arrest and conducted a search of Defendant's cellphone. The Government proffered, without objection, and the Court admitted a photograph of Defendant's cellphone contact for Mr. Sheikholeslam-Nouri as Government Exhibit 1. *See* Dkts. 26, 27-1. After learning Defendant proposed Mr. Sheikholeslam-Nouri as a third-party custodian, FBI agents discovered Defendant saved Mr. Sheikholeslam-Nouri's contact photo as a picture of Soleimani and Abu Mahdi al-Muhandis ("al-Muhandis"), the deputy leader of the Iraqi militia known as the Popular Mobilization Forces ("PMF"). The image taken from Defendant's cellphone is Soleimani and al-

Muhandis with missiles behind them and the statement "Is not the morning nigh?". Dkt. 27-1. Detective Hollingshead testified "Is not the morning nigh?" is a call to action for vengeance or martyrdom. Detective Hollingshead testified that the image of Soleimani and al-Muhandis appears to be adapted from an image available through an open-source search.

During cross-examination, Detective Hollingshead clarified that during Defendant's February 2023 arrest, Defendant informed arresting agents he used marijuana. Detective Hollingshead testified he does not know Defendant's political views and does not know whether Defendant was "mad" that Soleimani was killed in the drone strike. Detective Hollingshead also testified during cross-examination that Defendant's drinking of alcohol is prohibited in Islamic teachings, and that it is likely Islamic teaching is opposed to the use of marijuana and cocaine. Detective Hollingshead testified he was not familiar with the story of Ismail[5] referenced in Ms. Hemani's Facebook post. Detective Hollingshead testified "Is not the morning nigh?" refers to a "day of retribution" for the assassination of Soleimani. Detective Hollingshead testified he is not aware of any overt act Defendant has taken in support of terrorism and is only aware of the anti-American sentiments found on Defendant's cellphone. During re-direct examination, Detective Hollingshead testified that when Defendant was interviewed by FBI agents, he claimed ownership of the cocaine found in Ms. Hemani's bedroom.

**B. Defendant's Proffer of Third-Party Custodians**

Defendant proffered Ms. Sheikholeslam-Nouri as a third-party custodian.[6] Ms. Sheikholeslam-Nouri testified she was born in Corpus Christi, Texas and is a United States citizen.

---

[5] The biblical figure Ismail is also at times spelled Ishmael.

[6] At the conclusion of the February 16, 2023 hearing, Defendant advised the Court he had planned to proffer Mr. and Ms. Hemani as third-party custodians, but was concerned that after the testimony presented, Mr. and Ms. Hemani would require their own counsel to testify. Defendant requested additional time to find and proffer a new third-party

Ms. Sheikholeslam-Nouri testified she received a bachelor's degree in accounting from Baylor University and worked for PricewaterhouseCoopers following her graduation. Ms. Sheikholeslam-Nouri testified she later decided to change careers and received a master's degree in English and linguistics from University of Texas at El Paso. Ms. Sheikholeslam-Nouri testified she is now retired.[7] Ms. Sheikholeslam-Nouri testified that her husband, Mr. Sheikholeslam-Nouri, is also willing to act as a third-party custodian. Ms. Sheikholeslam-Nouri testified Mr. Sheikholeslam-Nouri moved to the United States from Iran in 1978 and is a United States citizen. Ms. Sheikholeslam-Nouri further testified Mr. Sheikholeslam-Nouri has a bachelor's and master's degree in industrial technology from University of North Texas and was a professor at University of North Texas for approximately twenty years before retiring. Ms. Sheikholeslam-Nouri testified that neither she nor her husband has any criminal history and they have two children, aged thirty-seven and thirty-two. Ms. Sheikholeslam-Nouri testified she has known Defendant since he was six years old and does not believe Defendant is a danger to the community or a risk of flight.

During cross-examination, Ms. Sheikholeslam-Nouri testified she typically saw Defendant one to two times a month and last saw him in January 2023. Ms. Sheikholeslam-Nouri testified she and her husband celebrated birthdays and shared meals with Defendant's family. Ms. Sheikholeslam-Nouri testified she was previously not aware of Defendant's use of marijuana, cocaine, and promethazine. Ms. Sheikholeslam-Nouri testified she learned Defendant and Mr. Hemani purchased firearms for recreational use. Ms. Sheikholeslam-Nouri testified she believed Defendant and Defendant's family traveled to Iran in February 2020 for a wedding and did not

---

custodian. The Court granted Defendant's request to continue the hearing to provide Defendant additional time to investigate and proffer a new third-party custodian.

[7] In the Addendum (Dkt. 24), Ms. Sheikholeslam-Nouri advised Pretrial Services during the March 2, 2023 interview she currently works outside the home.

know it was for the mourning of Soleimani. Ms. Sheikholeslam-Nouri further testified she is not

sure what "Is not the morning nigh?" means and her husband did not make his contact photo a

picture of Soleimani and al-Muhandis. When questioned about her own views of Soleimani, Ms.

Sheikholeslam-Nouri testified she believed Soleimani was a "good person" and she believed

Soleimani was instrumental in fighting Islamic State of Iraq ("ISIS"). Mr. Sheikholeslam-Nouri

was present on March 9, 2023, but did not testify.

## IV.   SECTION 3142(g) FACTORS

In the Motion for Pretrial Release (Dkt. 21) and at the Hearing (Dkts. 15, 22, 26), Defendant

argues he is not a serious risk of flight as he "has deep and enduring ties to DFW and no intention

of fleeing." Dkt. 21 at 7; *see also generally* Dkts. 15, 22, 26. Defendant emphasizes he has lived

in the DFW area his entire life, graduated with honors from Creekview High School, and was a

University of Texas at Arlington Presidential Scholar. *See* Dkt. 21 at 7. Defendant further asserts

that the family having traveled internationally during the ongoing investigation and the fact

Defendant has not fled since the execution of the search warrant in August 2022 point to Defendant

not being a risk of flight. *See id.* at 8. Defendant further argues the Government has misrepresented

Defendant's and Ms. Hemani's Shia faith. *See id.* at 9–10. Specifically, Defendant argues the

Government's discussion of Ms. Hemani's Facebook post on July 12, 2021 does not provide the

context that this statement was made during the celebration of Eid al-Adha, as follows:

> This holiday commemorates Abraham's willingness to sacrifice his son Ishmael,
> trusting and following the commandments of God, as they would never lead to
> harm. Since both father and son submitted to the will of God, Ishmael was spared
> and replaced by a ram. Allah says[,] "So pray to your Lord and do sacrifice (to Him
> alone)." This *willingness* to sacrifice is a major point in all three Abrahamic faiths
> and lauded as a virtue. It is not literal, despite western misunderstanding
> (intentional or unintentional).

*Id.* at 10. Defendant asserts Ms. Hemani's July 12, 2021 Facebook post is protected by the First Amendment and, "even if, *arguendo*, a connection to violence could be made to her, the Government would still lack any evidence to tie those beliefs to her son." *Id.* at 11. Defendant further argues the Government's arguments are "insinuation and fear-mongering." *Id.* at 12.

In the response (Dkt. 25) and at the Hearing (Dkts. 15, 22, 26), the Government argues "[D]efendant's family has connections to a cause that supports violent attacks on the United States government, and, clearly, his mother wishes for him to be a martyr, a sacrifice for the cause." Dkt. 25 at 7; *see also generally* Dkts. 15, 22, 26. The Government argues Ms. Hemani's Facebook post on July 12, 2021 shows Defendant's family supports violence and is quoted as follows:

> I wish Muslims would sacrifice their own sons like Ismail while following the Sunnah of Ibrahimi, then Allah would have given them the blessing of leadership of religion and the world and the emergence of Imam of the Mostazafin.

Dkt. 25 at 7 (emphasis omitted). The Government further argues Defendant has lied to Pretrial Services as follows: (1) "Admits international travel but fails to mention he went to Iran in February 2020 soon after Qasem Soleimani's death in a U.S. drone strike on January 3, 2020"; (2) "Admits to use of alcohol and cocaine, but fails to disclose abuse of promethazine and marijuana"; (3) and "Fails to mention that he is a dual citizen of the U.S. and the Republic of Pakistan". *Id.* at 5–6. The Government further asserts Defendant has family members who live in Iran and Pakistan, and if Defendant was to flee to Iran, he could not be extradited. *See id.* at 9. Finally, the Government asserts Defendant's proposed third-party custodians are not appropriate and argues Defendant has made his cellphone contact card for Mr. Sheikholeslam-Nouri's an image of Soleimani and al-Muhandis, who were killed by a U.S. drone strike near Baghdad International Airport on January 3, 2020. *See id.* at 1.

The Court finds, based on the evidence presented, the Government has proven by a preponderance of the evidence that Defendant is a serious risk of flight and that no condition or combination of conditions of release will reasonably assure Defendant's appearance as required. Additionally, the Court finds, based on the evidence presented, Defendant poses a serious risk that he will obstruct or attempt to obstruct justice.

### A. The Nature and Circumstances of the Charged Offense and the Weight of the Evidence

The weight of the evidence against Defendant is strong and Defendant has admitted he was a user of controlled substances while possessing a firearm.

On August 3, 2022, FBI agents executed a search warrant of Defendant's residence and interviewed Defendant and Mr. and Ms. Hemani. During the execution of the search warrant of Defendant's residence, FBI agents found the Glock 9mm registered to Defendant, sixty grams of marijuana, and approximately one gram of cocaine. Defendant informed FBI agents the cocaine, which had been found in Ms. Hemani's bedroom, was owned by Defendant. Detective Hollingshead also testified that during the February 2023 arrest, Defendant admitted to law enforcement he possessed and used marijuana. The Government further asserted in the response that an October 1, 2021 download of Defendant's cellphone revealed he abuses controlled substances; and Defendant confessed that he purchases cocaine one to two times a year, smoked marijuana every other day and kept a quarter ounce of marijuana in his car or hidden in his home, and purchased large quantities of drugs to split with his friends. *See* Dkt. 25 at 8. Defendant's cellphone communications also reveal he has sold and distributed promethazine and that he himself is addicted to promethazine. Promethazine when containing codeine, a strong medicinal syrup, may be abused in combination with alcohol and other substances. *See United States v. Brown*, 553 F.3d 768, 773 & n.2 (5th Cir. 2008) ("The other drug at issue, promethazine with codeine, is a

strong medicinal syrup, often consumed in combination with alcohol and other substances . . . Street users often combine promethazine with codeine with opioids such as hydrocodone for intensified, and yet more toxic, effect.").

Based on the evidence presented, the Court finds that both the nature and circumstances of the charged offense, along with the weight of the evidence to support such charges, favor detention.

### B. Defendant's History and Characteristics and the Nature and Seriousness of the Danger Posed by Defendant's Release

Defendant is twenty-five years old and has no prior criminal history. Defendant's lack of criminal history would normally weigh in favor of pretrial release. However, the evidence presented shows Defendant poses a serious risk of flight and a serious risk that he will obstruct or attempt to obstruct justice.

Detective Hollingshead testified that during a review of Defendant's cellphone during a 2019 border crossing following Defendant's return trip from Iran, law enforcement discovered Defendant communicating with individuals believed to be associated with the IRGC. These individuals appeared to be directing Defendant to commit fraud to interfere with the United States' financial systems. Further, Detective Hollingshead testified Defendant traveled to Iran in February 2020 to mourn the death of Soleimani. Soleimani was the leader of the Quds force, a branch of the IRGC specializing in military intelligence operations. Soleimani was designated by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") as a specially designated national ("SDN") in 2011 for his involvement in terrorist activities against the United States.[8] *See* U.S. Department of Treasury Office of Foreign Assets Control, ANTI-TERRORISM DESIGNATIONS; IRAN REVOLUTIONARY GUARD CORPS RELATED DESIGNATIONS, https://home.treasury.gov/policy-

---

[8] The Quds force, also spelled Qods Force, has also been designated as an SDN by OFAC. *See* U.S. Department of Treasury Office of Foreign Assets Control, SPECIALLY DESIGNATED NATIONALS & BLOCKED PERSON, https://www.treasury.gov/ofac/downloads/sdnlist.pdf,  (last visited Mar. 11, 2023).

issues/financial-sanctions/recent-actions/20111011, (last visited Mar. 11, 2023). Detective Hollingshead testified that although Ms. Sheikholeslam-Nouri testified Defendant and his family traveled to Iran in February 2020 for a wedding, Ms. Hemani stated in an interview with Iranian news media in February 2020 that she had traveled to Soleimani's shrine and that she prays her sons will also become martyrs like Soleimani.

Furthermore, the evidence shows Defendant and his family have taken counter-surveillance measures against law enforcement. Detective Hollingshead testified Defendant, his parents, his brother, and his brother's wife and children drove late at night towards Houston. During this drive to Houston, Defendant and his family drove at high speeds and took counter-surveillance measures, which Detective Hollingshead testified were "tradecraft" practices. Once arriving in Houston, Defendant's family drove around for a few hours before leaving Defendant in Houston alone. Defendant's family then sped back to their home in Lewisville, taking counter-surveillance measures while Defendant took a bus back to Lewisville the next day.

Additionally, Detective Hollingshead testified Defendant and his family have taken counter-surveillance measures while traveling internationally. During a review of Defendant's phone during a July 2022 border search following Defendant's return trip from Iran, law enforcement agents found Defendant deleted all messaging applications and wiped communication data from his cellphone. Additionally, during Defendant's return trip from Iran in July 2022, Defendant and his family took separate flights, with separate itineraries, and to different ports of entry. While Defendant's parents and brother traveled directly to DFW, Defendant flew to JFK in New York City and was booked to travel from LGA the next day. However, that same night, Defendant purchased a second ticket from JFK and then still flew from LGA to DFW. Detective Hollingshead testified this practice of "scrambling" is used to conduct counter-surveillance against

law enforcement. When Defendant arrived at DFW, his father and brother were waiting for him in the unsecured area. However, neither Defendant nor his father or brother made contact while in DFW. Defendant waited for and retrieved his luggage and walked out of the airport towards the parking garage. Approximately five to ten minutes later, Defendant's father and brother also left the airport and ultimately joined Defendant in the parking garage. Detective Hollingshead testified that this is a common tradecraft practice and Defendant's father and brother were acting as lookouts to see if Defendant was being followed. In this fuller context, Defendant's failure to inform Pretrial Services of his trip to Iran in February 2020, a month following the death of Soleimani, and Defendant's failure to inform Pretrial Services of being a dual citizen with Pakistan are more troubling than mere forgetfulness. These lies by omission seen in conjunction with Defendant's practice of counter-surveillance are further evidence that Defendant has the awareness and knowledge to evade pretrial release conditions and to obstruct justice. Furthermore, Defendant has admitted that he would not inform law enforcement of an imminent attack against the United States.

It is not Defendant's or his family's religious beliefs, his family's national identity, or his anti-American sentiments that weigh in favor of detention. The First Amendment protects the right to express one's frustration and anger towards the United States Government. The Supreme Court has made clear this right extends to all views, even those  many Americans may find indefensible. *See Brandenburg v. Ohio*, 395 U.S. 444, 448 (1969) ("As we said in *Noto v. United States*, 367 U.S. 290, 297–98, (1961), 'the mere abstract teaching of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action.'"); *Texas v. Johnson*, 491 U.S. 397, 418 (1989) ("The First Amendment does not guarantee that other concepts virtually sacred to our Nation as a whole—

such as the principle that discrimination on the basis of race is odious and destructive—will go unquestioned in the marketplace of ideas." (citing *Brandenburg*, 395 U.S. 444)). Protecting the right of all Americans to speak out publicly and privately about their frustration or anger towards their leaders and government is integral to the functioning of American democracy. Likewise, the First Amendment enshrines the right to express one's religious beliefs. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 523 (1993) ("The principle that government may not enact laws that suppress religious belief or practice is so well understood that few violations are recorded in our opinions."). This right is at the heart of the First Amendment and the ability to practice freely without fear of repercussion is a core ideal of the United States. *See Hassan v. City of New York*, 804 F.3d 277, 309 (3d Cir. 2015) ("We believe that statement of Justice Jackson to be on the right side of history, and for a majority of us in quiet times it remains so . . . until the next time there is the fear of a few who cannot be sorted out easily from the many. Even when we narrow the many to a class or group, that narrowing—here to those affiliated with a major worldwide religion—is not near enough under our Constitution." (citing *Korematsu v. United States*, 323 U.S. 214, 247 (1944) (Jackson, J., dissenting))).

Rather, in the present case, it is Defendant's *own* actions that make clear he is a serious risk of flight and serious risk that he will obstruct or attempt to obstruct justice. Defendant has been in communication with affiliates of the IRGC since at least 2019, and these individuals appear to have directed him to take action against the United States' financial systems. The evidence further shows Defendant and his family have used counter-surveillance tactics to evade law enforcement surveillance both in domestic and international travel. Especially troubling to the Court is that on his return trip from Iran in July 2022, Defendant wiped the communication data from his cellphone and attempted to "scramble" his travel itinerary to evade surveillance.

19

Defendant's family has also shown a willingness to support Defendant in counter-surveillance and appears to be actively involved in their own counter-surveillance of law enforcement. Defendant has family in Pakistan and Defendant's brother, Mohammed Hemani, and his aunt and uncle presently live in Iran and could support Defendant if he were to flee. Importantly, the United States and Iran do not maintain diplomatic relations and, thus, if Defendant were to flee it would be impossible to extradite Defendant to the United States. Furthermore, Defendant has already lied to Pretrial Services about his travel to Iran in February 2020, and did not tell Pretrial Services he has dual citizenship with Pakistan. Thus, the evidence as to Defendant's own actions leads the Court to conclude there are no conditions that could reasonably assure Defendant's appearance and there is a serious risk Defendant will obstruct or attempt to obstruct justice.

### IV. CONCLUSION

For the reasons stated herein, the Motion for Pretrial Release (Dkt. 21) is **DENIED** and the Government's Motion for detention is **GRANTED**. Defendant shall be detained pending trial and, is thus remanded to the custody of the Attorney General or to the Attorney General's designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. Defendant must be afforded a reasonable opportunity for private consultation with defense counsel. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility must deliver Defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

**So ORDERED and SIGNED this 21st day of March, 2023.**

_____

KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE