THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

* * * * *

UNITED STATES OF AMERICA     *     4:23-CR-018-ALM-KPJ-1
                         *     Plano, Texas
VS.                       *
                         *     10:32 a.m. - 11:29 a.m.
ALI DANIAL HEMANI        *     March 9, 2023

* * * * *

**DETENTION HEARING**

BEFORE THE HONORABLE KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE

* * * * *

Proceedings recorded by electronic sound recording
Transcript produced by transcription service

*GLR TRANSCRIBERS*
9251 Lynne Circle
Orange, Texas 77630 * 409-330-1610

1  **APPEARANCES:**

2  For the Government:

3       MS. HEATHER H. RATTAN *(Plano Office)*
         MS. MAUREEN E. SMITH *(Sherman Office)*
4        **U.S. Attorney's Office**
         101 East Park Blvd
5        Suite 500
         Plano, TX 75074
6
    For the Defendant:
7
         MR. BRIAN G. O'SHEA
8        **Federal Public Defender's Office**
         7460 Warren Parkway
9        Suite 270
         Frisco, Texas 75034
10
    Deputy Clerk:
11
         MARIA COX
12

13

14                    **WITNESS INDEX**

15  GOVERNMENT'S EVIDENCE:

16      Task Force Officer Jason Hollingshead

17           Direct Examination by Ms. Rattan.......  6

18           Cross-Examination by Mr. O'Shea........ 21

19  DEFENSE EVIDENCE:

20       Deborah Sheikholes Lam-Nouri

21           Direct Examination by Mr. O' Shea...... 33

22           Cross-examination by Ms. Rattan........ 38

23  Argument by the Government..................... 49

24  Argument by the Defense........................ 52

25

**P R O C E E D I N G S**

**10:32 A.M. - MARCH 9, 2023**

1

2

3    THE COURT:  All right.  For the record -- and

4  Mr. Hemani, if you could stand up for just a moment --

5  the Court calls Case No. 4:23-CR-18, United States vs.

6  Ali Danial Hemani.

7    Could we have appearances for the record,

8  please.

9    MS. RATTAN:  Heather Rattan and Maureen Smith

10  for the United States.

11    THE COURT:  All right, good morning.

12    MR. O'SHEA:  Brian O'Shea for Mr. Hemani.

13  We're ready, Your Honor.

14    THE COURT:  All right.  Mr. Hemani, would you

15  please raise your right hand to be sworn.

16    DEPUTY CLERK:  Do you solemnly swear that the

17  testimony you are about to give in the case before the

18  Court shall be the truth, the whole truth, and nothing

19  but the truth, so help you God?

20    DEFENDANT HERMANI:  Yes, ma'am.

21    THE COURT:  All right, thank you.  You may be

22  seated.  We're here today for the continuation of your

23  Detention Hearing.

24    Are both counsel ready to proceed?

25    MS. RATTAN:  We are, Your Honor.

1          MR. O'SHEA:  We are, Your Honor.

2          THE COURT:  All right, it's my understanding

3    from conferring with counsel that the Government wants

4    to recall the case agent, and so we'll do that first.

5    And then, Mr. O'Shea, we'll hear from your proposed

6    third-party custodian.

7          MR. O'SHEA:  Your Honor, and for the record,

8    we would object because the Government did rest.  They

9    have not provided any discovery to us whatsoever.  My

10   client has been in jail for a month.  Under the Rules

11   of Procedure, we should be entitled at some point to

12   get some sort of evidence.  They keep putting on

13   evidence that we hear for the first time.  And if the

14   Court is just going to continue to let them reopen

15   their case and try to prove what they haven't proved

16   before, then, you know, at some point we're entitled to

17   get discovery in this matter.  It's been a month that

18   my client has been in jail.

19         THE COURT:  I don't know what the objection

20   is.  Are you objecting to me allowing the Government to

21   reopen or to recall the case agent, or are you

22   objecting to not having them provided discovery?

23         MR. O'SHEA:  I'm objecting to the Government

24   reopening their case.  Unless there's something new

25   that they have to provide for the Government, it's just

1  going to be a rehashing of the old what they said

2  before.  Unless they have something new that they can

3  tell the Court that they have, we would object to them

4  reopening.  They've rested.  The only thing that we

5  asked for was to provide a custodian.

6          THE COURT:  Well, I was going to point out, I

7  mean, the hearing was continued not because of the

8  Government because that was your request.

9          MR. O'SHEA:  That's correct.  Because all we

10  wanted to do -- because the last time we had the

11  parents as custodians.  But, you know, because the

12  mother was the focus in her religious beliefs and how

13  they were saying that my client was under the influence

14  of her somehow, we don't know, but we asked for a

15  continuance to find some other custodians.

16          But at this point the Government

17  reopening, it's not proper.  Unless they have something

18  new to show the Court, they are just going to get up

19  with another agent to -- I don't know what they're

20  going to say, but, you know, unless it's new, they've

21  rested already, so we would object to them --

22          THE COURT:  I don't disagree that it would be

23  improper to rehash the prior testimony.

24          Ms. Rattan, do you have new evidence to

25  offer?

1          MS. RATTAN:  Yes, Your Honor.

2          THE COURT:  All right, then I'll allow the

3   Government to reopen.  Anything else from you,

4   Mr. O'Shea?

5          MR. O'SHEA:  No, Your Honor.

6          THE COURT:  All right.  Ms. Rattan, you may

7   call your witness.

8          MS. RATTAN:  Thank you, Your Honor.  The United

9   States calls FBI Task Force Officer Jason Hollingshead.

10          DEPUTY CLERK:  Do you solemnly swear that the

11   testimony you are about to give in the case before the

12   Court shall be the truth, the whole truth, and nothing

13   but the truth, so help you God?

14          THE WITNESS:  I do.

15          DEPUTY CLERK:  Please state your name and

16   spell it for the record.

17          THE WITNESS:  Good morning.  My name is Jason

18   Hollingshead.  H-o-l-l-i-n-g-s-h-e-a-d is the last name.

19          THE COURT:  You may proceed.

20          MS. RATTAN:  Thank you, Your Honor.

21      **AGENT JASON HOLLINGSHEAD, Called by the Government**

22                      **DIRECT EXAMINATION**

23   **BY MS. RATTAN:**

24   Q.  Officer Hollingshead, of course, you testified at

25   the previous hearing and you provided the Court with

1   your background and there's been a transcript of that;

2   is that right?

3   A.   Yes, ma'am.

4   Q.   This morning the defendant is proposing a

5   third-party custodian.  And one of the third-party

6   custodians, it's a husband and wife, and one of is,

7   we'll call them Ali Nouri; is that right?

8   A.   That's my understanding.

9   Q.   Do you have information about Ali Nouri for the

10  Court?

11  A.   I do have some, yes.

12  Q.   In fact, has the defendant's cell phone been

13  reviewed and has information been evaluated out of the

14  defendant's cell phone?

15  A.   Yes, ma'am.

16  Q.   After the defendant proposed the third-party

17  custodian of Ali Nouri, was the information from the

18  defendant's cell phone evaluated to determine whether

19  there was any indication about his relationship, the

20  defendant's relationship, with Ali Nouri?

21  A.   Yes.

22  Q.   Will you describe for the Court what the

23  defendant's cell phone revealed about Ali Nouri?

24  A.   Ali Nouri was saved in the defendant's cell phone,

25  a contact was, and the photograph for that contact

1  card.  The contact card was a photograph of Quasem

2  Soleimani, along with an Iraqi leader of the militia,

3  who was also killed in the drone strike that killed

4  Soleimani.

5            MS. RATTAN:  And, Your Honor, we filed

6  yesterday afternoon our response to the defendant's

7  Motion for Release and we attached as Exhibit A, pages

8  1 and 2, the exact contact that was found in the

9  defendant's phone.  And then page 2 of Exhibit A is

10 something that's just open source.  You can find it

11 online.  And it's the exact photo that shows in the

12 defendant's contacts in the phone for Ali Nouri.

13            At this point, though, for this hearing,

14 we'll offer as Government's Exhibit No. 1, page 1 and 2.

15 And may I approach the witness?

16            THE COURT:  Yes.

17            Is there any objection?

18            MR. O'SHEA:  No objection, Your Honor.

19            THE COURT:  All right, it's admitted.

20 BY MS. RATTAN:

21 Q.  Sir, I'm going to share the microphone with you.

22            We're looking at Government's Exhibit 1 and

23 page 1.  Is this contact info, as you see at the top of

24 the page, that's taken from the defendant's phone?

25 A.  Yes.

1  Q.   Okay.  And does it indicate that this photo is

2  what comes up and what is associated with the proposed

3  third-party custodian, Ali Nouri?

4  A.   That's correct.

5  Q.   And again, this contact photo, it's not a photo of

6  Ali Nouri; is that right?

7  A.   No, it is not.

8  Q.   Okay, describe for the Court, who are these people

9  in the defendant's contact list that he associates

10 with, Ali Nouri.

11 A.   Right.  It is a photograph -- my understanding is

12 it's a fairly widespread image, if you will, depicting

13 Quasem Soleimani, who was killed during a USA drone

14 strike, along with an Iraqi militia leader.  I can't

15 recall his name.  But they are depicted together and

16 the image is frequently shared as a way of kind of

17 glorifying their martyrdom is typically the association

18 with it.

19 Q.   And in fact, this other individual that you've

20 described, this Soleimani, was he also killed in the

21 drone strike?

22 A.   He was.

23 Q.   And so both of them are celebrated and identified

24 in Iran as martyrs, and in the terrorist community as

25 martyrs; is that right?

1   A.   That's correct.

2   Q.   Now, when we look at this photograph, we see in the

3   bottom lefthand corner it says in small print in

4   English, "Is not the morning nigh."  When you see that

5   term, "Is not the morning nigh."  What does that mean

6   especially in the context of everything we know about

7   what's happened with these two proposed alleged

8   martyrs?

9   A.   My understanding of that quote, "Is the morning

10  nigh," it's another way of saying, "Is today the day"

11  to seek vengeance for this, quote-unquote, martyrdom.

12  Q.   So essentially a call to action?

13  A.   Yes, ma'am.

14  Q.   And after these two individuals were killed in the

15  drone strike, was there within the terrorist community,

16  and in the Iranian community broader, a call to action

17  for retribution?

18  A.   Yes.  In fact, the individual who replaced Quasem

19  Soleimani, he publicly stated that there would be

20  retribution.

21  Q.   Okay.  So, again, in the defendant's phone, in the

22  contacts associated with a third-party custodian,

23  there's not just a picture of the two martyrs; there's

24  also a call to action?

25  A.   That's my understanding.

1   Q.   And if we look at page 2 -- and you've already

2   described this, page 2 of Government's Exhibit No. 1 --

3   what is that?

4   A.   That's just an open source record of that image,

5   which is saved as Mr. Nouri's contact card on the

6   defendant's phone.  As I've mentioned, that's an image

7   that has kind of been fairly widespread, I suppose, and

8   so that's just a depiction of that image that was found

9   open source.

10  Q.   And as you said, it's a very common image, it's on

11  the Internet, and here they're even identified as

12  martyrs; is that right?

13  A.   Yes, ma'am.

14          MS. RATTAN:  We've already offered it.  It's

15  been admitted.  Thank you, Your Honor.  May I return?

16          THE COURT:  Yes.

17  BY MS. RATTAN:

18  Q.   Now, we're talking about the defendant's phone and

19  analysis of the defendant's phone, so let me talk to

20  you a little bit more about analysis of the defendant's

21  phone, what was in it.

22          Was it reviewed in 2019 and were there some

23  concerning things that were found in a border crossing

24  review of his phone in 2019?

25          MR. O'SHEA:  Judge, we would object to --

 1  she's already presented her case in chief.  And all

 2  she's doing now is reopening with new evidence that

 3  she's trying to get in, and it's inappropriate at this

 4  time.  If they want to bring up stuff about the

 5  custodian, that would be relevant, but at this time

 6  they've rested, Judge, and we don't have anything of

 7  what they're talking about.

 8            THE COURT:  Overruled.

 9            THE WITNESS:  I'm sorry, could you repeat the

10  question?

11  BY MS. RATTAN:

12  Q.  Yes.  Focusing on the defendant's phone and the

13  review of his phone that was conducted in the border

14  search in 2019, was there concerning information found

15  on his phone at that time?

16  A.  Yes, there was.

17  Q.  Will you describe that for Judge Johnson?

18  A.  Certainly.  There was two items of concern located

19  on his device when it was searched at the border.

20  First, there was information, communication that the

21  defendant was having with multiple other individuals.

22            MR. O'SHEA:  Objection, Judge, this is

23  hearsay.  Again, they're getting into stuff that they

24  could have gotten into last time --

25            THE COURT:  Mr. O'Shea, I've already overruled

Agent Jason Hollingshead - Direct by Ms. Rattan                          13

1  that objection.

2            MR. O'SHEA:  Okay.

3            THE COURT:  And the hearsay rules don't apply

4  in detention hearings, and you know that; okay?

5                Go ahead.

6            THE WITNESS:  Thank you, Your Honor.

7  A.   The defendant was in communication with multiple

8  other individuals.  Those communications indicated that

9  the defendant, Mr. Ali, was poised to commit fraud in

10  order to interfere with the financial systems in the

11  United States.  And there's indication that this was at

12  the direction of individuals who were suspected to be

13  affiliated with the IRGC.

14  BY MS. RATTAN:

15  Q.   And in terms of the IRGC, is that a group or

16  organization that's been designated by the United

17  States Government as terrorist affiliated?

18  A.   Yes, I believe it was labeled a terrorist

19  organization officially in 2019.

20  Q.   Okay.  And we call it the IRGC for short, but of

21  course, that's the Islamic Revolutionary Guard Corps;

22  is that right?

23  A.   I believe it's the Iranian Revolutionary Guard

24  Corps.

25  Q.   And the defendant appears in the phone to be

1    acting at the direction of or in concert with that

2    organization and talking about disrupting the United

3    States financial system?

4           MR. O'SHEA:  Objection, speculation, Your

5    Honor.

6           THE COURT:  Overruled.

7    A.   That's correct.  Those conversations are with

8    individuals who are affiliated with IRGC.

9    BY MS. RATTAN:

10   Q.   And also in his phone at that time, the review of

11   his phone, were there concerns about his expression of

12   hate towards the United States Government?

13   A.   Yes.  His device, they contained information

14   expressing, yeah, anti-American sentiments.

15   Q.   Now, while we're still talking about his phone,

16   let's go forward to -- we just talked about a review of

17   his phone in 2019.  Let's talk about a review of his

18   phone from July of 2022.  Was there other things that

19   were concerning that were seen about his phone in July

20   of 2022 in terms of erasing messages?

21   A.   Yes.

22   Q.   Will you describe that for the Court?

23   A.   Upon the defendant's entry back into the United

24   States, after a visit to Iran in 2022, I believe it was

25   July, there was a search conducted of his device at the

 1  border.  And investigators noted that basically all

 2  messages, messaging apps, third-party messaging apps,

 3  everything had been wiped clean to a level that

 4  investigators, having their training and experience,

 5  that's indicative of someone who is intentionally

 6  erasing data and messages to prevent law enforcement

 7  from observing or detecting criminal acts.

 8  Q.   Now, when you testified last time, you talked to

 9  the Court about counter-surveillance techniques that

10  the defendant and his family both used.  And those are

11  reflected in pages 22 and 23 of the transcript from the

12  last hearing:  The Houston trip, the defendant talking

13  about not wanting to pick up his bags or be associated

14  with his bags.  Other than those two events, is there

15  additional information that you have for the Court

16  about the defendant and his family and people

17  associated with him being involved with trade craft or

18  counter-surveillance?

19  A.   Yes.

20  Q.   Let's describe that for the Court.  And then is it

21  as recent -- it's not even a year old.  It's July 2022?

22  A.   Correct, july of 2022 when the family returned from

23  Iran to the DFW area.

24  Q.   Okay.  So describe for Judge Johnson the concerning

25  things that the FBI found about that event.

1  A.   Certainly.   Investigators noted multiple instances

2  of suspicious activity, counter-surveillance tactics,

3  and trade craft, if you will, on the part of the

4  defendant, Mr. Hemani, as well as both of his parents

5  and his brother.

6          Specifically, the family returned from Tehran

7  to DFW, and all the members of the family -- the

8  defendant's mother and father traveled together, but

9  Mr. Hemani, the defendant, and his brother -- the

10  groups all took separate flights, separate itineraries,

11  arrived at different times, came in through different

12  ports of entry into the United States.   Mr. Hemani's

13  parents arrived first, and then later through another

14  port of entry the defendant's brother arrived and --

15  Q.   Close in time, not days later?

16  A.   Correct.

17  Q.   Okay.

18  A.   With all -- I believe if my memory is correct, the

19  defendant's parents and his brother both arrived on the

20  24th.   His brother arrived late in the evening on the

21  24th.   And then the defendant arrived the following day

22  on the 25th.   And I believe that's the same time that

23  we're -- investigators are seeing messages from the

24  defendant about other family members taking his checked

25  baggage, so that, you know, he's less likely to fall

1   under the attention of law enforcement.

2   Q.   So the mom and dad are on one flight; the brother,

3   Mohammed, is on another flight; and the defendant, Ali

4   Hemani, is on a separate flight?

5   A.   That's correct.  And his flight was very suspicious

6   in nature in and of itself.

7   Q.   And why do you say that?

8   A.   It's tough to describe.  I'll do my best.  The

9   defendant traveled back to DFW.  His original point of

10  entry was into JFK Airport in New York City.  That was

11  going to require entry at JFK, a five-hour layover, and

12  then a departure from La Guardia Airport, which is a

13  separate airport in New York City.

14        The night prior to the travel, the defendant

15  booked a second flight to DFW from JFK.  So he now

16  holds tickets to return flights out of two different

17  airports back to DFW.  And that's a common tactic that

18  investigators are familiar with where you scramble

19  your travel plans.  It's all meant to confuse law

20  enforcement, make it tougher to be followed, to be kept

21  under surveillance, tougher to track.  And that's what

22  they observed is the defendant returning to JFK.  His

23  device was searched at that border entry, which is

24  where investigators noticed that the phone had

25  practically been wiped.  He's now holding tickets.  He

1  could stay at that airport and return home or he could

2  run across town.  And that's what he does.  He promptly

3  leaves the airport, takes an Uber all the way across

4  New York City to La Guardia, and flies back to DFW from

5  La Guardia.

6          It should be noted that at the time of his

7  flight there was a direct flight from Tehran to DFW

8  available.  He bypassed that and opted to go this

9  confusing route through multiple airports in New York

10  City.

11  Q.   Now, once the family is in the airport here in DFW,

12  is suspicious behavior noted?

13  A.   Yes.

14  Q.   Describe that.

15  A.   So at that point the Hemani family, I understand,

16  was under surveillance, and I don't know all of the

17  reasons for that.  But investigators noted that at the

18  time the defendant's flight was to arrive, the

19  defendant's father and brother were both awaiting in

20  the unsecured area of DFW Airport around Gate A15, I

21  believe, the unsecured area.  The defendant arrived, he

22  entered that same area, and investigators found it

23  suspicious because there was zero interaction between

24  the defendant and his father and brother.  They didn't

25  acknowledge each other, they made no contact with each

Agent Jason Hollingshead - Direct by Ms. Rattan                    19

1  other.  It was almost -- it seemed a conscious effort

2  to avoid interaction, even though they were very close

3  together, same proximity, same area.

4        The defendant gathers his things, he leaves

5  the airport.  The defendant's father and brother remain

6  seated for a minute and just waited.  And after a

7  minute, they both got up, they exited the airport, and

8  the investigators observed all three of them -- the

9  defendant, his father, and his brother -- meeting in a

10 parking garage and then they left the airport together.

11        That's also a common tactic.  It appears that

12 the defendant's father and brother were acting as

13 lookouts, trying to see if their brother or son, the

14 defendant, was being tailed, followed by law

15 enforcement, anything suspicious, counter-surveillance

16 techniques utilized by the family.  And then once they

17 thought it was safe, they met up in an inconspicuous

18 place.

19 Q.  So was the defendant at some point interviewed and

20 was he asked about whether he would report anything

21 that were concerning or any terrorist activity, any

22 imminent attack, was he asked if he would report that

23 to the United States or any authority?

24 A.  He was.

25 Q.  Will you describe that situation for the Court.

```
 1  A.   The defendant was asked that, you know,
 2  hypothetical situation, if he had knowledge that an
 3  attack was going to take place where innocent people
 4  were injured or killed, would he report that imminent
 5  attack to law enforcement, to the authorities for the
 6  FBI, and he indicated -- the defendant said that if it
 7  was a Shia brother, he would not.
 8  Q.   Now, you have been talking about the summer of
 9  2022, July of 2022, and the defendant's brother.  Are
10  you talking about his brother, Mohammed?
11  A.   Yes, ma'am.
12  Q.   And that's the only brother he has; is that
13  correct?
14  A.   That's the only one I'm aware of.
15  Q.   And is that the same brother who, in fact, doesn't
16  live here, he lives internationally?
17  A.   Correct, I believe he resides in Iran.
18  Q.   In Iran.  And his wife and his children are in
19  Iran; is that right?
20  A.   That's my understanding, yes, ma'am.
21  Q.   And that's the same brother the defendant reports
22  having daily contact with when he talks to the United
23  States Probation Officer; is that right?
24  A.   I believe he reported weekly contact.  I don't
25  know, it could have been daily, I might be wrong.  But
```

1  I know for sure weekly.

2  Q.   Okay, continuous contact?

3  A.   Yes, ma'am.

4  Q.   And that's the same brother who attended the

5  University in Iran that's been designated as being

6  associated with terrorism; is that right?

7  A.   That's correct.

8           MS. RATTAN:  I'll pass the witness, Your Honor.

9           THE COURT:  Cross-examination?

10          MR. O'SHEA:  Thank you, Your Honor.

11                        **CROSS-EXAMINATION**

12 **BY MR. O'SHEA:**

13 Q.   Officer Hollingshead, let me ask you a couple of

14 questions here.

15          So, with respect to Ali's family in 2019,

16 you've testified as to various movements the family has

17 made; right?

18 A.   The 2019 instance that I referred to earlier was

19 the instance where the defendant, Mr. Hemani, had his

20 phone searched at a border entry.  I don't know what

21 the family's movements were in 2019.  I just know about

22 his phone being searched in 2019.  That's where they

23 found the anti-America sentiment and also the

24 conversations about fraud.

25 Q.   So you said he was in JFK Airport?

1  A.   I believe that was 2022.

2  Q.   Okay.  How many agents were there watching him?

3  A.   I don't know, sir.

4  Q.   No idea?

5  A.   No idea.

6  Q.   Where did you get this information that you didn't

7  have last time?

8  A.   From some conversations that I've had with

9  investigators and agents involved in the case.

10  Q.   And how many agents and investigators sat down with

11  you and talked to you about it?

12  A.   A handful, two or three.

13  Q.   Two or three.  How many were involved in watching

14  the Hemanis?

15  A.   I'm sorry, could you repeat?

16  Q.   How many agents are involved in watching the

17  Hemanis?

18        MS. RATTAN:  Your Honor, I think this is far

19  afield and it goes into irrelevant matters and it goes

20  into an investigation.

21        THE COURT:  Where are you headed with this?

22        MR. O'SHEA:  It goes into flight risk, Judge.

23  I mean, if they're being surveilled and spied on and

24  watched and followed everywhere and they're calling it

25  a trade craft, I mean, where is he going to go when all

 1   these agents have been spying on this family for three

 2   years?

 3          THE COURT:  Okay.  Well, I think it's been

 4   established that the family is being watched by the

 5   FBI.  And so you can make those arguments when it's

 6   time for you to argue.

 7   BY MR. O'SHEA:

 8   Q.  Are you familiar now with the investigation in

 9   2020, the warrant that was searched that was for their

10   house?

11   A.  I'm sorry, are you asking if I'm familiar with the

12   2020 warrant?

13   Q.  Right.

14   A.  I know nothing more today than I did when we

15   previously spoke a few weeks ago.

16   Q.  So let's talk about Mr. Hemani and his flight risk.

17   Is there a tracker on any of the Hemani's cars?

18   A.  Not that I'm aware of.

19   Q.  Do you know if their phones are being tapped?

20   A.  Not that I'm aware of.

21          MS. RATTAN:  Your Honor, I'm going to object.

22   This is not appropriate.  It goes into matters that

23   aren't appropriate for this hearing and I object, not

24   relevant.

25          THE COURT:  Sustained to the extent you're

1   asking about underlying investigations.

2          MR. O'SHEA:  Thank you, Your Honor.

3   BY MR. O'SHEA:

4   Q.   Are they still following the Hemani family?

5          MS. RATTAN:  Again, I object to that.  Counsel

6   can make the argument -- may I be heard?

7          THE COURT:  Okay.

8          MS. RATTAN:  He can certainly make the argument

9   that there's no opportunity to flee because they're

10  under investigation.

11         THE COURT:  I think that's what he just --

12         MR. O'SHEA:  I'd like to know a factual basis

13  for that argument, Judge.

14         MS. RATTAN:  We object, it's not relevant.

15         THE COURT:  I'll overrule that question.  You

16  can answer that question.

17         THE WITNESS:  So which -- can you repeat the

18  question specifically that --

19  BY MR. O'SHEA:

20  Q.   Is the Hemani family still being spied on?

21  A.   I have no involvement in the case currently, so I

22  have no idea.  To my knowledge, there is no

23  surveillance.

24  Q.   No surveillance?

25  A.   None that I'm aware of.

 1  Q.   Any wiretaps on the Hemani family right now?

 2          MS. RATTAN:  I have to object again.  This

 3  goes into a potential additional investigation.  If he

 4  wants to make the argument, there's enough evidence

 5  here that's presented to the Court that he can make the

 6  argument that's he under surveillance and can't flee.

 7          THE COURT:  Again, these questions do go into

 8  underlying investigations, so I'm going to sustain the

 9  objection.

10  BY MR. O'SHEA:

11  Q.   With respect to the Nouris, you said you have these

12  pictures that you found on Mr. Nouri's phone; right?

13  A.   Not me personally, but investigators involved with

14  the case; that's correct.

15  Q.   Okay.  What else did they look at with respect to

16  Mr. Nouri?

17  A.   I'm not sure.

18          THE COURT:  Hold on just a second because I

19  don't want the record to be inaccurate.  I think you

20  just said on Mr. Nouri's phone.  It was Mr. Hemani's

21  phone; correct?

22          MR. O'SHEA:  No, no, Judge, I meant the

23  custodian.

24          THE COURT:  I know.  The picture that the

25  Government just introduced as Government's Exhibit 1

 1  was found on Mr. Hemani's phone, not Mr. Nouri's phone.

 2  BY MR. O'SHEA:

 3  Q.   Okay, so that was on Mr. Hemani's phone.  When was

 4  that found?

 5  A.   I don't know, sir.

 6  Q.   Was it found recently?

 7  A.   I don't know, sir.  I can assume that it's from the

 8  last time his device was searched.  I don't know the

 9  date of that.  And as far as when it was actually

10  located, technically speaking, it would have been

11  located for legal purposes when his device was

12  searched.  But I think when investigators learned of

13  the identity of the proposed third-party custodian,

14  they did a review of the previously obtained material

15  and that's where they found it.

16  Q.   So that's a contact for the custodian, Mr. Nouri;

17  right?

18  A.   That's correct.

19  Q.   In other words, my client didn't put that on his

20  phone, Mr. Nouri did; right?

21  A.    I don't believe that's correct.  I believe the way

22  it works is when I, or when you, whenever we enter a

23  contact into our device, we can edit that contact and

24  we can make their name whatever and we can depict or

25  associate any photograph from our gallery to that

 1  contact.  You know, you would probably have a picture

 2  of your spouse.

 3  Q.   So you don't know who put that picture on his

 4  contact?  Was it Mr. Nouri or Mr. Hemani?

 5  A.   It was on Mr. Hemani, the defendant's phone.  So I

 6  believe that the picture would have been put there by

 7  the defendant, Mr. Hemani?

 8  Q.   But you don't know?

 9  A.   No, sir, I do not know.

10  Q.   Okay.  So those two gentlemen who are on the phone,

11  there was some mention about -- what was that phrase

12  again on the second picture?

13  A.   So "Is the morning nigh," I believe, is the wording

14  on the bottom corner.

15  Q.   And what does that mean again?

16  A.   Is the morning nigh?  Is the day close?  Is the

17  morning close?  Is the --

18  Q.   What does that mean?

19  A.   As I spoke to when I was initially examined, my

20  understanding of it is it's another way of saying, "Is

21  today the day" or "Is the day close"?

22  Q.   But what are you talking about?

23  A.   It could be interpreted as the day of retribution.

24  That's a possibility.

25  Q.   What kind of retribution?

```
 1  A.   Perhaps retribution for the assassination, as it's
 2  perceived, of Quasem Soleimani.
 3  Q.   What does that mean?
 4  A.   To be assassinated?
 5          MS. RATTAN:  I'm going to object, Your Honor.
 6  I think we're going far afield at this point.
 7          THE COURT:  Sustained.
 8  BY MR. O'SHEA:
 9  Q.   Okay.  So you are interpreting that as Ali Hemani --
10  first of all, you said that was a common picture on a
11  lot of Shias' phones; right?
12  A.   I don't know about on Shias' phones.  I just know
13  that it's not an individual picture.  There is -- I was
14  told that that picture is readily available, it's
15  commonly seen.
16  Q.   So you've used the word "martyrdom" several times;
17  is that right?
18  A.   I have.
19  Q.   What does that mean?
20  A.   So martyrdom, the best depiction I can give of that
21  is someone who is unjustly killed in the name of a
22  cause.
23  Q.   Okay.  What does that have to do with Ali?
24  A.   Well, I mean, I know that he traveled to Iran
25  around the time that there was a celebration for Quasem
```

1  Soleimani, who was perceived in the community as a

2  martyr.  He has images of Soleimani on his phone.  And

3  then we've already spoken in the previous hearing of

4  his mother specifically referencing the word "martyr" in

5  that context.

6  Q.   In what context?

7  A.   Of her sons becoming martyrs like Quasem Soleimani.

8  Q.   So martyr means what?

9  A.   Someone who is unjustly killed for a cause.

10 Q.   Okay.  Are you saying that my client is going to

11 kill himself for a cause?  That's what martyrdom means

12 in Shia Muslim?

13          MS. RATTAN:  I object.  This calls for

14 speculation at this point.  There are inferences for

15 the Court to make.

16          THE COURT:  Mr. O'Shea, you're pushing it.

17 Where are you going with your questions?

18          MR. O'SHEA:  I'm trying to figure out what

19 they're trying to exactly say, how they're making --

20 they're concerned about things, there's insinuations

21 going on here.

22          THE COURT:  The agent is here to talk about

23 evidence and then to be cross-examined on the evidence,

24 not the attorney argument.  So, Ms. Rattan will make

25 her arguments from the evidence, you'll make your

1  arguments from the evidence.  If you have more

2  questions about the evidence for this agent, you should

3  ask him at this time.

4  BY MR. O'SHEA:

5  Q.   So everything you just testified to, has Ali acted

6  on anything to -- on any dangerous activity, overt acts

7  that he's done?  Can you name all the overt acts that

8  Ali has done to show that he's a danger to the

9  community?

10 A.   No, sir.  The only evidence that I'm aware of

11 specifically with him is he did have anti-American

12 sentiment on his phone during a search of his device in

13 2019.

14 Q.   What does that -- what did he say specifically?

15 A.   I don't know.  I did not see the actual content.

16 Q.   So the anti-American, like what?

17 A.   Sentiment.

18 Q.   Okay.  But you don't know what he said exactly?

19 A.   That's correct.  I was told by law investigators it

20 was anti-American sentiment.

21 Q.   Okay.  So, if someone has the anti-American

22 sentiment, they're a threat, too; right?

23         MS. RATTAN:  I object.  Again, it calls for

24 speculation.

25         THE COURT:  Overruled.  You can answer that

 1  question.

 2  A.   So I believe your question was, if someone has

 3  anti-American sentiment, it makes them a threat.

 4  BY MR. O'SHEA:

 5  Q.   Yeah.

 6  A.   And you asked me if that's correct?

 7  Q.   Yes.

 8  A.   Okay, it can.  I think in this instance we're

 9  looking at the totality of the circumstance.  We don't

10  just have one thing being anti-American on a device.

11  We have a number of things, which I can list off again,

12  which leads investigators to fear that your defendant

13  does pose a significant risk to the public.

14  Q.   Okay, what's the most concerning?

15  A.   Just --

16  Q.   The most.

17  A.   Would you like me to list all of them?  Because I --

18  Q.   Well, what's the most concerning?  That's the

19  question.

20  A.   Well, if he has anti-American sentiment on his

21  device.  He has communication with individuals who have

22  been affiliated with IRGC, a terrorist organization.

23  He lives in a household with a mother who has expressed

24  openly some extremist views.  So --

25  Q.   Let me stop you there.  Explain to me why she's not

1  arrested.

2          MS. RATTAN:  Your Honor, I have to object.

3  Now he's not letting him answer.

4          THE COURT:  I don't know what the question is.

5  BY MR. O'SHEA:

6  Q.  Did you know that the United States Government

7  allows Shia Muslims to travel on these pilgrimages to

8  Iran?

9  A.  Yes, sir.

10 Q.  Okay.  And despite that, you still have surveilled

11 this family on those pilgrimages?

12 A.  I have not.

13         MR. O'SHEA:  I'll pass the witness.

14         THE COURT:  All right.  Redirect?

15         MS. RATTAN:  No, thank you, Your Honor.

16         THE COURT:  All right, thank you, sir.  You

17 may step down.

18         THE WITNESS:  Thank you, Your Honor.

19         THE COURT:  Does the Government rest?

20         MS. RATTAN:  We do, Your Honor.  We'd rest.

21         THE COURT:  All right.  Mr. O'Shea, you may

22 call your witness.

23         MR. O'SHEA:  Your Honor, I'd like to call

24 Mrs. Nouri.

25         THE COURT:  All right, ma'am, if you'll please

1  come up to the witness stand.

2         DEPUTY CLERK:  Do you solemnly swear that the

3  testimony you are about to give in the case before the

4  Court shall be the truth, the whole truth, and nothing

5  but the truth, so help you God?

6         THE WITNESS:  I do.

7         DEPUTY CLERK:  Have a seat and state your name

8  and spell it for the record.

9         THE WITNESS:  Okay.  My name is Deborah

10 Sheikholes Lam-Nouri.  Deborah is spelled D-e-b-o-r-a-h.

11 Sheikholes Lam-Nouri, S-h-e-i-k-h-o-l-e-s L-a-m-

12 N-o-u-r-i.

13        THE COURT:  You may proceed, Mr. O'Shea.

14        MR. O'SHEA:  Thank you, Your Honor.

15        **DEBORAH S. LAM-NOURI, Called by the defense**

16                **DIRECT EXAMINATION**

17 **BY MR. O'SHEA:**

18 Q.  Mrs. Nouri, you've agreed to act as custodian for

19 Ali?

20 A.  Yes, I have.

21 Q.  Let me ask you some questions.  Where were you

22 born?

23 A.  I was born in Corpus Christi, Texas.

24 Q.  Are you an American citizen?

25 A.  Yes, I am.

Deborah Sheikholes Lam-Nouri - Direct by Mr. O'Shea                    34

1   Q.   Where did you go to college?

2   A.   I went to Baylor University for my Master's -- I

3   mean, my Bachelor's in Accounting.  And I went to the

4   University of Texas at El Paso for my Master's in

5   English Linguistics.

6   Q.   Okay.  And your husband, what's his name?

7   A.   His name is Ali Sheikholes Lam-Nouri.

8   Q.   And he's in the courtroom today?

9   A.   Yes, he is.

10  Q.   And you both agree to act as custodian?

11  A.   Yes, we have.

12  Q.   And allow Ali to live with you?

13  A.   Yes.

14  Q.   Let's skip to this point.  After hearing what

15  you've heard today, do you have any concerns about Ali

16  being a threat to society?

17  A.   Absolutely not.

18  Q.   Or a flight risk?

19  A.   No, I have known him since he was six years old.

20  He's a very decent and respectable, hardworking young

21  man.

22  Q.   Okay.  Can you tell the Judge what you've done for

23  your career?

24  A.   After graduating from Baylor, I was an accountant

25  with Price Waterhouse.  And then after that, I had a

1    change in careers.  I went back to school and got my

2    Master's in Linguistics.

3    Q.   And you're retired?

4    A.   Yes, I'm retired now.

5    Q.   Now, let me ask about your husband.  He came here

6    in 1978 --

7    A.   Yes.

8    Q.   -- from Iran; right?

9    A.   Yes.

10   Q.   Is he a citizen?

11   A.   Yes, he is.

12   Q.   Okay.  American citizen; right?

13   A.   Yes.

14   Q.   Okay.  And where did he go to school?

15   A.   He went to school at the University of North Texas.

16   Q.   Okay.  And what was his degree in?

17   A.   He had a Bachelor's and a Master's in Industrial

18   Technology.

19   Q.   And what was his career?

20   A.   His career was he became a university instructor at

21   UNT.

22   Q.   Okay.  So he was a professor --

23   A.   Yes.

24   Q.   -- for how long?

25   A.   I believe for 20 years.

Deborah Sheikholes Lam-Nouri - Direct by Mr. O'Shea                    36

1  Q.   A senior professor at UNT?

2  A.   Yes.

3  Q.   Okay.  Do you all have any problems with the law?

4  A.   No.

5  Q.   Okay.  And how long have you lived in your home?

6  A.   Almost 17 years.

7  Q.   Okay.  And you own the home?

8  A.   Yes, we do.

9  Q.   You're both retired?

10 A.   Yes.

11 Q.   So you're there all the time?

12 A.   Yes.

13 Q.   So, now, you talked with Pretrial; right?

14 A.   No.

15 Q.   Someone called you; right?

16 A.   Oh, someone called and asked to do the background

17 check.

18 Q.   All right.  And they also asked you that you'd keep

19 an eye on Ali?

20 A.   Yes.

21 Q.   And if he did anything that you found suspicious or

22 concerning, what did they ask you to do?

23 A.   They asked us to report it, and we said we

24 definitely would.

25 Q.   Okay.  Do you know Ali to be a troublemaker?

Deborah Sheikholes Lam-Nouri - Direct by Mr. O'Shea                    37

1   A.    No.

2   Q.    To have anti-American sentiments?

3   A.    No, no.

4   Q.    What do you know about Ali?

5   A.    I know he's a very decent young man.  He's very

6   respectful.  He -- as growing up, he would come to our

7   home many times.  And I have two sons of my own and

8   they would get together and play video games and do

9   things that, you know, young kids do.

10          I had -- my elderly mother was living with me

11  for the last eight years.  Unfortunately, about six

12  months ago she passed away.  But I remember whenever

13  Ali would come here, he never failed to go to her room

14  and talk to her and very respectful.  I have not seen

15  too many young people to be that respectful, especially

16  with the elderly.

17  Q.    You have two children?

18  A.    Yes, I do.

19  Q.    How old are they?

20  A.    My oldest son, I think is going to be 37 in July.

21  And I have another son who's going to be 32 in March.

22  Q.    Now, your oldest son lives in Redding, Connecticut;

23  correct?

24  A.    Yes, he does.

25  Q.    What does he do?

 1  A.   He's an engineer with a company, ASML.

 2  Q.   And he's married with how many children?

 3  A.   He has two children

 4  Q.   So you're a grandmother of those children; right?

 5  A.   Yes.

 6  Q.   And your youngest son is married with no children;

 7  right?

 8  A.   Yes.

 9  Q.   He lives where?

10  A.   He lives in Denton.

11  Q.   Okay, what does he do?

12  A.   He's a communications manager for a company.  I

13  can't remember the name of it, but the company makes

14  software for homeowners associations.

15  Q.   Okay.

16        MR. O'SHEA:  I'll pass the witness.

17        THE COURT:  All right.  Cross-Examination?

18                  **CROSS-EXAMINATION**

19  **BY MS. RATTAN:**

20  Q.   Ma'am, he's 25 years old; is that right?

21  A.   Yes.

22  Q.   And you testified about being around him when he

23  was younger.  When was the last time you saw him before

24  all this happened?

25  A.    I don't remember the exact date, but his family

1  would often come over to our home, you know, when we
2  would invite them.
3  Q.   So they would come once a month, once every six
4  months?  How often would you see them?
5  A.   Maybe a couple times a month.
6  Q.   So two times a month.  When was the last time you
7  saw him?
8  A.   I don't remember the exact day, I'm sorry.
9  Q.   That's okay.  Has it been six months, eight months?
10  A.   Oh, no.
11  Q.   More recently?
12  A.   More recently.
13  Q.   So it was late last year the last time you saw him?
14  A.   Probably, yes.  I don't remember the exact date.
15  Q.   That's okay, you don't have to.
16  A.   Yeah.
17  Q.   But could you estimate for us, please?
18  A.   It was probably in January.
19  Q.   So January of this year.  And then before that,
20  when was the last time you saw him?
21  A.   Probably December.
22  Q.   Okay.  So once a month --
23  A.   Yeah.
24  Q.   -- and he comes over with his family.  What do they
25  come over for?

```
 1  A.   For meals or like we celebrate birthdays,

 2  anniversaries together.

 3  Q.   And so you're having contact, your family with his

 4  family, not necessarily with him individually; is that

 5  right?

 6  A.   Well, as a family, they would --

 7  Q.   Well, tell Judge Johnson what you know about Ali

 8  Hemani's drug abuse.  What drugs does he use?

 9  A.   Well, I recently heard about this and, you know,

10  I'm pretty sure it was because in our conservative

11  community the family, I'm sure, was, you know,

12  embarrassed about it.  But when I found out about it,

13  it really did not shock me because I know that a lot of

14  young kids, you know, they fall for these things.  It

15  doesn't change my opinion of him.  He's a decent,

16  hardworking young man.

17  Q.   Do you know what drugs he was using?

18  A.   I just know what I heard.

19  Q.   What did you hear?  What do you know about that?

20  A.   I heard that they were saying marijuana.

21  Q.   That's what you heard, just marijuana?

22  A.   I think I heard cocaine, too.

23  Q.   Well, what did you hear?  Don't let it trickle in.

24  Tell us what you know.

25  A.   Well, because I read the brief.  That's what was
```

1  said in the brief that the FBI wrote.

2  Q.   Okay.  So, before you read the brief, what did you

3  really know about this defendant, Ali Hemani?

4  A.   Well, I didn't know about this substance abuse,

5  obviously.

6  Q.   You knew nothing about it?

7  A.   Not about that.

8  Q.   You didn't know he was abusing promethazine --

9  A.   No.

10  Q.   -- you didn't know he was using marijuana, you

11  didn't know that he was using cocaine?

12  A.   No, I didn't.

13  Q.   Now, did you know -- and you've read the brief --

14  that even in his own phone he says that this is

15  addictive and he's enjoying the promethazine?  Did you

16  know about that?

17  A.   No.

18  Q.   What about firearms?  Did you know him to ever use,

19  have, be involved with firearms in any way?

20  A.   I didn't know it.

21  Q.   So you didn't know he was abusing drugs, you didn't

22  know anything about the firearms, either; is that right?

23  A.   I found out about the firearms later when the

24  family mentioned that they bought it for recreational

25  use.

Deborah Sheikholes Lam-Nouri - Cross by Ms. Rattan                42

1  Q.   That the family, who said they bought it for

2  recreational use?

3  A.   The father said that they went together, actually,

4  and bought them and they would sometimes go to the

5  shooting range, and they said they were, you know,

6  thinking about it there that that was the sport of

7  their choice.

8  Q.   Okay.  So the father said that he and the son, Ali,

9  would use the firearms together?

10  A.   Yes.

11  Q.   And, you know, it's not necessarily illegal to have

12  a firearm?

13  A.   Right.

14  Q.   The problem is when you combine a firearm with the

15  drugs that he was abusing; you understand that?

16  A.   Yes.

17  Q.   Now, it's your testimony that the defendant has not

18  been -- and I'm going to use the term "radicalized."

19  There's no extremist views that you're aware of related

20  to the defendant?

21  A.   No.

22  Q.   And you're saying that you're close to the family;

23  is that right?

24  A.   Yes.

25  Q.   So, of course, that includes the mom?

1   A.   Yes.

2   Q.   Do you know when it was that Quasem Soleimani died?

3   A.   I don't remember that.

4   Q.   Does it sound correct to you that it would have

5   been in January of 2021?

6   A.   I just don't remember.

7   Q.   Do you know, and you say you have monthly,

8   bi-monthly, every two-month contact with the family.

9   Did you know that within a month of him dying,

10  Soleimani, and being martyred within the community and

11  the country there, that that family, the Hemani family,

12  the defendant and his parents, traveled to Iran?  Did

13  you know about that?

14  A.   Yes, they went to -- I believe they went to a

15  wedding.

16  Q.   Did you know anything about them participating in

17  any of the mourning or grieving of Soleimani or any of

18  the other individuals who died?

19  A.   No.

20  Q.   You didn't know anything about that?

21  A.   No.

22  Q.   Now, one thing that's available on the Internet

23  that's no secret, is kind of a "man on the street,

24  woman on the street" interview that was done with the

25  defendant's mother.  Have you seen that?

Deborah Sheikholes Lam-Nouri - Cross by Ms. Rattan                    44

1   A.   I don't think so.

2   Q.   Well, in this interview that's recorded, she's

3   standing in front of a very large depiction of

4   Soleimani.  And do you know what she says?  Have you

5   heard anything about that?  You said you read the

6   brief.

7   A.   Oh, in the brief?  I don't -- I mean, I read it,

8   but I  don't remember the exact words.

9   Q.   She said that she wanted her son to be martyrs just

10  like Soleimani.  Did you know about that?

11  A.   Well, I do now, I mean when I read the brief.

12  Q.   Well, and who are her sons?

13  A.   Well, she has two sons, yes.

14  Q.   So, do you take it that she's referring to Ali and

15  Mohammed, that she wants her sons to be martyrs like

16  Soleimani?

17  A.   I'm not sure what her meaning was.

18  Q.   What do you understand?  If you hear that, what do

19  you think?

20  A.   Maybe that it's just an honor if someone is

21  martyred for their religion.

22  Q.   Okay.  And that she wants them to do that; is that

23  right?

24  A.   I don't know necessarily if she wanted that.

25  Now, sometimes people say things, that maybe it's the

1   fervor of the moment and they say things, but it

2   doesn't necessarily mean that she really wanted her

3   sons to be martyrs.

4           MS. RATTAN:  May I approach the witness, Your

5   Honor?

6           THE COURT:  Yes.

7   BY MS. RATTAN:

8   Q.  Let me show you what's been marked as Government's

9   Exhibit No. 1 and ask you, on page 1 of Government's

10  Exhibit No. 1, do you recognize anyone in this

11  photograph?

12  A.  Well, now I know who they are.

13  Q.  If you'll speak into the microphone.  Did you not

14  know before you came to the courtroom today who those

15  people were?

16  A.  I mean, I've heard about them, yes.

17  Q.  And who are they?

18  A.  I believe one of them is an Iranian general and the

19  other one is an Iraqi general.

20  Q.  Okay.  Now, it says in this photograph right by

21  their picture, "Is not the morning nigh?"  What does

22  that mean to you?

23  A.  Well, the word "nigh" is an old English word

24  meaning "near".  So "the morning is near" could mean

25  anything.

Deborah Sheikholes Lam-Nouri - Cross by Ms. Rattan                    46

1  Q.   Right, it could, couldn't it.  It could also be a

2  call to action, a call to arms, is that right,

3  especially in the circumstances here?

4  A.   I'm not sure what that means.

5  Q.   So you see the photograph.  And what's the name

6  that you see right under that photograph, which is

7  Government's Exhibit 1, page 1?

8  A.   Well, I don't know where this photo is.  Where was

9  it taken from?

10  Q.   I'm just asking you.  You see the photograph,

11  you've identified who they are, "Is the morning nigh?"

12  And whose name is right under there?

13  A.   Well, I see my husband's name, but where was this

14  photo found?  On his phone?

15  Q.   Uh-huh, it was found in the defendant, Ali Hemani's

16  phone --

17  A.   Okay.

18  Q.   -- associated with your husband, Ali Nouri.

19  A.   Well, maybe he put the picture there, but that's

20  not the picture my husband has on his website.

21  Q.   So your husband wouldn't be associated at all with

22  that photo --

23  A.   No.

24  Q.   -- is that what you're saying?

25  A.   No.

1   Q.   Have you ever heard your husband express any

2   anti-American --

3   A.   No.

4   Q.   -- views?

5   A.   No.

6   Q.   Never?

7   A.   No.

8   Q.   No anti-American sentiments?

9   A.   No, not whatsoever.

10  Q.   No concerns about anything that the United States

11  did in terms of what happened --

12  A.   No.

13  Q.   -- to Soleimani?

14  A.   No.

15          THE COURT:  Ms. Rattan, if you're done asking

16  questions about the exhibit, can you go back to the

17  podium, please?

18          MS. RATTAN:  Yes, Your Honor.

19  BY MS. RATTAN:

20  Q.   In terms of your view on Soleimani General -- he

21  was promoted posthumously General Soleimani -- what is

22  your view of him?

23  A.   Well, what I heard is that he was very instrumental

24  in getting rid of ISIS, which is a good thing.

25  Q.   And so your view of him is that he did good things;

 1  is that right?

 2  A.   Yes.

 3  Q.   And what's your view of what happened to him?

 4  A.   I don't think it was right, what happened to him.

 5  Q.   Have you or your husband ever made any payments to

 6  the Government of Iran?

 7          MR. O'SHEA:  Objection, Your Honor.

 8  A.   No.

 9          THE COURT:  Overruled.

10  BY MS. RATTAN:

11  Q.   Never at all?

12  A.   No.

13  Q.   In fact, based on the things that you just said,

14  would you say that you and your husband view Soleimani

15  as something of a hero or, in fact, a martyr?  Do you

16  see him that way?

17  A.   I've heard that he's a good person.

18  Q.   I'm asking you what you think.

19  A.   I think he is.

20          MS. RATTAN:  I'll pass the witness, Your Honor.

21          THE COURT:  All right, redirect?

22          MR. O'SHEA:  No, Your Honor.

23          THE COURT:  All right, thank you, ma'am.  You

24  may step down and go back to your seat.

25          MR. O'SHEA:  Your Honor, we rest.

 1            THE COURT:  All right, I'll hear arguments at

 2   this time as soon as the witness gets back to her chair.

 3            Ms. Rattan, you may proceed.

 4            MS. RATTAN:  Thank you, Your Honor.

 5            Of course, we can't lose sight of what

 6   this case is.  The case is a firearms case and it has to

 7   do with the defendant abusing and using and possessing

 8   drugs at the same time that he has firearms.  And when

 9   you view the case in a vacuum alone with just those

10   facts, it would be our position that the Court could

11   detain him just on those facts.  The concern would be

12   that if the Court  were to release him, what reason do

13   we have to believe that he's not going to continue to

14   abuse these drugs that he's had, cocaine, promethazine,

15   marijuana, and then he also acknowledges to the

16   probation officer that he abuses -- or uses alcohol.

17            And when we talk about that and the

18   concerns, there's an obstruction concern and we outline

19   this in our brief, as well.  The Court, if you release

20   the defendant, essentially trusting him to abide by the

21   rules that the probation officer will try to enforce,

22   he's already lied to the Court.  We've pointed out in

23   our brief that when the probation officer asked him

24   about drugs and substances that he uses, he only said

25   two.  He said alcohol and cocaine, I believe.  There

1  are two other drugs that we know about based on the

2  search of his phone and the search of the house.  He's

3  involved with alcohol, marijuana, cocaine, and

4  promethazine.  So he's already not revealing things to

5  the Court.

6              The other thing that's very concerning in

7  terms of obstruction and the Court being able to trust

8  him if he's on release is the fact that it doesn't say

9  anywhere and he doesn't reveal that he's a dual citizen,

10  not just a citizen of the United States, but a citizen

11  of Pakistan.

12              And that dovetails into if he were to

13  flee, how would we be able to extradite him?  We know

14  that he has affiliations, associations with these

15  countries where the United States doesn't have a

16  relationship.  And when you talk about obstruction and

17  things that he might do, of course, the flight is part

18  of that.  But he also has contacts internationally.

19  It's his brother, who we know comes back and forth from

20  this country, was here as recently as the summer of

21  2022.  His brother attended the university that's been

22  designated by the United States Government as

23  associated with terrorist activity.  His brother and

24  his family live over there.  His brother has come back

25  over here.  He reports to the probation officer weekly

1  contact with his brother, so close contact.  He's also
2  got his aunt and uncle who live internationally.
3            So there are multiple concerns.  There's
4  concern about flight.  There's concern about
5  obstruction.  And the issue with the extremist contacts
6  is a danger to the community.  And, of course, we can't
7  overlook that.
8            And there have been enough, I'm going to
9  say red flags raised through the investigation that the
10  FBI has done so far.  The defendant's travel to Iran
11  clearly in the wake of the death of Soleimani.  And
12  when the probation officer asked him about his travel
13  history, he reported international travel.  Multiple
14  times he's traveled internationally.  But significant,
15  as we point out in the brief, he lied, didn't disclose,
16  whatever you want to call it, the family's travel very
17  soon, within a month after the death of Soleimani.
18            Obstruction, lies.  Can the Court trust
19  him?  It seems like the answer is no.  So abuse of
20  drugs, possession of firearms, and all of these red
21  flags that indicate that he is a concern and a danger
22  to the community.
23            And now he's presented a third-party
24  custodian.  And for whatever reason, they chose not to
25  call the husband, but they presented both the husband

 1  and the wife as third-party custodians.  And the wife

 2  has testified here before this Court that she believes

 3  that Soleimani is a good man and he did good things.

 4  It's concerning given the context of the whole case.

 5           And we know that in the defendant's phone

 6  he has Ali Nouri identified with a picture of

 7  Soleimani.  So, "Is the morning nigh?" is the question.

 8  There are red flags here, very concerning red flags,

 9  and we'd urge the Court to base a decision, of course,

10  on the evidence, but the fact that there's a firearm,

11  there's abuse of drugs and all these red flags in terms

12  of danger to the community.

13           Thank you.

14      THE COURT:  Thank you.

15           Mr. O'Shea?

16      MR. O'SHEA:  Yes, Your Honor.

17           With respect to the drug issue, Judge, the

18  Court is well aware that we see many, many people come

19  through with drug addiction issues and are out on

20  pretrial release and they are asked to give UAs on a

21  regular basis or a sporadic basis.  And so that's not

22  uncommon in and of itself.  And especially gun cases.

23  I mean, people get let out all the time.  He had the

24  gun apparently that was bought legally.

25           But with respect to these other red flags,

1  Judge, you know, it's really -- what's concerning, what
2  is really concerning is that they've been spying on this
3  family for three years, watching every move.  Whenever
4  he gets in a car and goes to Houston, they know every
5  turn he makes and yet they're saying he's a flight risk.
6  He's willing to turn in his passports.  He comes from a
7  stable family.  He's an American citizen, graduated
8  from an American high school, has a good job, or had a
9  good job, but he can get it back because he's so well
10 respected in the community.  He's a gentle person.
11 Apparently he made some anti-American statement, some
12 vague statement, which they won't tell us what it was.
13 I mean, you know, they could tap my phone and they would
14 have me buried under, you know, for what I think of some
15 things.  Anyways, but that's neither here nor there.
16            But that's no reason to hold someone
17 because we have something called the First Amendment.
18 And the First Amendment allows people to say things
19 even though they may be anti-government or, you know,
20 whatever anti against this Government, or what someone
21 may construe is anti-American.  We don't even know what
22 specifically he said.
23            Of course, he has ties to his brother.
24 It's his brother.  He calls him weekly.  He's over
25 there studying and the United States Government knows

 1   that these pilgrimages have been legalized; okay?  So
 2   the fact that the Shia Muslims are going on these
 3   pilgrimages is well known to the Government.  The fact
 4   that they're spying on people going on these
 5   pilgrimages is very concerning.  That's concerning in
 6   this country, Your Honor.
 7            These folks have -- I asked the agent last
 8   time, is there anything concerning about Ali?  And
 9   there was nothing.  And today they come in with a
10   couple of pictures that apparently are spread
11   throughout the Internet.  I mean, you can get anything
12   on the Internet, and the fact they put it on the phone
13   doesn't mean you're going to go commit some terrorist
14   act or that you've been radicalized.
15            When the first time we had this hearing,
16   they showed some statements from his mother, which
17   were completely taken out of context.  The concept of
18   martyrdom has completely been distorted with respect to
19   what it means in the Shia Muslim religion.  It's very
20   concerning in these types of things, the way they're
21   characterizing these people of faith.
22            They're saying that Ali is under the
23   influence of his mother because she supposedly is a
24   radical Shia Muslim.  Well, if he's so much under the
25   influence of his mother, why is he smoking marijuana,

 1   you know?  To me, he's a normal teenage -- or

 2   25-year-old kid up there doing what 25-year-old kids

 3   do.  He's out there with a job, he's got a car, there

 4   are girlfriends.  He shouldn't be smoking marijuana, but

 5   he does like, what, 60 to 70 percent of the kids now.

 6   And how many Texans are we going to lock up that smoke

 7   marijuana and own a handgun?  That, in and of itself,

 8   is not a red flag, Your Honor.

 9           These other things that they're trying to

10   impute onto Ali don't exist.  It's all smoke and

11   mirrors.  And what they're really doing is engaging in

12   fear mongering.  That's it.  This is nothing but just

13   fear mongering and going after the Shia community, and

14   it's not right and Ali shouldn't bear the brunt of that.

15   He's a good kid and the Court should let him out on

16   pretrial release because he will show up and he won't

17   test positive.  He'll get a job and abide by conditions.

18           Thank you, Judge.

19        THE COURT:  Thank you.

20           All right.  My intention is to issue an

21   opinion very soon.  We'll stand adjourned.  The Court

22   will be in recess.

23       *[11:29 a.m. - Proceedings adjourned]*

24

25

C E R T I F I C A T I O N


    I certify that the foregoing is a correct
transcript of the electronic sound recording of the
proceedings in the above-entitled matter.



/s/ Gwen Reed
4-5-23