IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | No. 4:23-CR-18 |
| v. | § | Judge Mazzant |
| | § | |
| ALI DANIAL HEMANI | § | |
| | § | |

**GOVERNMENT'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS
RESPONSE TO DEFENDANT'S MOTION TO DISMISS INDICTMENT**

In response to the Court's directive to provide supplemental briefing in connection
with Defendant Ali Danial Hemani's motion to dismiss the indictment, the government
provides the following responsive points:

1. ***Rahimi* does not foreclose the government's argument that Congress may
constitutionally disarm unlawful users of controlled substances who per se
are not law-abiding, responsible citizens.**

The government argued in its original response that illegal drug abusers are not
among "the people" whom the Second Amendment protects. *See* USA Resp. (doc. 18) at
6-9. The Fifth Circuit's decision in *United States v. Rahimi*, 59 F.4th 163 (5th Cir. Feb. 2,
2023), *withdrawn and superseded*, 61 F.4th 443 (5th Cir. March 2, 2023), which
addressed 18 U.S.C. § 922(g)(8), should not be read to foreclose that contention in the
context of 18 U.S.C. § 922(g)(3). True, the original panel decision in *Rahimi* concluded
that *Heller*'s and *Bruen*'s repeated use of the terms "law-abiding, responsible citizens"
and "ordinary, law-abiding citizens" did "not add an implied gloss that constricts the
Second Amendment's reach." *Rahimi*, 59 F.4th at 171. Instead, the *Rahimi* panel's

1

original opinion understood this term to be a rhetorical "shorthand" to exclude "groups that have historically been stripped of their Second Amendments rights" such as felons and the mentally ill. *Id.* Surely, the Supreme Court's selection of that shorthand has real meaning, particularly given *Heller*'s statement that the list of regulations for which it used this shorthand was not "exhaustive." *Heller*, 554 U.S. at 627 n.26.

As further evidenced by the revised *Rahimi* panel opinion, this Court should agree. In the revised opinion, the panel explained, "*Heller*'s reference to 'law-abiding, responsible citizens' meant to exclude from the Court's discussions groups that have historically been stripped of their Second Amendment rights, i.e., groups whose disarmament the Founders **'presumptively'** tolerated or would have tolerated." *Rahimi*, 61 F.4th at 452 (emphasis added) (quoting *Bruen*, 554 U.S. at 627 n.26). The revised panel opinion further explained that Rahimi did not fit into any of those groups because his domestic violence restraining order was entered in a civil proceeding and he was only "suspected" of other criminal conduct. *Id*.; *see also id*. at 465 (Ho, J., concurring) (expressing concern that "18 U.S.C. § 922(g)(8) disarms individuals based on civil protective orders—not criminal proceedings").

Understood in context, this Court's references to "law-abiding" and "responsible" citizens exclude those who have committed serious crimes (such as felonies or dangerous misdemeanors) and who are irresponsible **in relation to gun possession** (such as minors or the mentally ill). *See Heller*, 554 U.S. at 625-26; *Bruen*, 142 S.Ct. at 2138 n.9. Individuals who commit ongoing criminal violations cannot be classified as "law-

abiding" or "responsible." While drug possession alone typically is a misdemeanor, in order to implicate § 922(g)(3), defendants must engage in ongoing unlawful drug use at the time they possess firearms.1  Whatever the Second Amendment implications for other offenses, the continuing conduct required to qualify as an "unlawful user" of a controlled substance removes the perpetrator from the class of law-abiding, responsible citizens.

Even though the *Rahimi* panel originally used broad language when rejecting the Government's "non-law-abiding" argument in the context of § 922(g)(8), that decision need not be read as foreclosing the same position in the context of § 922(g)(3). *Rahimi*, as revised, explicitly recognizes that ***some*** groups historically have been stripped of their Second Amendment rights, including "felons" and the "mentally ill" and that the Founders tolerated or would have accepted the disarmament of certain other groups of individuals. *Rahimi*, 61 F.4th at 452. And, as explained further below, those subject to § 922(g)(3) are analogous not only to both of those groups, but other groups who historically have been disarmed based on their illegal and potentially dangerous behavior. Moreover, even if *Rahimi* forecloses the claim, the government preserves for further review the argument that those subject to § 922(g)(3) can be disarmed because they are not law-abiding, responsible citizens.

**2.    Historical analogues show that § 922(g)(3) is constitutional because it follows this Nation's longstanding tradition of regulating the possession of firearms by individuals deemed sufficiently dangerous.**

---

1 While drug possession is a misdemeanor, it is still punishable by up to a year in prison under federal law. *See* 21 U.S.C. § 844(a). Moreover, repeated possession violations can result in a sentence of over one year, a sentence typically associated with a felony conviction. *See id*.

3

*First*, § 922(g)(3)'s prohibition on firearm possession by unlawful users of controlled substances is analogous to "longstanding prohibitions on the possession of firearms by … the mentally ill" and the intoxicated. *Heller*, 554 U.S. at 626. In England, justices of the peace could lock up dangerous lunatics and seize their property to pay for the cost of securing them. *See The Origin of Insanity as A Special Verdict: The Trial for Treason of James Hadfield (1800)*, 19 LAW & SOC'Y REV. 487 (1985). Similarly, "in eighteenth-century America, justices of the peace were authorized to 'lock up' 'lunatics' who were 'dangerous to be permitted to go abroad.'" *United States v. Yancey*, 621 F.3d 681, 686 (7th Cir. 2010) (citation omitted). As the Third Circuit reasoned in a decision vacated on other grounds, these severe restrictions on the liberty of the mentally ill made any specific restrictions on firearm possession unnecessary at the time. *Beers v. Attorney General of the United States*, 927 F.3d 150, 157 (3d Cir. 2019), *vacated*, 140 S.Ct. 2758 (2020). But, as *Heller* recognized, it was beyond dispute that the mentally ill could be disarmed. 554 U.S. at 626.

Although being under the influence of a controlled substance is not tantamount to mental illness, both conditions can render a person incapable of safely and responsibly possessing a firearm. The Founders placed intoxicated individuals in the same category as the mentally ill, criminals, and others subject to disarmament. Benjamin Rush, a signer of the Declaration of Independence and a prominent physician, equated drunkenness with a "temporary fit of madness." BENJAMIN RUSH, AN INQUIRY INTO THE EFFECTS OF ARDENT SPIRITS ON THE MIND AND BODY, 2 (1784). And other eighteenth-century

observers likewise designated "habitual drinking" as a form of "insanity." CARL ERIK

FISHER, URGE: OUR HISTORY OF ADDICTION 47 (2022) (citing Roy Porter, *The Drinking*

*Man's Disease: The Pre-history of Alcoholism in Georgian Britain*, 80 BRITISH J. OF

ADDICTION 385, 390 (1985)). As the Seventh Circuit has observed, "habitual drug

abusers, like the mentally ill, are more likely to have difficulty exercising self-control,

making it dangerous for them to possess deadly firearms." *Yancey*, 621 F.3d at 685.

Section 922(g)(3) is also analogous to historical laws that prohibited carrying a

firearm while under the influence of alcohol. For example, in 1655, Virginia prohibited

"shoot[ing] any gunns at drinkeing." 1 Hening, Statutes at Large; Being a Collection of

All the Laws of Virginia, from the First Session of the Legislature 401-02 (1823). In

1771, New York prohibited firing guns during the New Year's holiday, a restriction that

"was aimed at preventing the 'great Damages … frequently done on [those days] by

persons … being often intoxicated with Liquor.'" *Heller*, 554 U.S. at 632 (quoting Ch.

1501, 5 Colonial Laws of New York 244–46 (1894)). And a 1746 New Jersey statute

authorized militia officers to "disarm" any soldier who "appear[ed] in Arms disguised in

Liquor." Acts of the General Assembly of the Province of New-Jersey 303 (1752).

Similarly, in the era following ratification of the Fourteenth Amendment in 1868,

which extended the Second Amendment to the states, *see McDonald v. City of Chicago*,

561 U.S. 742, 749-50 (2010), many states enacted statutes prohibiting intoxicated persons

from possessing, using, or receiving firearms. *See, e.g.*, Kansas Gen. Stat., Crimes &

Punishments § 282 (1868); 1878 Miss. Laws 175-76 § 2; 1883 Mo. Laws 76, § 1; 1883

Wis. Sess. Laws 290, Offenses Against Lives and Persons of Individuals, ch. 329 § 3; 1890 Okla. Sess. Laws 495, art. 47, § 4; 1899 S.C. Acts 97, No. 67, § 1; *see also State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886). As an influential Missouri Supreme Court decision explained, these laws comport with the right to bear arms because they mitigate the "mischief" that may result "from an intoxicated person going abroad with fire-arms." *Shelby*, 2 S.W. at 469.

That legislatures retain significant authority to keep firearms out of the hands of intoxicated individuals is further illustrated by historical militia laws. As the Second Amendment's text indicates, the Framers recognized that armed members of the militia must be "well-regulated," U.S. CONST. amend. II, a term that at the time connoted "discipline," *Heller*, 554 U.S. at 597, and "self-control," MICHAEL WALDMAN, THE SECOND AMENDMENT: A BIOGRAPHY 61 (2014). For that reason, at least one state excluded "common drunkards" from the militia, 1844 R.I. Pub. Laws 503-16, §§ 1, 45, and many others forbade the sale of "any Strong Liquor" near locations where militias mustered and trained.[2]  These laws confirm that the Founders perceived the risks created when alcohol and firearms coincide and permitted legislatures substantial latitude to

---

2 *See* An Act for Regulating the Militia of the Province of Maryland (1756), *available in* MILITARY OBLIGATION: THE AMERICAN TRADITION (1947) 93, pt. 5, Maryland; An Act for Establishing a Militia in this Government (1756), *available in* MILITARY OBLIGATION 13, pt 3, Delaware; An Act for better settling and regulating the Militia of this Colony of New-Jersey, for the repelling of Invasions, and Suppressing Insurrections and Rebellions (1746) (§§' 3, 23), *available in* MILITARY OBLIGATION 25, pt. 8, New Jersey; An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania (1780) (§ XLV and § XLVIII(12)), *available in* MILITARY OBLIGATION pt. 11, Pennsylvania *see also id.* (excluding "common drunkards" from the militia).

address them.

Drugs other than alcohol were not widely used as intoxicants in the United States until the late nineteenth and early twentieth centuries. *See, e.g.*, David F. Musto, *The American Experience with Stimulants and Opiates*, 2 PERSP. ON CRIME & JUST. 51, 63 (1997-98). Prohibitions on controlled substances accordingly did not emerge until around the 1880s and the early twentieth century respectively. *See* U.S. TREASURY DEP'T, STATE LAWS RELATING TO THE CONTROL OF NARCOTIC DRUGS AND THE TREATMENT OF DRUG ADDICTION (1931) 1-9 (describing development of state-level laws); Richard J. Bonnie & Charles H. Whitebread, II, *The Forbidden Fruit and the Tree of Knowledge: An Inquiry into the Legal History of American Marijuana Prohibition*, 56 VA. L. REV. 971, 985 (1970); *id*. at 1010 (noting Utah passed first state prohibition on cannabis sale or possession in 1915). As new and often more potent substances proliferated, so too did associated firearms regulations. For example, a Pennsylvania statute established that "[n]o person shall deliver a firearm . . . to one who he has reasonable cause to believe … is a drug addict." 1931 Pa. Laws 499, no. 158, § 8. Following Pennsylvania's lead, jurisdictions across the country — including the District of Columbia, Alabama, California, South Dakota, and Washington—all passed laws barring the sale of firearms or pistols to "drug addict[s]." 47 Stat. 652, § 7 (1932) (D.C.). *See* 1936 Ala. Laws 52, no. 82, § 8; 1935 S.D. Sess. Laws 356, ch. 208, § 8; 1935 Wash. Sess. Laws 601, ch. 172, § 8.

In a testament to the strength of this historical tradition, prohibitions on firearms

possession by drug users remain prevalent today. In recent times, at least twenty-six states and the District of Columbia "have restricted the right of habitual drug abusers or alcoholics to possess or carry firearms." *Yancey*, 621 F.3d at 684 (collecting examples). Section 922(g)(3) thus stands in stark contrast to the "outlier[]" laws the Supreme Court invalidated in *Bruen* and *Heller*. *Bruen*, 142 S.Ct. at 2156; *see id.* at 2161 (Kavanaugh, J., joined by Roberts, C.J., concurring) (emphasizing the "unusual" nature and "outlier" status of the New York law in *Bruen*); *Heller*, 554 U.S. at 629 (noting that "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban"). Unlike those exceptional laws, § 922(g)(3) reflects a historical tradition that stretches from the Founding to the present, and it therefore comports with the Second Amendment. Although none of the pre-twentieth century historical analogues is a "dead ringer" or "historical *twin*" for § 922(g)(3), *Bruen*, 142 S.Ct. at 2133, they nevertheless show that § 922(g)(3) is "analogous enough" to historical laws "to pass constitutional muster," *id.*

     *Bruen* identified "two metrics" that are relevant to the analogical inquiry—"how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S.Ct. at 2133; *see also Rahimi*, 61 F.4th at 454 ("*how* the challenged law burdens the right to armed self-defense, and *why* the law burdens that right") (emphasis by the Court). Section 922(g)(3) imposes *no* burden on a "law-abiding citizen's" right to self-defense because establishing a violation of that statute requires proof that the defendant has violated the law by possessing a controlled substance. But even as to

lawbreakers, § 922(g)(3) imposes only a temporary ban while the person is regularly using a controlled substance. United States v. *McCowan*, 469 F.3d 386, 392 (5th Cir. 2006); *Patterson*, 431 F.3d at 839. "[A]n unlawful drug user like [Hemani] could regain his right to possess a firearm simply by ending his drug abuse." *Yancey*, 621 F.3d at 686. The statute therefore imposes a burden "comparable" to, or even less severe than, the historical laws discussed above. *Bruen*, 142 S.Ct. at 2133. As for "why" such laws were enacted, the reason such laws existed is the same as for the present law, namely, "to keep firearms out of the hands of presumptively risky people." *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 113 n.6 (1983).

*Second*, § 922(g)(3) is consistent with Nation's long historical tradition of disarming individuals deemed untrustworthy, potentially dangerous, or otherwise unfaithful to the rule of law. The historical record demonstrates a long Anglo-American tradition allowing the government to categorically limit the gun rights of untrustworthy or potentially dangerous persons. The Militia Act of 1662 permitted officers of the Crown to "seize all arms in the custody or possession of any person" whom they "judge[d] dangerous to the Peace of the Kingdom." 13 & 14 Car. 2, c.3, § 13. *Rahimi* reads the 1689 English Bill of Rights as "restrict[ing] the Militia Act's reach in order to prevent the kind of politically motivated disarmaments pursued by Charles II and James II." *Rahimi*, 61 F.4th at 456 (italics omitted).

But the English Bill of Rights, which was a "predecessor of our Second Amendment," *Heller*, 554 U.S. at 593, did not guarantee an unqualified right. It provided

that "Subjects which are Protestants, may have Arms for their Defence **suitable to their Conditions, and as allowed by Law**." *Id*. (citing 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441) (emphasis added). And the historical scholarship indicates that the English Bill of Rights was ***not*** intended to curtail the power to disarm the truly dangerous or disaffected, a practice that continued well after the Glorious Revolution and the adoption of the English Bill of Rights. *See* Patrick J. Charles, *"Arms For Their Defense"?: An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated in* McDonald v. City of Chicago, 57 CLEVE. STATE L. REV. 351, 375-77 (2009) (observing that, during the reign of William and Mary, "the 1662 Militia Act's seizure of arms provision was not only frequently used, but it was also supported by both Houses of Parliament"); Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 NOTRE DAME L. REV. 397, 405-06 (2019) (explaining that the "[u]se of the Militia Act to disarm dangerous and disaffected persons continued unabated" following the Glorious Revolution). In short, the Militia Act of 1662 and the English Bill of Rights evidence a historical tradition of disarming both lawbreakers and those deemed to be dangerous.

This tradition of disarming individuals deemed to be untrustworthy or potentially dangerous carried over into the American colonies. *See United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022) (recognizing that during the colonial period certain persons were denied the right to bear arms). Moreover, at the Founding, felony offenders

could be punished with the death penalty, *see Baze v. Rees*, 553 U.S. 35, 94 (2008)

(Thomas, J., concurring in the judgment), or with forfeiture of one's entire estate, *see* 4

WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 95 (1769); Beth A.

Colgan, *Reviving the Excessive Fines Clause*, 102 CAL. L. REV. 277, 332 & nn.275-76

(2014). Thus, those who committed serious crimes could be stripped of their right to

possess firearms just as they could be stripped of other rights, such as the right to vote,

*see Green v. Bd. of Elections of City of N.Y.*, 380 F.2d 445, 450 (2d Cir.   967), *cert.*

*denied*, 389 U.S. 1048 (1968), or to serve on a jury, *see* Brian C. Kalt, *The Exclusion of*

*Felons from Jury Service*, 53 AM. UNIV. L. REV. 65, 179 (2003). And some states

required firearm forfeiture even for misdemeanor offenses involving unauthorized

hunting or misuse of a gun.3

The Second Amendment's ratification history also indicates that lawbreakers

could be disarmed. In what *Heller* characterized as a "highly influential proposal" and a

"Second Amendment precursor," 554 U.S. at 604, a group of Pennsylvania antifederalists

advocated an amendment guaranteeing the right to bear arms "***unless*** for crimes

---

3 *See* Laws and Ordinances of New Netherlands 138 (1868) (1652 law) (firing a gun within the city of New Amsterdam); 1 Complete Revisal of All the Acts of Assembly, of the Province of North Carolina, Now in Force and Use 446-447 (1773) (1768 law) (hunting by non-freeholders); Acts of the General Assembly of the Province of New-Jersey 344 (1776) (1771 law) (trespassing with a gun by non-residents of the colony); 3 Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, with the Constitutions of the United States of America, and of the Commonwealth, Prefixed 37-38 n* (1897) (1783 law) (storing a loaded gun within Boston); 1 Private and Special Statutes of the Commonwealth of Massachusetts from the Year 1780 to the Close of the Session of the General Court, Begun and Held on the Last Wednesday in May, A.D. 1805 (1805) (1790 law) (possession of a gun on certain islands without permission).

committed, or real danger of public injury." The Address and Reasons of Dissent of the

Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787,

*reprinted in* 2 Bernard Schwartz, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 662,

665 (1971) (emphasis added). As the D.C. Circuit has observed, this proposal "indicates

that criminals, in addition to those who posed a 'real danger' (such as the mentally ill,

perhaps) were proper subjects of disarmament." *Medina v. Whitaker*, 913 F.3d 152, 158-

59 (D.C. Cir. 2019). And although the proposal did not prevail at the Pennsylvania

convention, it was vindicated four years later through the adoption of the Bill of Rights,

eight provisions of which—including the Second Amendment—echoed a set of

amendments first proposed by the Pennsylvania delegates. 2 SCHWARTZ, THE BILL OF

RIGHTS at 628. "[I]nfluential" proponents of the Second Amendment thus understood the

"pre-existing right" the Amendment codified as permitting legislatures to disarm

individuals who either disrespected the law or who otherwise posed a danger if armed.

*Heller*, 554 U.S. at 604.

American colonies and states also frequently disarmed those who were deemed

dangerous or untrustworthy. During the French and Indian War, Virginia passed a law

that disarmed Catholics but allowed them to keep their arms if they swore an oath of

allegiance to the King. *See* 7 Statutes at Large; Being a Collection of All the Laws of

Virginia 35-36 (1820) (1756 law). During the Revolutionary War, Connecticut passed a

law providing that any person who "shall libel or defame" any acts or resolves of the

Continental Congress or the Connecticut General Assembly "made for the defence or

security of the rights and privileges" of the colonies "shall be disarmed and not allowed
to have or keep any arms." Public Records of the Colony of Connecticut 193 (1890)
(1775 law). And, at the recommendation of the Continental Congress, *see* 4 Journals of
the Continental Congress 205 (1906) (resolution of March 14, 1776), at least six states
disarmed the "disaffected" who refused to take an oath of allegiance to those states.[4]
Similarly, in 1900, the Ohio Supreme Court upheld the constitutionality of a law
criminalizing a tramp's possession of a firearm. *See State v. Hogan*, 63 Ohio St. 202, 58
N.E. 572 (Ohio 1900). Such acts of disarmament were designed to keep firearms out of
the hands of dangerous individuals.

Thus, the "historical evidence" shows that "the legislature may disarm those who
have demonstrated a proclivity for violence or whose possession of guns would otherwise
threaten the public safety." *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J.,
dissenting). Moreover, the historical disarmament of individuals deemed to be dangerous
or risky was implicitly recognized by *Bruen*, 142 S.Ct. at 2152.[5]

Here, § 922(g)(3)'s prohibition on firearm possession applies only to those in

---

4 *See, e.g.*, 5 The Acts and Resolves, Public and Private, of the Province of the
Massachusetts Bay 479 (1886) (1776 law); 7 Records of the Colony of Rhode Island and
Providence Plantations, in New England 567 (1776 law); 1 The Public Acts of the
General Assembly of North Carolina 231 (1804) (1777 law); 9 Statutes at Large; Being A
Collection of All the Laws of Virginia 282 (1821) (1777 law); Rutgers, New Jersey Session
Laws Online, Acts of the General Assembly of the State of New-Jersey 90 (1777 law); 9
Statutes at Large of Pennsylvania 348 (1779 law).

5 *See Bruen*, 142 S.Ct. at 2152 & n.26 (citing General D.E. Sickles's 1886 decree
barring any "disorderly person, vagrant, or disturber of peace" from bearing arms).

13

violation of the drug laws. Societal risk was a key consideration in Congress's adoption

of the statute which was aimed at keeping guns out of the hands of illegal drug users. *See,*

*e.g.*, S. Rep. No. 1097, 1968 U.S. CODE CONG. & AD. NEWS 2112, *2114, 1968 WL 4956

(Leg. Hist.) (the ready availability of firearms for "***narcotic addicts***, mental defectives, …

and others whose possession of firearms is similarly contrary to the public interest … is a

matter of serious national concern") (emphasis added).6  Accordingly, the burdens

imposed by § 922(g)(3) and the referenced historical analogues are "comparably

justified." *Bruen*, 142 S.Ct. at 2133.

What's more, "[a]mple academic research confirms the connection between drug

use and violent crime." *Yancey*, 621 F.3d at 686-87 (discussing research). And even if

some drugs like marijuana have less significant mind-altering effects than other drugs,

Congress was entitled to categorically conclude that those who violate the law by being

current regular users of controlled substances cannot be trusted to use firearms in a safe

and responsible way. As a district judge for the Western District of Oklahoma recently

explained in a case upholding the constitutionality of § 922(g)(3), the statute "is

relevantly similar to regulations aimed at preventing dangerous or untrustworthy persons

from possessing and using firearms, such as individuals convicted of felonies or suffering

from mental illness, or individuals who are intoxicated." *United States v. Lewis*, 2023

---

6 As the Supreme Court has concluded: "Congress' intent in enacting [18 U.S.C. §
922(g)] was to keep firearms out of the hands of presumptively risky people." *Dickerson*, 460
U.S. at 113 n.6; *see also Abramski v. United States*, 573 U.S. 169, 172 (2014) (federal firearms
laws serve "to prevent guns from falling into the wrong hands" and, pursuant to 18 U.S.C. §
922(g), "certain classes of people—felons, ***drug addicts***, and the mentally ill, to list a few—may
not purchase or possess any firearm") (emphasis added).

WL 187582, at *4 (W.D. Okla. Jan. 13, 2023) (internal quotations and citations omitted).

Because this satisfies the "how" and "why" metrics explicitly set forth in *Bruen*, §

922(g)(3) is "analogous enough" to these historical laws "to pass constitutional muster."

142 S.Ct. at 2133.

<div style="margin-left:40%">

Respectfully submitted,

DAMIEN M. DIGGS
United States Attorney

/s/ Maureen Smith
MAUREEN SMITH
Assistant United States Attorney
600 E. Taylor St., Ste. 2000
Sherman, Texas 75090
Telephone: 903/868-9454
Facsimile: 903/892-2792

</div>

## **CERTIFICATE OF SERVICE**

I hereby certify a true and correct copy of the foregoing was delivered to the attorney for defendant, via CM/ECF electronic filing as of this the 21st day of June, 2023.

<div style="margin-left:40%">

/s/ Maureen Smith
MAUREEN SMITH

</div>