UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | No. 4:23-cr-00018 |
| | § | |
| ALI DANIAL HEMANI, | § | |
| | § | |
| Defendant | § | |

**DEFENDANT'S RESPONSE TO GOVERNMENT'S
SUPPLEMENTAL BRIEF RESPONDING TO MOTION TO DISMISS**

COMES NOW Defendant, ALI DANIAL HEMANI, by and through his attorneys of record, CAMILLE M. KNIGHT and CARL DAVID MEDDERS, and pursuant to the Court's order of June 15, 2023, provides supplemental arguments and authorities in support of his Motion to Dismiss Indictment and responds to the Government's Supplemental Brief filed on June 21, 2023.

## I.  Introduction

At the hearing on June 15, the Court ordered the Government to file supplemental briefing regarding analogous historical firearms regulations "consistent with the Nation's historical tradition of firearm regulation." *United States v. Rahimi,* 61 F.4th 443, 454 (5th Cir. 2023) (quoting *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2130 (2022).  The Court asked the Government to address the *how* and *why* of those regulations, as discussed in *Rahimi*.[1]

In support of its burden to provide historically analogous and distinctly or relevantly similar precedent, the Government reiterates its reliance on the New York and Virginia laws it previously

---

[1] At the hearing, the Court referenced the recent oral arguments in *United States v. Daniels*, No. 22-60596, before the Fifth Circuit.  On June 7, 2023, the Fifth Circuit issued a directive inviting amici brief on the topic of "the history and tradition of restrictions on the use and possession of firearms," specifically, "historical gun regulations applicable to intoxicated or impaired individuals."  The deadline for amici briefs is July 6, 2023.

cited, and submits a New Jersey law applicable to soldiers, along with a laundry list of laws enacted in the Reconstruction era from Kansas, Mississippi, Missouri, Wisconsin, and Oklahoma. Gov't Supp. Brf., pp. 5-6. It then touches on laws regulating members of state militias, discusses entirely modern laws, and notes that regulations of marijuana specifically do not appear historically until the 20th century. Gov't Supp. Brf., pp. 6-9. Finally, it cites regulations disarming dangerous, untrustworthy, or disaffected people - like Catholics, political dissidents, and "tramps." Gov't Supp. Brf., pp. 9-13.

## II.  *Bruen's* Framework for Analyzing Historical Tradition

In *Bruen*, the Supreme Court described three metrics by which to analyze historical precedent: temporal proximity to the founding era, similarity to the challenged restriction, and breadth. *Bruen*, 142 S. Ct. at 2130-2134, 2136, 2138.

### A.     Proximity

Regarding temporal proximity to the founding era, "not all history is created equal. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Id.* at 2136 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 634-635 (2008)). "The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions change in the intervening years." *Id.* Similarly, "we must also guard against giving postenactment history more weight than it can bear." *Id.* Given that 18 U.S.C. § 922 (g)(3) is a federal statute, regulations, dating to the 1860s after application of the Second Amendment to the states through the Fourteenth Amendment, appear to have limited value to the Court's analysis. Indeed, the *Bruen* Court noted that "to the extent later history contradicts what the text says, the text controls." *Id.* at

2

2137.  "Thus, post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen* at 2137. (quoting *Heller*, 670 F.3d at 1274, n. 6 (Kavanaugh, J., dissenting)).  To the extent the Government's authorities post-date the founding significantly (the Reconstruction era state laws post-date the adoption of the Second Amendment by nearly 100 years and the modern statutes by well over 100 years), their applicability is certainly limited; the modern laws cited by the Government suffer the same limited relevance.

      **B.**      **Distinct or Relevant Similarity**

"When a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* at 2131.  When confronted with new circumstances implicating changed societal concerns or "dramatic technological changes" that were "unimaginable at the founding," the Government' must present a "relevantly similar" historical analogue. *Id.* at 2132.  Determining what is relevantly similar depends on how and why the regulation burdens the Second Amendment right. *Id.* at 2132-2133.

Much of the Government's Supplemental Brief focuses on laws that applied to dissidents, lunatics, or "those who [] demonstrated a proclivity for violence," and on its general argument that people "deemed to be dangerous or risky" were disarmed in the 17th and 19th centuries.  Gov't Supp. Brf., p. 13.  This harkens back to its prior arguments that "the people" in the Second

Amendment refers only law-abiding and responsible citizens. This argument was addressed in *Rahimi*; the Fifth Circuit held that this interpretation "admit[ted] to no true limiting principle" and would result in a Second Amendment that is "malleable" in scope. *Rahimi*, 61 F.4th at 453. Moreover, many of the historical analogues offered by the Government are similar to the "disarmament of dangerous people" and "going armed" laws relied on with no avail in *Rahimi*. "[T]he 'going armed' laws, like the 'dangerousness' laws . . . appear to have been aimed at curbing terroristic or riotous behavior, i.e., disarming those who had been adjudicated to be a threat to society generally, rather than identified individuals." *Id.* at 459. And, like § 922(g)(8), § 922(g)(3) is not "tied to violent or riotous conduct and threats to society," and thus "implicates a much wider swath of conduct, not inherently dependent on any actual violence or threat." *Id.* The historical laws proffered by the Government are neither distinctly or relevantly similar to 18 U.S.C. § 922(g)(3) and thus are not "viable historical analogues."

One scholar who conducted "a full survey of printed session laws pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815" found that disarmament regulations were largely reserved for people of color and those whose allegiance was questioned; the colonies and early states consistently did not curb the *ownership* of guns by citizens. "[A]t no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." Robert H. Churchill*, Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 142-143 (2007). Rather, according to Professor Churchill, the laws of the time existed to regulate "dangerous *uses*" of guns. *Id.* at 163 (emphasis added). This fact goes straight to the analysis of the "how" and "why" of the regulations. In that

4

analysis, several of the government's cited precedent support the notion that § 922(g)(3) is unconstitutional in its regulation of possession of firearms to a malleable class of "drug users."

C. **Breadth**

The government's arguments regarding possession of arms by intoxicated people reveal that § 922(g)(3) regulates "possession" in a manner not historically used at the time of the founding of the Nation. It cites to Benjamin Rush's treatise on the effect of ardent spirits on people, wherein Rush "equated drunkenness with a *temporary* fit of madness." Gov't Supp. Brf., p. 4 (emphasis added). The 1655 Virginia statute presented to the Court prohibited *shooting* firearms while *actively drinking.* Gov't Supp. Brf., p. 5. New York prohibited *firing* guns on a holiday by people who were "intoxicated with liquor." *Id.* The New Jersey militia statute was aimed at those "in Arms disguised in Liquor," which would appear to be soldiers who were intoxicated at the time. All the reconstruction-era laws cited by the Government regulated gun possession only while people were actively under the influence of alcohol. *See, e.g.,* Kansas Gen. Stat., Crimes & Punishment § 282 (1868) ("under the influence of intoxicating drink"); Mo. Laws 76, § I ("intoxicated or under the influence of intoxicating drinks"); 1883 Wis. Sess. Laws 290, Offenses Against Lives and Persons of Individuals, ch. 329 § 3 ("in a state of intoxication"); 1899 S.C. Acts 97, No. 67 ("under the influence of intoxicating liquors"). Oklahoma's law applied only to public officials, much like the New Jersey law applied to soldiers. The Missouri case cited by the government discussed a law that applied to persons actively under the influence of alcohol; a violation of the law was a misdemeanor which was punished by a fine. *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886). Gov't Supp. Brf., pp. 5-6.

All these statutes are narrower in scope than is § 922(g)(3) – they regulated the use of firearms during a certain time period, most often when a person was actively under the influence, rather than disqualifying those imbibing from ownership or possession. And if, as the Government argues, a person could cure § 922(g)(3)'s restriction on his Constitutional rights "simply by ending his drug abuse," how would the standard be workable? Does a person regain his right to possession when the metabolites of the substance are purged from his system? When he goes to a Narcotics Anonymous meeting for the first time? When he reaches the fifth, eighth, or twelfth step of a recovery program? Must the courts decide who is truly a "user" every time a prosecution under § 922(g)(3) is brought? This is exactly why the *Rahimi* Court found that the "law-abiding, responsible person" definition of "the people" created no true limiting standard.

What is more is that § 922(g)(3) essentially operates as a lifetime restriction of Second Amendment rights: if a person is convicted under § 922(g)(3), he becomes a felon, is subject to 18 U.S.C. § 922(g)(1) and is prevented from possessing arms forever. It makes no difference whether, for example, at the time of conviction, the person charged under § 922(g)(3) has not used drugs for months or years prior to his conviction. Contrary to the Government's assertion, the burden on his Second Amendment rights continues far beyond the temporal scope of any of the historical precedents it cites and is more broad than regulations restricting the use of firearms during identifiable time periods when a person is actively intoxicated.

### III. Conclusion

For the foregoing reasons, Mr. Hemani again urges the Court to conduct the analysis required by *Bruen* and *Rahimi* to 18 U.S.C. § 922(g)(3) and dismiss the Indictment against him.

Respectfully submitted,

/s/ *Camille M. Knight*
Camille M. Knight
Texas State Bar No. 24027124
900 Jackson Street, Suite 430
Dallas, Texas 75202
214.871.1133
camille@cknightlaw.com

*/s/ Carl David Medders*
BURLESON, PATE & GIBSON, LLP
D. C. Bar No. 494911
900 Jackson Street, Suite 330
Dallas, Texas 75202
214.871.4900
dmedders@bp-g.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2023, I electronically filed the foregoing document using the Court's CM/ECF system, thereby providing service on attorneys of record.

/s/ *Camille M. Knight*
Camille M. Knight