**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Crim. No. 4:23-cr-18-ALM-KPJ-1** |
| | § | |
| **ALI DANIAL HEMANI (1),** | § | |
| | § | |
| **Defendant.** | § | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

Pending before the Court is Defendant Ali Danial Hemani's ("Defendant") Motion to Dismiss Indictment (the "Motion") (Dkt. 12), wherein Defendant requests the Court dismiss the "sole count of the indictment 18 U.S.C. § 922(g)(3), possession of a firearm while being a drug user, . . . as unconstitutionally vague and violative of his Second Amendment Right . . . ." Dkt. 12 at 1. On May 17, 2023, the Motion (Dkt. 12) was referred to the undersigned. Upon consideration, the Court recommends the Motion (Dkt. 12) be **GRANTED**.

## I.    BACKGROUND

The Government alleges that in August 2022, Defendant, knowing that he was an unlawful user of a controlled substance as defined in 21 U.S.C. § 802, knowingly possessed a Glock 19 9mm pistol bearing serial number BRWX640. *See* Dkt. 1 at 1. On February 8, 2023, the Grand Jury returned a single count Indictment charging Defendant with violation of 18 U.S.C. § 922(g)(3). *See* Dkt. 1. On February 10, 2023, Defendant was arrested, and on February 13, 2023, he made an initial appearance before the undersigned. *See* Minute Entry for February 10, 2023; Dkt. 4.

On February 15, 2023, Defendant filed the Motion (Dkt. 12) arguing *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) and *United States v. Rahimi*, 59 F.4th 163 (5th Cir. 2023) renders 18 U.S.C. § 922(g)(3) unconstitutional. *See* Dkt. 12 at 9. Defendant argues the Second Amendment's plain text covers Defendant's possession of the Glock 19 9mm pistol and he is a member of "the people" as he "is an American citizen who has resided in the United States his entire life . . . ." *Id.* Defendant further argues the Government cannot show 18 U.S.C. § 922(g)(3) has a sufficient historical analogue and, thus, the statute places "an unconstitutional burden on [Defendant's] Second Amendment right." Dkt. 12 at 11 and n.11 (collecting cases). Defendant additionally argues 18 U.S.C. § 922(g)(3) is unconstitutionally vague because the statute "(1) fails to define 'unlawful user' or 'addict', and (2) fails to provide a temporal nexus between the unlawful drug use and the possession of the firearm." Dkt. 12 at 12.

On February 23, 2023, the Government filed its response (Dkt. 18) arguing *Bruen* "does not change the result as to [18 U.S.C. §] 922(g)(3)" because Defendant is "outside the scope of the Second Amendment's text" and "§ 922(g)(3)'s temporary prohibition of gun possession . . . comfortably fits a longstanding historical tradition of disarming groups considered dangerous or unvirtuous." Dkt. 18 at 3. The Government argues "[a]nyone who violates § 922(g)(3) is, by definition, not a law-abiding, responsible citizen who enjoys the Second Amendment's protection under *Heller* and *Bruen*." Dkt. 18 at 7. The Government asserts this is because 18 U.S.C. § 922(g)(3) requires "a defendant's illegal drug use be both (1) 'with regularity and over an extended period of time'; and (2) close in time to the gun possession." Dkt. 18 at 7 (quoting *United States v. McCowan*, 469 F.3d 386, 392 (5th Cir. 2006)). The Government also argues that *Bruen*'s endorsement of "shall-issue" permitting regimes "denying the right to carry to drug abusers are

constitutional." Dkt. 18 at 8 (citing *Bruen*, 142 S. Ct. at 2138 & n.9; *id.* at 2162 (Kavanaugh, J., concurring)).

The Government further argues that "[e]ven if the Second Amendment's plain text covers [Defendant's] conduct, his Second Amendment claim fails because § 922(g)(3) 'is consistent with the Nation's historical tradition of firearm regulation.'" Dkt. 18 at 9 (quoting *Bruen*, 142 S. Ct. at 2130). The Government asserts that there are longstanding historical analogues to 18 U.S.C. § 922(g)(3), including laws restricting gun rights of groups to promote public safety and laws restricting the gun rights of those who are intoxicated. *See* Dkt. 18 at 10–15. The Government further asserts that "[o]ne can hardly question Congress's judgment that unlawful drug abusers are, as a class, presumptively dangerous." *Id.* at 16 (citing *United States v. Carter*, 750 F.3d 462, 467–69 (4th Cir. 2014); *United States v. Yancey*, 621 F.3d 681, 685–86 (7th Cir. 2010)). The Government also argues the Court should reject Defendant's facial void-for-vagueness challenge to 18 U.S.C. § 922(g)(3). *See* Dkt. 18 at 17–18.

On May 17, 2023, U.S. District Judge Amos L. Mazzant, III, referred the Motion (Dkt. 12) to the undersigned. *See* Dkt. 42. On May 22, 2023, the Court ordered the parties provide supplemental briefing as to *United States v. Connelly*, — F. Supp. 3d —, 2023 WL 2806324 (W.D. Tex. Apr. 6, 2023). *See* Dkt. 43. On May 28, 2023, Defendant filed his Supplemental Brief in Support of Motion to Dismiss (the "Defendant's First Supplemental Brief") (Dkt. 46). In Defendant's First Supplemental Brief (Dkt. 46), Defendant argues that *Connelly* correctly rejected the Government's "virtuous" or "law abiding" argument in line with the Fifth Circuit's decision in *Rahimi* and also properly rejected the Government's historical analogues that are similarly raised in Defendant's case. *See generally* Dkt. 46.

On June 5, 2023, the Government filed its Supplemental Brief in Support of its Response to Defendant's Motion to Dismiss Indictment (the "Government's First Supplemental Brief") (Dkt. 47), wherein the Government argues *Bruen* and *Rahimi* did not overturn *United States v. Patterson*, 431 F.3d 832 (5th Cir. 2005) and *United States v. May*, 538 F. App'x 465 (5th Cir. 2013) because those "decisions are best understood not as relying on means-end scrutiny, but instead as concluding that [18 U.S.C. §] 922(g)(3) is consistent with the historical understanding of the Second Amendment." Dkt. 47 at 3. The Government argues "[a] panel of the Fifth Circuit, let alone a district court, cannot overrule another [Fifth Circuit] panel's decision without *en banc* reconsideration or a superseding contrary Supreme Court decision." *Id.* at 4 (citing *United States v. King*, 979 F.3d 1075, 1084 (5th Cir. 2020)). The Government reasserts that Defendant is not a "law-abiding responsible citizen" and, unlike the defendant in *Connelly*, Defendant not only uses marijuana but also promethazine and cocaine. Dkt. 47 at 4–5. The Government additionally argues *Connelly* is in the minority of post-*Bruen* 18 U.S.C. § 922(g)(3) cases. Dkt. 47 at 6–7.

On June 15, 2023, the Court held oral argument on the Motion (Dkt. 12), and ordered the Government provide supplemental briefing as to the "how" and "why" the Government's asserted historical analogues are similar to 18 U.S.C. § 922(g)(3). *See* Minute Entry for June 15, 2023; *Bruen*, 142 S. Ct. at 2132–33 ("[W]e do think that [*District of Columbia v. Heller*, 554 U.S. 570 (2008)] and [*McDonald v. City of Chicago*, 561 U.S. 742 (2010)] point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense."). The Court also provided Defendant an opportunity to file a response brief. *See* Minute Entry for June 15, 2023.

On June 21, 2023, the Government filed its Supplemental Brief in Support of Its Response to Defendant's Motion to Dismiss Indictment (the "Government's Second Supplemental Brief")

(Dkt. 50). In the Government's Second Supplemental Brief (Dkt. 50), the Government argues *Rahimi* does not foreclose the Government's argument that Congress may constitutionally disarm unlawful users of controlled substances on the basis that they are "not law-abiding, responsible citizens." *Id.* at 1. The Government further argues the defendant in *Rahimi* was found not to "fit into" any of the groups as he was subject to a civil protective order and "he was only 'suspected' of other criminal conduct." *Id.* at 2 (quoting *Rahimi*, 61 F.4th at 452). The Government argues 18 U.S.C. § 922(g)(3)'s prohibition on firearm possession by unlawful users of controlled substances is analogous to prohibitions on firearms possession by the mentally ill. *See* Dkt. 50 at 4. The Government argues that "[a]lthough being under the influence of a controlled substance is not tantamount to mental illness, both conditions can render a person incapable of safely and responsibly possessing a firearm." *Id.*

The Government additionally argues 18 U.S.C. § 922(g)(3) is analogous to historical laws, both before the passage of the Second Amendment and following the passage of the Fourteenth Amendment, that prohibited carrying a firearm while under the influence of alcohol. *See* Dkt. 50 at 4–6. The Government argues that "[a]s new and often more potent substances proliferated [in the late nineteenth and early twentieth centuries], so too did associated firearms regulations." *Id.* at 7. The Government asserts 18 U.S.C. § 922(g)(3) "imposes a burden 'comparable' to, or even less severe than, the historical laws" raised by the Government and "the reasons such laws existed is the same as for the present law, namely, 'to keep firearms out of the hands of presumptively risky people.'" Dkt. 50 at 9 (quoting *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 113 n.6 (1983)).

Finally, the Government argues 18 U.S.C. § 922(g)(3) "is consistent with [the] Nation's long historical tradition of disarming individuals deemed untrustworthy, potentially dangerous, or

otherwise unfaithful to the rule of law." Dkt. 50 at 9. The Government asserts the English Bill of Rights and the Militia Act of 1662 "evidence a historical tradition of disarming both lawbreakers and those deemed to be dangerous." *Id.* at 10. The Government argues "those who committed serious crimes could be stripped of their right to possess firearms just as they could be stripped of other rights" and "some states required firearm forfeiture even for misdemeanor offenses involving unauthorized or misuse of a gun." *Id.* at 11. The Government further argues "a group of Pennsylvania antifederalists advocated an amendment guaranteeing the right to bear arms 'unless for crimes committed, or real danger of public injury'" and "although the proposal did not prevail at the Pennsylvania convention, it was vindicated four years later through the adoption of the Bill of Rights . . . ." *Id.* at 11–12 (quoting The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787, *reprinted in* 2 Bernard Schwartz, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 662, 665 (1971)). The Government also argues a law passed by the Commonwealth of Virginia during the French and Indian War "that disarmed Catholics but allowed them to keep their arms if they swore an oath of allegiance to the King" is analogous to 18 U.S.C. § 922(g)(3). Dkt. 50 at 11–12. The Government further argues a law passed by Connecticut that disarmed anyone who libeled or defamed the Continental Congress or the Connecticut General Assembly and laws passed by six states that disarmed the "disaffected" who refused to take an oath of allegiance to those states at the recommendation of the Continental Congress are also relevant historical analogues. *Id.* at 12–13. The Government further argues the disarmament of "a tramp's possession of a firearm" found constitutional by the Ohio Supreme Court in 1900 is analogous to 18 U.S.C. § 922(g)(3). *See* Dkt. 50 at 13 (citing *State v. Hogan*, 58 N.E. 572 (Ohio 1900)).

On June 27, 2023, Defendant filed his Response to Government's Supplemental Brief Responding to Motion to Dismiss ("Defendant's Second Supplemental Brief") (Dkt. 55). In Defendant's Second Supplemental Brief (Dkt. 55), Defendant argues that the applicability of Reconstruction-era state laws postdating the adoption of the Second Amendment by nearly one hundred years is "certainly limited," as the *Bruen* Court emphasized courts must "'guard against giving postenactment history more weight than it can bear.'" Dkt. 55 at 2 (citing *Bruen*, 142 S. Ct. at 2136). Defendant further argues that the Government's argument as to "dissidents, lunatics, or those who demonstrated a proclivity for violence . . . harkens back to its prior arguments that 'the people' in the Second Amendment refers only [to] law-abiding and responsible citizens" and that this argument was rejected by *Rahimi*. *Id.* at 2–3. Defendant argues that scholarship found disarmament regulations in the Thirteen Colonies and Vermont between 1607 and 1815 were "largely reserved for people of color and those whose allegiance was questioned; the colonies and early states consistently did not curb the *ownership* of guns by citizens." *Id.* at 4 (citing Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 LAW & HIST. REV. 139, 142–143 (2007)) (emphasis in original). Defendant argues the laws cited by the Government as to possession of intoxicated people "reveal that § 922(g)(3) regulates 'possession' in a manner not historically used at the time of the founding of the Nation" because these statutes "regulated the use of firearms during a certain time period, most often when a person was actively under the influence, rather than disqualifying those imbibing from ownership or possession." Dkt. 55 at 5–6. Finally, Defendant argues that 18 U.S.C. § 922(g)(3) "operates as a lifetime restriction of Second Amendment rights" because a felony conviction would in turn result in Defendant becoming "subject to 18 U.S.C. § 922(g)(1) and [being] prevented from possessing arms forever." Dkt. 55 at 6. Defendant argues, "[i]t makes no difference whether, for example, at

the time of conviction, the person charged under § 922(g)(3) has not used drugs for months or years prior to his conviction." *Id.*

## II.    LEGAL STANDARD

Federal Rule of Criminal Procedure 12 allows a party to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fᴇᴅ. R. Cʀɪᴍ. P. 12(b)(1). Challenges alleging a "defect in the indictment or information" include "failure to state an offense." Fᴇᴅ. R. Cʀɪᴍ. P. 12(b)(3)(B)(v). "'The propriety of granting a motion to dismiss an indictment . . . is by-and-large contingent upon whether the infirmity in the prosecution is essentially one of law or involves determinations of fact . . . If a question of law is involved, then consideration of the motion is generally proper.'" *United States v. Guthrie*, 720 F. App'x 199, 201 (5th Cir. 2018) (per curiam) (quoting *United States v. Fontenot*, 665 F.3d 640, 644 (5th Cir. 2011)).

## III.    ANALYSIS

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S.Cᴏɴsᴛ. amend. II. Before *Bruen*, "the Courts of Appeals [had] coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combine[d] history with means-end scrutiny." *Bruen*, 142 S.Ct. at 2125. However, the *Bruen* court declined to follow this approach and instead required courts engage in a two-step analysis of (1) whether the Second Amendment's plain text covers an individual's conduct; and, if so, (2) then the Government "must justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129–30. As *Bruen* explained, "[i]n keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively

protects that conduct." *Id.* at 2126. If such conduct is covered, the Government must "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133 (emphases in original).

Defendant and the Government dispute whether Defendant's conduct is covered by the Second Amendment and whether *Bruen* affected the constitutionality of 18 U.S.C. § 922(g)(3). The Court concludes Defendant's conduct is covered by the Second Amendment's plain text and 18 U.S.C. § 922(g)(3) is not consistent with the Nation's history and tradition of firearm regulation under *Bruen*'s test. Accordingly, the Court recommends finding 18 U.S.C. § 922(g)(3) unconstitutional.

### A. Intervening Changes and Defendant's Void-for-Vagueness Challenge

The Court must briefly address two preliminary matters. First, the Government appears to argue the Court should deny Defendant's constitutional challenge on the grounds there has not been superseding caselaw that renders some pre-*Bruen* Fifth Circuit precedent no longer binding and the Court should find the law is constitutional as applied to Defendant. *See* Dkt. 47 at 4 ("A panel of the Fifth Circuit, let alone a district court, cannot overrule another Fifth Circuit panel's decision without en banc reconsideration or a superseding contrary Supreme Court decision." (internal brackets and quotations omitted); *id.* at 5 ("Because 922(g)(3) does not violate the Second Amendment *as applied to* [Defendant], this court should not entertain any facial challenge to the statute.") (emphasis in original).

*Rahimi* recognized an abrogation of *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001). *See Rahimi*, 61 F.4th at 450–51 ("To the extent that the Court did not overtly overrule *Emerson* and *McGinnis*—it did not cite those cases but discussed other circuits' similar precedent—*Bruen* clearly fundamentally changed our analysis of laws that implicate the Second

Amendment, rendering our prior precedent obsolete.") (cleaned up). *Patterson*, which denied a defendant's Second Amendment challenge to 18 U.S.C. § 922(g)(3), relies directly on *Emerson* as to the constitutionality of 18 U.S.C. § 922(g)(3), and *May* in turn relies on *Patterson*. *See Patterson*, 431 F.3d at 835 (citing *Emerson*, 270 F.3d at 261); *May*, 538 F. App'x at 466 (citing *Patterson*, 431 F.3d at 836). Thus, the Court finds the Government's argument is incorrect as to whether the Court is foreclosed from considering the constitutionality of 18 U.S.C. § 922(g)(3) following *Bruen*. Additionally, Defendant does not assert an as-applied challenge, and *Rahimi* held that "if a statute is inconsistent with the Second Amendment's text and historical understanding, then it falls under any circumstances." *Rahimi*, 61 F.4th at 453 (citations omitted); *accord Connelly*, 2023 WL 286324, at *15.

Defendant's argument that is couched as a void-for-vagueness challenge—i.e., the statute "as written would mean that anyone who had ever used an illegal drug, at any time, was prohibited from possessing a firearm"—largely conflates vagueness with the argument as to whether Defendant remains one of "the people" of the Second Amendment. Dkt. 18 at 12. Furthermore, it does not appear that *Bruen* can be read to have rendered 18 U.S.C. § 922(g)(3) susceptible to a void-for-vagueness challenge. The burden on Defendant's Second Amendment rights, which courts previously analyzed under the now disavowed two-step inquiry, is a separate analysis from whether the statute is unconstitutionally vague. *See United States v. Edwards*, 182 F.3d 333, 335–36 (5th Cir. 1999) ("On December 6, 1996, the night on which the police recovered the gun forming the basis of this conviction, the police found marijuana and cocaine at [the defendant's] residence. Finally, on September 27, 1997, [the defendant] admitted in a statement to a Bureau of Alcohol, Tobacco & Firearms agent that he used marijuana on a daily basis and had done so for the past two to three years. An ordinary person would understand that [the defendant's] actions

establish him as 'an unlawful user of a controlled substance' while in possession of a firearm.");

*see also Patterson*, 431 F.3d at 836 (conducting separate analysis of whether Second Amendment right was unconstitutionally burdened and whether statute was unconstitutionally vague). Thus, Fifth Circuit law as to Defendant's void-for-vagueness challenge remains undisturbed and the Court does not appear to have authority to consider such a challenge.

**B. The Second Amendment's Text**

18 U.S.C. § 922(g)(3) states:

> It shall be unlawful for any person . . . who is an unlawful user or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(3).

Defendant argues "[t]he Second Amendment's plain text covers the conduct of [Defendant] possessing a handgun. It is not in dispute that [Defendant] is an American citizen who has resided in the United States his entire life, which makes him part of the 'national community,' and thus part of 'the people' to which the Second Amendment applies." Dkt. 12 at 9 (citing *Heller*, 554 U.S. at 580; *Bruen*, 142 S. Ct. at 2156). The Government argues that the "Second Amendment's text does not cover possession of a firearm by unlawful drug abusers" and "[i]llegal drug abusers are not among 'the people' whom the Second Amendment protects." Dkt. 18 at 5–6. The Court finds that Defendant's conduct is covered by the plain text of the Second Amendment and Defendant remains one of "the people."

*1. Right to Keep and Bear Arms*

"In *Heller*, the Supreme Court made clear that the Second Amendment's right to 'keep and bear arms' includes possession of weapons, such as firearms, and 'extends, prima facie, to all

instruments that constitute bearable arms.'" *United States v. Barber*, No. 4:20-CR-384-SDJ, 2023 WL 1073667, at *5 (E.D. Tex. Jan. 27, 2023) (quoting *Heller*, 554 U.S. at 582); *accord United States v. Charles*, — F. Supp. 3d —, No. MO:22-CR-00154-DC, 2022 WL 4913900, at *2 (W.D. Tex. Oct. 3, 2022) ("[T]he Second Amendment's 'keep and bear arms' language plainly encompasses possession [of a firearm]."). The *Heller* Court explained "that the sorts of weapons protected were those in common use at the time" and that this "limitation is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Heller*, 554 U.S. at 627 (internal quotations omitted).

In the present case, the burdened conduct is Defendant's possession of a Glock 19 9mm pistol in the closet of his parents' home.[1] The Government does not assert that the Glock 19 9mm pistol is not in common use or that possessing the firearm within the home is not covered by the Second Amendment. Furthermore, the Government has not asserted that there have been any unlawful modifications to the firearm. *Heller* noted that the "American people have considered the handgun to be the quintessential self-defense weapon" and the "most popular weapon chosen by Americans for self-defense in the home." *Heller*, 554 U.S. at 629; *accord Rahimi*, 61 F.4th at 454 ("[The defendant's] possession of a pistol and a rifle easily falls within the purview of the Second Amendment. The Amendment grants [the defendant] the right 'to keep' firearms, and 'possession' is included within the meaning of 'keep.'"); *cf. United States v. Dixon*, No. 22 CR 140, 2023 WL 2664076, at *3 (N.D. Ill. Mar. 28, 2023) (finding Glock firearm equipped with a "Glock switch" that converted firearm from semiautomatic to automatic was "dangerous and unusual" for purposes of the Second Amendment).

---

[1] According to the Pretrial Services Report, Defendant had resided with his parents since April 2016. *See* Dkt. 13 at 2.

Accordingly, Defendant's possession of the Glock 19 9mm pistol in the closet of his parents' home is covered by the plain text of the Second Amendment.

2. *The People*

While the Government does not challenge that generally, the possession of a firearm is covered by the Second Amendment, the Government asserts Defendant is not one of "the people" covered by the Second Amendment due to his alleged drug use. *See* Dkt. 18 at 3, 7; Dkt. 47 at 4–5; Dkt. 50 at 1. Defendant asserts he remains one of "the people" protected by the Second Amendment. *See* Dkt. 12 at 9; Dkt 46 at 5–6; Dkt 55 at 2–3.

The Government's argument, frequently characterized as the "virtuous citizen" theory, asserts that those individuals who have committed a serious criminal offense are excluded from the Second Amendment's protections because such individuals are removed from "the people." Courts across the nation, including within the Fifth Circuit, have been divided over whether an individual accused or convicted of a felony is excluded from "the people." *Compare Barber*, 2023 WL 1073667, at *6 ("The 'virtuous citizen' theory, which excludes certain groups of people—like convicted felons—from the plain text of the Second Amendment, misreads *Heller*."); *United States v. Hicks*, — F. Supp. 3d —, No. W:21-CR-00060-ADA, 2023 WL 164170, at *4 (W.D. Tex. Jan. 9, 2023) (finding the defendant charged under 18 § U.S.C. 922(n) was not outside of "the people" covered by the Second Amendment), *with United States v. Collette*, No. MO:22-CR-00141-DC, 630 F. Supp. 3d 841, 850 (W.D. Tex. 2022) (finding those convicted of felonies are excluded from "the people"); *Charles*, 2022 WL 4913900, at *12 ("[T]his Nation has a longstanding history of excluding felons from the rights of "the people.").

In *Rahimi*, the Fifth Circuit rejected the Government's argument that the "law-abiding qualifier constricts the Second Amendment's reach" as "run[ning] headlong into *Heller* and

*Bruen*." *Rahimi*, 61 F.4th at 452. The Fifth Circuit explained that *Heller*'s exposition as to "law-abiding, responsible citizens" is "shorthand in explaining that its holding (that the amendment codifies an individual right to keep and bear arms) should not 'be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . .'" *Id.* (quoting *Heller*, 554 U.S. at 626–27). Thus, the *Rahimi* court explained, "while [the defendant] was *suspected* of other criminal conduct, [the defendant] was not a convicted felon or otherwise subject to another 'longstanding prohibition[] on the possession of firearms' that would have excluded him" from "the people" within the Second Amendment. *Id.* (quoting *Heller*, 554 U.S. at 626–27) (emphasis in original).

The *Rahimi* court cautioned against an expansive interpretation of "law-abiding," as it could render the phrase so malleable that it may "risk[] swallowing the text of the amendment." *Id.* at 453. The Fifth Circuit held the Government's "proffered interpretation of 'law-abiding' admits to no true limiting principle" and explained that "[u]nder the Government's reading, Congress could remove 'unordinary' or 'irresponsible' or 'non-law-abiding' people however expediently defined—from the scope of the Second Amendment." *Id.*; *see also Range v. Att'y Gen. U.S.*, 69 F.4th 96, 102–103 (3d Cir. 2023) (en banc) ("At root, the Government's claim that only 'law-abiding, responsible citizens' are protected by the Second Amendment devolves authority to legislators to decide whom to exclude from 'the people.' We reject that approach because such 'extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label.'" (quoting *Folajtar v. Att'y Gen. of the U.S.*, 980 F.3d 897, 912 (3d Cir. 2020) (Bibas, J. dissenting))). Therefore, *Rahimi*'s rejection of the Government's "law-abiding" qualifier as a restriction on "the people" forecloses the Government's argument that Defendant is not one

of "the people." Defendant is a citizen of the United States, residing in the United States, and has never been convicted of a felony. And while the weight of the evidence against Defendant is strong, he remains *suspected* of unlawful drug use and has not yet been found guilty. *See United States v. Gil*, No. EP-22-CR-773-DB, 2023 WL 4356067, at \*4 (W.D. Tex. July 5, 2023) ("Although [the defendant] admitted to unlawful drug use, at the time of his arrest he was not a 'convicted felon or otherwise subject to another longstanding prohibition' on firearm possession." (quoting *Rahimi*, 62 F.4th at 452)).

Furthermore, the Government's argument as to "the people" would render its meaning in the Second Amendment different than its meaning in the First and Fourth Amendments. *See Bruen*, 142 S. Ct. at 2156 ("The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" (quoting *McDonald*, 561 U.S. at 780)). As *Heller* explained, "the people" of the Second Amendment is the same as that of the First and Fourth, and the "term unambiguously refers to all members of the political community" which "belongs to all Americans." *Heller*, 554 U.S. at 580–81 (citing *United States v. Verdugo–Urquidez*, 494 U.S. 259, 265 (1990)). Critically, our Fourth Amendment jurisprudence does not render one outside of "the people" and without constitutional protection once one is suspected of a crime, even when the evidence is great. Thus, the Government's interpretation of the "law-abiding" qualifier to constrict the reach of the Second Amendment would render "the people" of the Second Amendment a malleable meaning that is not present in the First and Fourth Amendments.

Accordingly, Defendant must be found to be among "the people" covered by the Second Amendment.

**C. History and Tradition**

To sustain 18 U.S.C. § 922(g)(3)'s burden on Defendant's Second Amendment right, "the Government bears the burden of proffering 'relevantly similar' historical regulations that imposed 'a comparable burden on the right of armed self-defense' that were also 'comparably justified.'" *Rahimi*, 61 F.4th at 455 (quoting *Bruen*, 142 S. Ct. at 2132–33). To meet its burden, the Government asserts 18 U.S.C. § 922(g)(3) has historical analogues in statutes penalizing those who use firearms while intoxicated, statutes disarming the mentally ill, and statutes disarming the "untrustworthy" or "potentially dangerous persons." The Court considers each of these proposed historical analogues in turn and finds these statutes are insufficient historical analogues.

*1. Intoxication Laws*

In *United States v. Herrera*, the Fifth Circuit adopted the following definition of "unlawful user" as proffered by the Government: "for a defendant to be an 'unlawful user' for § 922(g)(3) purposes, his 'drug use would have to be with regularity and over an extended period of time.'" *United States v. Herrara (Herrara II)*, 313 F.3d 882, 885 (5th Cir. 2002) (en banc) (per curiam). In *Patterson*, the Fifth Circuit clarified this definition includes an element of "contemporaneousness." *Patterson*, 731 F.3d at 838 ("[T]he "pattern of use" language in the inference instruction aligns with the above-quoted "period of time" language considered by the *Herrera II* court; moreover, *the inference instruction properly requires a time frame that coincides with possession of the firearm*.") (emphasis added). Defendant argues that 18 U.S.C. § 922(g)(3) does not require a temporal nexus between drug use and firearm possession.[2] *See* Dkt. 12 at 12.

---

[2] Defendant cites the same Reconstruction-era laws the Government raises in its Supplemental Brief (Dkt. 50), emphasizing that they all have a contemporaneous requirement by prohibiting intoxication when carrying or using a firearm. *See* Dkt. 12 at 11–12 and n.11.

However, Defendant concedes that current Fifth Circuit precedent imposes the contemporaneous requirement. *See id.* at 12 n.12.

As the contemporaneous requirement does not appear disturbed by *Bruen*, in conducting the "how" and "why" analysis, the Court will read 18 U.S.C. § 922(g)(3) to have a contemporaneous element as a limiting principle. *See Bruen*, 142 U.S. at 2132–33 ("*Heller* and *McDonald* point to at least two metrics [to determine if a regulation is relevantly similar under the Second Amendment]: how and why the regulations burden a law-abiding citizen's right to armed self-defense."). Even with this limiting principle, the Court finds the Government's cited intoxication laws are not sufficiently analogous to 18 U.S.C. § 922(g)(3).

*a. Reconstruction-Era State Laws*

The Government presents late-1800s laws from Kansas, Mississippi, Missouri, Wisconsin, Oklahoma, and South Carolina, asserting that they proscribe possession, use, and receipt of firearms by intoxicated people. *See id.* at 5-6. However, all of these laws were passed between 1880 and 1900. *See id*. *Bruen* has made clear that "when it comes to interpreting the Constitution, not all history is created equal" and, as such, the scope of historical analysis is limited. *Bruen*, 142 U.S. at 2136. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634–35. Accordingly, the most persuasive historical analogues for this case are laws that were passed around the same time as the Second Amendment. *See Rahimi*, 61 F.4th at 456 ("We thus afford greater weight to historical analogues more contemporaneous to the Second Amendment's ratification."); *Bruen*, 142 S. Ct. at 2137 (holding courts should generally assume that "the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."). As the above-listed laws were passed in the Reconstruction Era, these

statutes are therefore minimally persuasive. *See Bruen*, 142 U.S. at 2137 ("[B]ecause post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" (citing *Heller*, 554 U.S. at 614)).[3]

Similarly, the Government's reliance on *United States v. Daniels*, 610 F. Supp. 3d 892, 896 (S.D. Miss. 2022), which in turn relies on *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010) for its historical analysis, is misplaced. In *Yancey*, the Seventh Circuit relied on two cases upholding statutes from the late nineteenth century that disarmed intoxicated persons and "tramps," which the *Bruen* Court explained would be minimally persuasive. *Yancey*, 621 F.3d at 684–85 (citing *State v. Shelby*, 90 Mo. 302, S.W. 468 (1886); *Hogan*, 58 N.E. 572). Additionally, the *Yancey* court concluded the Second Amendment right "was tied to the concept of a virtuous citizenry and that, accordingly, the Government could disarm 'unvirtuous citizens.'" *Id.* (citing *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010)). But, as discussed above, the Fifth Circuit held that the virtuous citizen theory "runs headlong into *Heller* and *Bruen*." *Rahimi*, 61 F.4th at 452.

---

[3] The Government also references laws denying guns to drug addicts enacted in the 1930s. *See* Dkt. 50 at 7. However, as referenced above, *Bruen* considered Reconstruction-era laws to be minimally persuasive, and thus, this reasoning applies in greater force to laws passed in the twentieth century. *See Bruen*, 142 S. Ct. at 2137; *see also Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 312 (2008) (Roberts, C. J., dissenting) ("The belated innovations of the mid- to late-19th-century courts come too late to provide insight into the meaning of [the Constitution in 1787].")). In her concurrence, Justice Barrett noted *Bruen* "should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill Rights. On the contrary, the Court is careful to caution against giving postenactment history more weight than it can rightly bear." *Bruen*, 142 S. Ct. at 2163 (Barrett, J., concurring) (citation omitted).

Additionally, the Government's argument that anti-federalists' proposal at the Pennsylvania convention and Samuel Adams's proposal at the Massachusetts convention, regarding limitations on the Second Amendment, is without merit. *See* Dkt. 50 at 12. *Rahimi* made clear that while these proposals were "influential . . . neither became part of the Second Amendment as ratified." *Rahimi*, 61 F.4th at 457 (citation omitted). "Thus, the proposals might somewhat illuminate the scope of firearm rights at the time of ratification, but they cannot counter the Second Amendment's text, or serve as an analogue . . . because, *inter alia*, they were not enacted." *Id.* (citing *Bruen*, 142 S. Ct. at 2137).

While these statutes bar the use of firearms by intoxicated people, the violation of these statutes only results in fines and imprisonment—not disarmament. *See* Kansas Gen. Stat., Crimes & Punishments § 282 (1868) (barring intoxicated persons from carrying deadly weapons with the punishment of a fine or imprisonment); 1878 Miss. Laws 175-76, § 2 (forbidding the sale of any weapon to intoxicated people, punishable by fine or hard labor); 1883 Mo. Laws 76, § 1 (prohibiting carrying weapons when intoxicated, punishable by fine and/or imprisonment); 1883 Wis. Sess. Laws 290, Offenses Against Lives and Persons of Individuals, ch. 329 § 3 (barring intoxicated people from carrying guns, punishable by fine or imprisonment); 1890 Okla. Sess. Laws 495, art. 47, § 4 (prohibiting public officers from carrying arms while intoxicated); 1899 S.C. Acts 97, No. 67, § 1 (forbidding intoxicated persons from shooting firearms except on their own premises, punishable by fine or imprisonment). Furthermore, these laws only proscribe carrying or using firearms *while intoxicated*, constraining the length of time of the disarmament. These statutes do not suspend those who have been intoxicated or continue to use intoxicants from carrying guns indefinitely, or from possessing them at all. 18 U.S.C. § 922(g)(3), on the other hand, restricts Second Amendment rights while a person is "an active drug user." And "although this language may, at first glance, appear synonymous, under § 922(g)(3) 'a person may be an unlawful current user of a controlled substance even though the substance is not being used at the precise time the person seeks to acquire a firearm or receives or possesses a firearm.'" *Gil*, 2023 WL 4356067, at *6 (quoting 27 C.F.R. § 478.11). Courts may infer active use from a positive drug test, conviction, or arrest for a controlled substance up to one year prior. *See id.* Thus, 18 U.S.C. § 922(g)(3) may impose disarmament based on drug use a year prior while the Reconstruction-era laws imposed a fine or imprisonment for use of firearm solely while intoxicated. *See Gil*, 2023 WL 4356067, at *6.

For all of the above reasons, the Court finds the aforementioned state statutes to be unpersuasive as to the "how" and "why." *Accord Connelly*, 2023 WL 2806324 at *8 (holding the same laws as not analogous because "they prevented individuals from using or carrying firearms while intoxicated, rather than preventing users of intoxicants from possessing firearms at all.").

    *b. State Laws Enacted Around the Adoption of the Second Amendment*

The Government presents three historical intoxication laws enacted near the time the Second Amendment was adopted, arguing that they are sufficiently analogous to 18 U.S.C. § 922(g)(3) to allow Defendant's disarmament. The Government presents a 1655 Virginia statute that prohibited shooting while drinking at celebrations, a 1771 New York statute that prohibited shooting during the New Year's holiday to prevent drunken harm, and a 1746 New Jersey statute that allowed the militia to disarm any soldier who was intoxicated. *See* Dkt. 50 at 5. As explained below, the Court finds these laws are disanalogous to 18 U.S.C. § 922(g)(3).

    *i. The Virginia Law*

The 1655 Virginia law cited by the Government differs from § 922(g)(3) in how it burdens the right to keep and bear arms. The Virginia law prohibits "shoot[ing] any guns at drinkeing (marriages and ffuneralls onely excepted) . . . ." WILLIAM WALLER HENING, 1 *Statutes at Large: Being a Collection of all the Laws of Virginia, from the First Session of the Legislature in the Year 1619*, 401–02, Act XII (1823). Accordingly, the Virginia law prohibited citizens from firing guns *while intoxicated*. *See id.* The Virginia law did not prohibit an individual who had been or was currently intoxicated from possessing a firearm—it only prohibited *firing* guns while intoxicated. *See id.* This Virginia law therefore disarms the intoxicated individual only for the duration of his or her intoxication and only when the individual discharged the firearm while intoxicated. *See id.*; *accord Connelly*, 2023 WL 2806324, at *7 ("[T]he Virginia law prevented individuals from using

firearms while actively intoxicated, while § 922(g)(3) prevents users of intoxicants from possessing firearms altogether."); *Gil*, 2023 WL 4356067, at *6 (same).

In addition, the Virginia law was enacted for different reasons than the Gun Control Act, which contains 18 U.S.C. § 922(g)(3). The Virginia law was enacted to ensure that citizens would be able to discern alarms for Indian attacks and to prevent waste of valuable gunpowder to be used in case of attack. *See* Hening, *supra*, at 401. In contrast, the purpose of the Gun Control Act was to promote domestic safety by keeping guns out of the hands of persons that were assumed dangerous to the public. *See Huddleston v. United States*, 415 U.S. 814, 824 (1974) ("[Congress] was concerned with the widespread traffic in firearms and with their general availability to those whose possession thereof was contrary to the public interest."); *Barrett v. United States*, 423 U.S. 212, 220 (1976) ("[The Gun Control Act's] broadly stated principal purpose was 'to make it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.'" (citing S. Rep. No. 1501, 90th Cong., 2d Sess., 22 (1968)).

While there is some similarity to the "why," i.e., the general proposition that both laws are for the purpose of security (though the Virginia law focused on foreign threats), the "how" of the Virginia law remains so disanalogous from the Gun Control Act that the Court cannot find that the Virginia law is relevantly similar. *Accord Connelly*, 2023 WL 2806324, at *7 ("Prohibiting individuals who have used drugs sometime in the last year from owning and keeping a firearm in their homes for self-defense is a much more burdensome infringement on the Second Amendment's 'core protection,' than preventing people from shooting their guns while intoxicated."). Thus, the Court cannot find the Virginia law is sufficiently analogous to 18 U.S.C. § 922(g)(3).

*ii. The New York Law*

The 1771 New York law differs from § 922(g)(3) in how it burdens the right to keep and bear arms. The New York law forbade the firing of, *inter alia*, any gun or pistol in any building or "before any Door, or in any Garden, street, Lane, or other Inclosure on [the last day of December or the first and second days of January]." Ch. 1501, 5 Colonial Laws of New York 244–245 (1894). Similar to the Virginia law, this law does not restrict the possession of firearms; it merely restricts their firing on three days of the year. *See id.* In contrast, 18 U.S.C. § 922(g)(3) forbids unlawful drug users from possessing firearms—the status of an "unlawful user" has a temporal nexus that allows for disarmament for drug use of up to one year. 18 U.S.C. § 922(g)(3). Additionally, the New York law is concerned with firearm use as to certain locations, i.e., similar to restrictions today regarding sensitive places. *See Connelly*, 2023 WL 2806324, at *7 ("The New York law thus bears a closer similarity to restrictions on the use of firearms 'in sensitive place' than it does to categorial restrictions on firearm possession by classes of people." (citing *Heller*, 554 U.S. at 626–27 & n.26)). In sum, the New York law restricts firearm *use* for only three days and in certain locations, while 18 U.S.C. § 922(g)(3) imposes a categorical prohibition on firearm *possession* while one is a "contemporaneous user." *Compare* Ch. 1501, 5 Colonial Laws of New York 244–245 (1894), *with* 18 U.S.C. § 922(g)(3); *see also Connelly*, 2023 WL 2806324, at *7 ("An inference of current use may be drawn from evidence" of a positive drug test, "provided that the test was administered within the past year. . . ." (citing 27 C.F.R. § 478.11)); *Gil*, 2023 WL 4356067, at *6 (same).

The New York law also differs to some extent from 18 U.S.C. § 922(g)(3) in why it burdened Second Amendment rights. This "why" is related to the "how" in that the legislature cited the "great Damages" and "Mischief" done on New Years "by persons going from House to

House, with Guns and other Fire Arms and being often intoxicated with Liquor" as the reason for restricting gun use. Ch. 1501, 5 Colonial Laws of New York 244 (1894). This reason is narrower in scope than the broad reason for the Gun Control Act to prevent gun violence across the nation. *Compare id.*, *with* Gun Control Act, Pub. L. No. 90-618, § 101, 82 Stat. at 1213. Further, the New York law was only in effect for two years, from 1771 to 1173, before being repealed. *See* Ch. 1501, 5 Colonial Laws of New York 244 (1894). This belies a finding that this statute was a "well-established" part of our Nation's history of firearm regulation. *See Bruen*, 142 S.Ct. at 2133 ("[A]nalogical reasoning requires only that the government identify a well-established and representative historical analogue . . . ."). As such, the Court finds the New York law disanalogous to 18 U.S.C. § 922(g)(3).

*iii. The New Jersey Law*

The New Jersey law is unlike 18 U.S.C. § 922(g)(3) in how it burdened the right to keep and bear arms. The New Jersey law stated:

> if any solder shall . . . appear in Arm disguised in Liquor, it shall and may be lawful for the caption or Commanding Officer to disarm such Soldier at the Head of his Company, and to set a Centinel over him during the time of the Company's being in Arms, and no longer, or to fine him . . . .

Acts of the General Assembly of the Province of New-Jersey 303 (1752). A clear difference here is that disarmament is not the only prescribed option of punishment; the soldier could be fined instead. In contrast, 18 U.S.C. § 922(g)(3) offers no such option. *Compare id.*, *with* 18 U.S.C. § 922(g)(3). The disarmament only persisted "during the time of the Company's being in Arms, *and no longer* . . . ." Acts of the General Assembly of the Province of New-Jersey 303 (1752) (emphasis added). Clearly, this was not a permanent disarmament, although the law did interfere with gun possession, however briefly. Conversely, the durational scope of 18 U.S.C. § 922(g)(3) is broader and less defined, as one is disarmed so long as one is an "unlawful user." 18 U.S.C. § 922(g)(3).

This decided difference in duration of the disarmament is significant, and therefore "how" the New Jersey law burdens Second Amendment rights is distinct from how 18 U.S.C. § 922(g)(3) does so.

Critically, the New Jersey law is also disanalogous to 18 U.S.C. § 922(g)(3) in "why" it burdened Second Amendment rights. *See* Acts of the General Assembly of the Province of New-Jersey 303 (1752). Noted in the margins of this law is the statement "Officers and Soldiers to behave well when under Arms." *Id.* This note reflects the reason for this law—namely, to preserve order within military ranks. In contrast, the Gun Control Act was created to prevent certain status groups, such as the unlawful users and addicts mentioned in 18 U.S.C. § 922(g)(3), from possessing guns, in order to promote the public interest. *See* Gun Control Act, Pub. L. No. 90-618, § 101, 82 Stat. at 1213; *see also United States v. Roach*, 201 F. App'x 969, 974 (5th Cir. 2006) ("Congress has an interest in keeping guns out of the hands of drug users, and § 922(g)(3) is rationally related to this interest." (citing *Huddleston*, 415 U.S. at 824)). Once again, the Gun Control Act's "why" is broad, as it applies to the entire public, while the New Jersey law's "why" is narrow and only applies to the militia. *Compare id.*, *with* Acts of the General Assembly of the Province of New-Jersey 303 (1752). Because the "how" and "why" the New Jersey Law burdens Second Amendment rights differ meaningfully from the "how" and "why" 18 U.S.C. § 922(g)(3) burden Second Amendment rights, the New Jersey law is not analogous to 18 U.S.C. § 922(g)(3).

*2. Laws Regarding the Mentally Ill*

The Government argues that 18 U.S.C. § 922(g)(3) "is analogous to 'longstanding prohibitions on the possession of firearms by . . . the mentally ill' . . ., even as it concedes that "being under the influence of a controlled substance is not tantamount to mental illness." Dkt. 50 at 4 (citing *Heller*, 554 U.S. at 626). Defendant correctly argues that intoxication laws are not

analogous to 18 U.S.C. § 922 (g)(3) because intoxication is temporary; however, mental illness, by its definition, is an illness that may afflict one for a longer duration. *See* Dkt. 55 at 5–6.

Laws disarming the mentally ill are not analogous to 18 U.S.C. § 922(g)(3) as they are fundamentally different in kind. Intoxication results when a person ingests a substance such that they are physically or mentally impaired, and it ends when the substance is sufficiently processed out of the body. *See, e.g.*, Tex. Penal Code Ann. § 8.04(d) ("For purposes of this section [defining intoxication as a defense] 'intoxication' means disturbance of mental or physical capacity resulting from the introduction of any substance into the body."). Conversely, mental illness is a long-term ailment that often requires long-term treatment such as therapy and medication.[4] The difference in duration between intoxication and mental illness is critical.

Criminal law also treats mental illness differently than it does intoxication, showing that the law has not historically equated mental illness and intoxication.[5] As analyzed in the previous section, historically, the law proscribed intoxicated people from discharging firearms for the duration of their intoxication. The same is not true for those deemed insane. The Government cites an English law and an American law that instructed justices to lock up "lunatics" and points to *Heller*'s acceptance of the historic disarmament of the mentally ill. *See* Dkt. 50 at 4. But once again, duration presents a problem. "Lunatics" were not permitted to possess firearms at all. *See Heller*, 554 U.S. at 626. Furthermore, "lunatics" were imprisoned on the principle they were an inherent danger to society. *See* Carlton F.W. Larson, *Four Exceptions in Search of a Theory:*

---

[4] *See generally* Mayo Clinic, *Mental illness*, https:// www.mayoclinic.org/diseases-conditions/mental-illness/diagnosistreatment/drc-2037 4974 (last visited July 14, 2023).

[5] *Robinson v. California*, 370 U.S. 660 (1962) and *Powell v. Texas*, 392 U.S. 514 (1968) (plurality opinion) are evidence that our criminal law has treated intoxication and mental illness differently. *Compare Robinson*, 370 U.S. at 667 (holding narcotics addiction could not be criminally punished because "it is apparently an illness which may be contracted innocently or involuntarily"), *with Powell*, 392 U.S. at 536–37 (holding intoxication in public is a "condition" that may be criminally published).

*District of Columbia v. Heller and Judicial Ipse Dixit*, 60 HASTINGS L.J. 1371, 1377 (2009). These laws related to mental illness imposed significantly more severe restraints on personal liberty for different purposes than prohibiting the use of firearms by someone who is a contemporaneous user of controlled substances.

As such, laws prohibiting the possession of firearms by the mentally ill are disanalogous from 18 U.S.C. § 922(g)(3).

### 3. Disarmament Laws

Finally, the Government argues Defendant, as an unlawful user, is a member of a group that has been historically disarmed. The Government points to "a long Anglo-American tradition allowing the [G]overnment to categorically limit the gun rights of untrustworthy or potentially dangerous persons." Dkt. 50 at 9. Defendant argues, on the other hand, that "the laws of the time existed to regulate 'dangerous *uses*' of guns" and did not "restrict the ownership of guns by members of the body politic." Dkt. 55 at 4.

The Government's argument is unavailing because its cited laws are not directed towards a class of people of which Defendant is a member. First, the Government points to pre-Revolution English laws that were later mimicked in America. *See* Dkt 50 at 9–11. Such laws disarmed political enemies and Catholics, among others, as they were deemed to be dangerous. *See id.* at 9–10. Next, the Government points to Revolution-era laws that disarmed felons and those who did not swear allegiance to the newly formed states. *See id.* at 10–11. All of these classes of people, the Government asserts, were deemed dangerous at the time of the laws' passage, and so were disarmed. *See id.* at 9–11. The Court is not convinced by the Government's argument.

The *Rahimi* court, while discussing historical disarmament laws, stated "we question at a threshold level whether colonial and state laws disarming categories of 'disloyal' or 'unacceptable'

people present tenable analogues to § 922(g)(8)." *Rahimi*, 64 F.4th at 457. The *Rahimi* court reasoned "[l]aws that disarmed slaves, Native Americans, and disloyal people may well have been targeted at groups excluded from the political community—*i.e., written out of 'the people' altogether*—as much as they were about curtailing violence or ensuring the security of the state. Their utility as historical analogues is therefore dubious, at best." *Id.* (emphasis added). Such laws focused on those presumed to be disloyal or outside "the people" altogether. *See id.* As discussed above, Defendant remains a member of "the people" and *not yet* removed from the Nation's political community. Moreover, allowing for a generalized analogy to "dangerousness" would create a "regulatory blank check," *Bruen*, 142 S.Ct. at 2133, and render the protections of "the people" largely meaningless. *Bruen*, 142 S.Ct. at 2133. To avoid constitutional protections, a legislature would need only declare that a class of individuals, even those within "the people," are "dangerous." Thus, there would be no limiting principle on the legislature's authority to disarm and would in effect short-circuit the Fifth Circuit's reading of "the people." *See Rahimi*, 61 F.4th at 453, 460 461 (rejecting disarmament laws as historical analogues regardless of 18 U.S.C. § 922(g)(8)'s "salutary policy goal" of preventing domestic gun abuse); *but see Gil*, 2023 WL 4356067, at *7 ("Yet the disarmament of unlawful drug users and addicts under § 922(g)(3) more closely resembles these historical laws to serve the preservation of political and social order rather than protecting an identified person.") (citation omitted).

Furthermore, courts have questioned whether such statutes—focused on race and religion to establish assumptions of disloyalty—can support disarmament today. *See Hicks*, 2023 WL 164170, at *7 ("This Court is also skeptical of using historical laws that removed someone's Second Amendment rights based on race, class, and religion to support doing the same today. Indeed, the Court believes that "rejecting" the discriminatory application of those unconstitutional

laws historically—while still arguing those laws should be a basis for the Court's decision—walks too fine a line."); *see also Range*, 69 F.4th at 104–05 ("Apart from the fact that those restrictions based on race and religion now would be unconstitutional under the First and Fourteenth Amendments, the Government does not successfully analogize those groups to [the defendant] and his individual circumstances. That Founding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that [the defendant] is part of a similar group today.").

The Court recognizes that the strictures of *Bruen*'s test impose a difficult burden on the Government to find analogous statutes from the founding period and the early 1800s. Courts are struggling with the historical analysis that *Bruen* sets forth. *See, e.g.*, *United States v. Quiroz*, 629 F. Supp. 3d 511, 526–27 (W.D. Tex. 2022) ("*Bruen* did not, however, erase societal and public safety concerns—they still exist—even if *Bruen*'s new framework prevents courts from making that analysis. As stated above, the new standard creates unknown unknowns, raising many questions."). But the Court must be faithful to *Bruen* and *Rahimi* and, ultimately, it remains the Government's burden to show that Defendant's constitutional rights may be regulated. And, with any constitutional right, liberty comes at the cost of security.

Accordingly, the Government has not met its burden of showing the disarmament laws are a sufficient analogue to 18 U.S.C. § 922(g)(3).

## IV. RECOMMENDATION

For the foregoing reasons, the Court recommends the Motion (Dkt. 12) be **GRANTED**; and recommends finding 18 U.S.C. § 922(g)(3) to be unconstitutional after *Bruen*.

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C).

A party filing objections is entitled to a *de novo* review by the district court of the findings and conclusions contained in this report only if specific objections are made, and failure to timely file written objections to any proposed findings, conclusions, and recommendations contained in this report shall bar an aggrieved party from appellate review of those factual findings and legal conclusions accepted by the district court, except on grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140 (1985); *see also Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten (10) to fourteen (14) days).

**So ORDERED and SIGNED this 31st day of July, 2023.**

KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE